**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**
Caption in Compliance with D.N.J. LBR 9004-2

**KLEHR HARRISON HARVEY BRANZBURG LLP**
(A Pennsylvania Limited Liability Partnership)
457 Haddonfield Road, Suite 510
Cherry Hill, New Jersey 08002
Telephone:    (215) 568-6060
Morton R. Branzburg (MB 7251)
Domenic E. Pacitti (DP 1792)
Carol Ann Slocum (CS 2818)

-and-

**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
James H.M. Sprayregen, P.C. (*pro hac vice* admission pending)
Marc Kieselstein, P.C. (*pro hac vice* admission pending)
Nicole L. Greenblatt (*pro hac vice* admission pending)

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

| | |
|---|---|
| In re: | Chapter 11 |
| REVEL AC, INC., et al.,[1] | Case No. 13-16253 (  ) |
| Debtors. | Joint Administration Requested |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (A) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING AND LETTERS OF CREDIT, (B) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (C) AUTHORIZING USE OF CASH COLLATERAL, (D) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES, (E) AUTHORIZING THE DEBTORS TO ENTER INTO EXIT FACILITY ENGAGEMENT AND FEE LETTERS, AND (F) SCHEDULING A FINAL HEARING**

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Revel AC, Inc. (3856); NB Acquisition LLC (9387); Revel AC, LLC (4456); Revel Atlantic City, LLC (9513); and Revel Entertainment Group, LLC (2321).  The Debtors' corporate headquarters and service address is:  500 Boardwalk, Atlantic City, New Jersey 08401.

The above-captioned debtors, as debtors and debtors in possession (collectively, the "Debtors") file this motion (this "Motion") for entry of an interim order, substantially in the form attached hereto as **Exhibit A** (the "Interim DIP Order"), and a final order (the "Final DIP Order," and together with the Interim DIP Order, the "DIP Orders"), (a) authorizing the Debtors to obtain (i) postpetition financing on a superpriority priming basis and (ii) letters of credit, (b) authorizing the Debtors to use Cash Collateral,[2] (c) granting Adequate Protection to Prepetition Secured Lenders for the priming of their existing liens on the Prepetition Collateral and the Debtors' use of the Cash Collateral, (d) authorizing the Debtors to enter into a (i) senior secured exit financing facilities engagement letter and (ii) senior secured exit financing facilities fee letter, and (e) scheduling a final hearing (the "Final Hearing") to consider entry of the Final DIP Order. In support of this Motion, the Debtors respectfully state as follows:[3]

### Jurisdiction and Venue

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are sections 105, 361, 362, 363, and 364 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, and

---

[2]    Capitalized terms used in this preliminary statement and introduction but not otherwise defined shall have the meanings later ascribed to such terms in this Motion or in the *Joint Prepackaged Plan of Reorganization of Revel AC, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, dated March 13, 2013 (as amended, supplemented, and modified from time to time, the "Joint Prepackaged Plan"), as applicable.

[3]    A detailed description of the Debtors and their business, and the facts and circumstances supporting this Motion and the Debtors' chapter 11 cases, are set forth in the *Declaration of Dennis Stogsdill, Chief Restructuring Officer of Revel AC, Inc., In Support of the Debtors' First Day Pleading* (the "First Day Declaration"), filed on March 25, 2013 (the "Petition Date") and the *Declaration of Barak Klein in Support of the Debtors' Motion for Entry of Interim and Final DIP Orders (A) Authorizing the Debtors to Obtain Postpetition Financing and Letters of Credit, (B) Authorizing the Debtors To Use Cash Collateral, (C) Granting Adequate Protection to Prepetition Secured Lenders, and (D) Scheduling a Final Hearing*, attached hereto as **Exhibit B** (the "Klein Declaration").

9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 4001-4 and 6003-1 of the Local Rules of the United States Bankruptcy Court for the District of New Jersey (the "Local Rules").

## **Introduction**

4.     Since opening of the Revel Atlantic City Hotel ("Revel") less than one year ago, the Debtors have struggled to overcome a torrent of financial and operational challenges in the midst of a broad decline across the Atlantic City entertainment market. While these challenges alone have placed a significant strain on the Debtors' liquidity, the Debtors have had to endure these challenges outside the peak period of their business cycle—the season ranging from Memorial Day to Labor Day. Consequently, the Debtors need immediate access to liquidity to ensure that they are able to continue operating during the pendency of these chapter 11 cases and thus preserve the value of their estates for the benefit of all stakeholders.

5.     To that end, prior to filing these prepackaged chapter 11 cases, the Debtors secured $250 million in postpetition debtor-in-possession financing (the "DIP Financing") to ensure that ongoing business operations—and overall enterprise value—can be preserved, protected, and undisrupted. The DIP Financing proposed herein, which consists of a $125 million revolving loan (the "DIP Revolving Credit Facility") and a $125 million term loan (the "DIP Term Loan Facility," and together with the DIP Revolving Credit Facility, the "DIP Facility"), has been made available by certain lenders party to the Debtors' 2012 Credit Agreement. Importantly, the DIP Financing, together with anticipated cash flow from operations, will provide the Debtors with the wherewithal to maintain favorable relationships with their employees, vendors, suppliers, and patrons while the Debtors work diligently to achieve a smooth and expeditious exit from chapter 11.

6.    In addition to providing critical working capital, the majority of the DIP Financing will be used to refinance or "roll-up" amounts outstanding under the Debtors' 2012 Credit Agreement.    While the Debtors are mindful that such a provision constitutes "extraordinary relief" pursuant to this Court's Local Rules, the Debtors believe that substantial cause and compelling circumstances warrant the Court's approval of the DIP Financing upon the terms set forth herein.    Specifically, the Debtors believe that four unique factors constitute appropriate grounds for granting the relief requested.

7.    *First*, the DIP Financing proposed herein, which is contemplated under the Joint Prepackaged Plan, has the overwhelming consent and support of the Debtors' key creditor constituencies. As of the Petition Date, approximately 100% of the Holders of the 2012 Credit Agreement Claims and 100% of the Holders of the Term Loan Credit Agreement Claims[4] voting on the Joint Prepackaged Plan have voted to accept the Joint Prepackaged Plan.    Prior to evidencing their support of the Joint Prepackaged Plan via the ballot box, approximately 87% of the Holders of the 2012 Credit Agreement Claims, 76% of the Holders of the Term Loan Credit Agreement Claims, and 76.1% of the Holders of the Second Lien Note Claims have pledged their support for the de-leveraging transactions contemplated by Joint Prepackaged Plan through their execution of that certain restructuring support agreement, dated as of February 19, 2013 (as amended on March 8, 2013 and March 13, 2013, the "Restructuring Support Agreement").    Both the Joint Prepackaged Plan and Restructuring Support Agreement—which are materially consistent in all respects—embody a settlement between the Debtors and their stakeholders that

---

[4]    While the voting deadline with respect to Holders of the 2012 Credit Agreement Claims and Holders of the Term Loan Credit Agreement Claims was March 20, 2013, the voting deadline with respect to of the Holders of the Second Lien Note Claims (together with the Holders of the 2012 Credit Agreement Claims and Holders of the Term Loan Credit Agreement Claims, collectively, the "Consenting Debtholders") is April 10, 2013.

serves to reduce the Debtors' total debt by more than 82% from approximately $1.517 billion to $272 million.

8.    *Second*, the Debtors urgently need access to the liquidity provided by the DIP Financing. In addition to providing liquidity to carry the Debtors to their peak summer season and implement additional and improved amenities, the DIP Financing will support the administration of these chapter 11 cases—ensuring that the Joint Prepackaged Plan remains on course and that the de-leveraging transactions contemplated by the Joint Prepackaged Plan are effectively consummated. With such measures in place, the Debtors will be well-positioned to emerge from chapter 11 appropriately capitalized and with access to a financing facility that will support their business going forward.

9.    *Third*, the DIP Financing contemplated herein will be repaid by the Second Lien Exit Facility on the terms and conditions set forth in the Exit Facilities Term Sheet. Accordingly, the obligations arising from the DIP Loans will effectively be rolled into an exit facility under the terms of the Joint Prepackaged Plan.

10.    Furthermore, in connection with this Motion, the Debtors seek authority to enter into that (a) certain senior secured exit financing facilities engagement letter (the "Exit Facility Engagement Letter") by and among JPMorgan Chase Bank, N.A. ("JPMorgan"), as sole and exclusive administrative agent, J.P. Morgan Securities LLC ("J.P. Morgan Securities"), as sole and exclusive lead arranger and bookrunner, and Revel AC, Inc. ("Revel AC"), as borrower and (b) certain senior secured exit financing facilities fee letter (the "Exit Facility Fee Letter," attached hereto under seal, and together with the Exit Facility Engagement Letter, the "Exit Facility Letters") by and among J.P. Morgan Securities and Revel AC. As discussed herein, the Exit Facility Letters will formally engage JPMorgan to continue, on a postpetition basis, the

structuring, arranging, and syndicating of the Debtors' proposed First Lien Exit Facility and Second Lien Exit Facility, which will provide a financial blueprint for the Debtors emergence from chapter 11.

11.    *Fourth*, as discussed below and in the Klein Declaration, the Debtors' decision to proceed with the DIP Financing was made only after a diligent but fruitless search for superior financing alternatives demonstrated that the DIP Financing is the best and *only* viable financing option available to the Debtors. The Debtors' substantial debt and lack of unencumbered assets drastically limited the universe of able and willing lenders. Furthermore, the near certainty of a priming dispute with the Debtors' secured creditors which, to put it charitably, would be an uphill battle, also tightly quelled the interest of potential financiers. Nevertheless, through constructive negotiations with their lenders, and in coordination with the Office of the United States Trustee for the District of New Jersey (the "U.S. Trustee"), the Debtors were able to obtain important concessions from the DIP Lenders—most notably, a revised 2012 Credit Agreement pay-down structure that allows the Debtors to roll-up the 2012 Credit Agreement over time during the interim period, as opposed to a full immediate pay-down in cash. Accordingly, the DIP Financing represents the best and only source of financing available under these circumstances, was negotiated at arm's-length, in good faith, and on reasonable terms.

12.    Notably, the Restructuring Support Agreement is contingent upon the Court's entry of the Interim DIP Order no later than March 28, 2013. If the Debtors are unable to achieve this milestone, the obligation of the Consenting Debtholders to support the restructuring of the Debtors pursuant to the Restructuring Support Agreement will expire. Thus, absent approval of the DIP Financing, the Debtors will suffer immediate and irreparable harm to the detriment of all parties in interest.

6

13.    For these reasons, the Debtors respectfully submit that the DIP Financing should

be approved.

## Summary of Relief Requested

14.    By this Motion, the Debtors request entry of the DIP Orders, which among other

things, provide the Debtors with the following relief:[5]

> (1)    Cash Collateral:    authority to use the Debtors' cash on hand, cash proceeds of Prepetition Collateral, and other cash that constitutes the prepetition secured lenders' "cash collateral," as that term is defined in section 363(a) of the Bankruptcy Code (the "Cash Collateral");
>
> (2)    DIP Facility:    authority to obtain the full amount of the $125 million DIP Term Loan Facility (the loan advanced thereunder, the "Term DIP Loan") and access to the sum of (a) $20 million and (b) the maximum amount under certain letters of credit under the DIP Revolving Credit Facility (the loans advanced thereunder, "Revolving DIP Loans," and together with the Term DIP Loan, the "DIP Loans"), on an interim basis, and access to the remaining amounts under the DIP Revolving Credit Facility on a final basis, in each case, together with other financial accommodations, pursuant to the terms and conditions of that certain Debtor-in-Possession Credit Agreement (the "DIP Agreement"), substantially in the form attached hereto as **Exhibit C**. The initial DIP Facility proceeds will be used, among other things, to provide working capital to support the Debtors' operations and administration of these chapter 11 cases and to satisfy the loans outstanding under the 2012 Credit Agreement at a ratio of approximately five-to-one as new money funds are advanced to the Debtors, or new letters of credit are issued on behalf of the Debtors, during the interim period;
>
> (3)    Letters of Credit:    authority to issue new letters of credit as well as cause certain Existing Letters of Credit issued and outstanding prior to the closing date of the DIP Agreement (the "Closing Date") pursuant to the 2012 Credit Agreement to be deemed to have been issued, upon entry of the Interim Order, under the DIP Revolving Credit Facility;
>
> (4)    DIP Documents:    authority to execute and deliver the DIP Agreement and all agreements, documents, and instruments contemplated by each (collectively, the "DIP Documents"), and to take all actions

---

[5]    This summary is qualified in its entirety by reference to the actual DIP Documents (including as such DIP Documents may be amended in connection with the syndication of the DIP Facility) and the DIP Orders. The DIP Documents and the DIP Orders shall control if there is any conflict between them and this summary.

necessary, appropriate, or required to comply with the Debtors' obligations thereunder and under the DIP Orders;

(5)    <u>DIP Liens and Claims</u>: authority to grant the DIP Agent, for its own benefit and the benefit of the Issuing Lender and the DIP Lenders, senior, perfected first priority, priming liens on the Collateral (as defined in the Interim DIP Order) securing, and the superpriority claim (the "<u>DIP Lender Superpriority Claim</u>") in respect of the DIP Facility (the "<u>DIP Liens</u>");

(6)    <u>Adequate Protection</u>: approval of the Adequate Protection to be provided to (a) the 2012 Agent and 2012 Lenders under the 2012 Credit Agreement, (b) the Second Lien Notes Indenture Trustee and Noteholders under the Indenture for the Second Lien Notes, and (c) the Term Loan Agent and Existing Lenders under the Term Loan Credit Agreement to protect the Prepetition Secured Lenders' interests in the real, personal, and mixed property of such Debtors constituting "Collateral" under, and as defined in, the Term Loan Credit Agreement and the Indenture (together with the Cash Collateral, the "<u>Prepetition Collateral</u>");

(7)    <u>Exit Facility Letters</u>: authority to enter into the Exit Facility Engagement Letter and the Exit Facility Fee Letter, copies of which are attached hereto as **Exhibit D** and **Exhibit E**,[6] respectively, and to take all actions necessary, appropriate, or required to comply with the Debtors' obligations under the Exit Facility Letters; and

(8)    <u>Final Hearing</u>: a date for a Final Hearing on the Motion to consider entry of the Final DIP Order, to be held no sooner than 14 days after the date of service of this Motion, and no later than 25 days after the Petition Date.

### **Summary of Material Terms of the DIP Facility**

15.    Pursuant to Bankruptcy Rules 4001(b), (c), and (d), and Appendix § I.A.2 to Local Rule 4001-4, the following is a concise statement and summary of the proposed material provisions of the DIP Documents and DIP Orders:[7]

---

[6]    Pursuant to the *Debtors' Motion for Entry of an Order Authorizing the Filing Under Seal of an Exit Facility Fee Letter*, the Debtors seek authorization to file the Exit Facility Fee Letter under seal. The Debtors have provided a copy of the Exit Facility Fee Letter to the Court and the U.S. Trustee. Upon request, the Debtors shall provide a copy of the Exit Facility Fee Letter on a confidential "professional eyes only" basis to the official committee of unsecured creditors, if any, appointed in the Debtors' chapter 11 cases.

[7]    Capitalized terms used in this statement but not otherwise defined herein shall have the meanings ascribed to such terms in the DIP Documents or DIP Orders, as applicable. This concise statement is qualified in its entirety by reference to the applicable provisions of the DIP Documents (including as such DIP Documents may

| MATERIAL TERMS OF THE DIP FINANCING | |
|---|---|
| **DIP Agreement Parties**<br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | **Debtor Parties**:<br>Borrower: |
| | Guarantors: |
| | Administrative and Collateral Agent: |
| | DIP Lenders: |
| | Issuing Bank: |
| | Arranger and Bookrunner: |

| | |
|---|---|
| Borrower: | Revel AC (the "Borrower") |
| Guarantors: | Revel Entertainment Group, LLC, NB Acquisition, LLC, and Revel Atlantic City, LLC, and Revel AC, LLC (collectively, the "DIP Guarantors) |
| Administrative and Collateral Agent: | JPMorgan Chase Bank, N.A. (in such capacities, the "DIP Agent") |
| DIP Lenders: | Each lender party to the 2012 Credit Agreement who, as of the Petition Date (each as defined below), holds a "Term Loan" (as defined in the 2012 Credit Agreement) shall participate in the DIP Term Loan Facility in a pro rata amount in accordance with their Term Loans outstanding under the 2012 Credit Agreement as of the Petition Date (such lenders, the "DIP Term Loan Lenders"). Each lender party to the 2012 Credit Agreement who, as of the Petition Date, holds "Revolving Loans" or "Revolving Commitments" (each as defined in the 2012 Credit Agreement) shall participate in the DIP Revolving Credit Facility in a pro rata amount in accordance with their revolving commitment under the 2012 Credit Agreement as of the Petition Date (such lenders, the "DIP Revolving Loan Lenders," and together with the DIP Term Loan Lenders, the "DIP Lenders") |
| Issuing Bank: | JPMorgan. (in such capacity, the "Issuing Bank") |
| Arranger and Bookrunner: | J. P. Morgan Securities (in such capacity, the "DIP Arranger") |

be amended in connection with the syndication of the DIP Facility) or the DIP Orders, as applicable. To the extent there exists any inconsistency between this concise statement and the provisions of the DIP Documents or the DIP Orders, the provisions of the DIP Documents or the DIP Orders, as applicable, shall control.

| MATERIAL TERMS OF THE DIP FINANCING | |
|---|---|
| **Maturity**<br><br>*Fed. R. Bankr. P.*<br>*4001(c)(1)(B);*<br><br><br>*D.N.J. LBR 4001-4,*<br>*Appendix § I.A.2(g)* | **Maturity Date for DIP Term Loan Facility.** The earliest of (a) May 30, 2013 (subject to extension to allow for any Gaming Approvals required to allow the Acceptable Reorganization Plan to become effective, but in no event later than June 15, 2013), (b) April 15, 2013 if the Court shall not have entered the Final DIP Order by such date, (c) the effective date of the Acceptable Reorganization Plan, as confirmed, and (d) the acceleration of any DIP Loans and the termination of the commitment to advance Revolving DIP Loans.<br><br>**Termination Date for DIP Revolving Credit Facility.** The earliest of (a) May 30, 2013 (subject to extension to allow for any Gaming Approvals required to allow the Acceptable Reorganization Plan to become effective, but in no event later than June 15, 2013), (b) April 22, 2013 if the Court shall not have entered the Final DIP Order by such date, (c) the effective date of the Acceptable Reorganization Plan, as confirmed, and (d) the acceleration of any DIP Loans and the termination of the commitment to advance Revolving DIP Loans.<br><br>(DIP Agreement, §§ 1.01, 2.05(a)) |

| MATERIAL TERMS OF THE DIP FINANCING | |
|---|---|
| **Purpose**<br><br>*Fed. R. Bankr. P.*<br>*4001(c)(1)(B)(ii)*<br><br><br>*D.N.J. LBR 4001-4,*<br>*Appendix § I.A.2(a)* | The proceeds of the Revolving Loans, the Term Loans and the Letters of Credit will be used to (a) repay amounts outstanding under the Prepetition 2012 Credit Agreement, (b) pay reasonable costs, fees, and expenses, including fees of the Agents, the Steering Committee, the Issuing Bank and the Lenders, associated with the transactions contemplated by the DIP Agreement and the other Loan Documents, (c) pay the fees, costs, and expenses incurred by persons or firms retained by the Loan Parties pursuant to section 327, 328 or 363 of the Bankruptcy Code ("**Loan Parties' Professional Fees**"), (d) provide ongoing working capital requirements of the Loan Parties and pay for fees, costs and expenses relating to the Cases (other than Loan Parties' Professional Fees), each in accordance with the Approved Budget, (which is annexed as **Exhibit 1** to **Exhibit B** attached hereto) and (e) for Day Club CapEx and Amenities CapEx, to the extent set forth on Schedule 3.12.<br><br>(DIP Agreement, § 3.12)<br><br>The Obligors require the Financing described in the Motion and as expressly provided in the DIP Documents to (a) pay in full the outstanding balance of all loans and other obligations outstanding under the Prepetition 2012 Credit Agreement; *provided* that, during the Interim Period, the Borrower is authorized to pay $5.11 towards the principal amount of obligations under the Prepetition 2012 Credit Agreement for each $1.00 of (I) Revolving DIP Loan issued to the Borrower that is not used to repay principal amounts outstanding under the Prepetition 2012 Credit Agreement or (II) Letter of Credit (other than Existing LC and the Day Club CapEx LC) issued or amended to effect an increase, (b) pay Transaction Expenses associated with the Transactions, (c) pay the Debtors' Professional Fees, (d) provide ongoing working capital requirements of the Obligors and to pay fees, costs and expenses relating to the Chapter 11 Cases (other than Debtors' Professional Fees), each in accordance with the DIP Documents, and (e) make the currently identified capital expenditures, subject to conditions as set forth in the DIP Documents.<br><br>(Interim DIP Order, ¶ G) |
| **Interest Rates**<br><br>*Fed. R. Bankr. P.*<br>*4001(c)(1)(B);*<br><br><br>*D.N.J. LBR 4001-4,*<br>*Appendix § I.A.2(e)* | The interest rates provided for below represent a continuation of the interest rates set forth in the 2012 Credit Agreement.<br><br>**Interest Rate for ABR Revolving DIP Loans.**  Alternative Base Rate + 6.50% *per annum.*[8]<br>**Interest Rate for ABR Term DIP Loan.** Alternative Base Rate + 8.0% *per annum*<br>**Interest Rate for Eurodollar Revolving DIP Loans.** Adjusted LIBOR Rate + 7.50% *per annum.*[9]<br>**Interest Rate for Eurodollar Term DIP Loan.** Adjusted LIBOR Rate + 9.0% *per annum.*<br>**Default Interest Rate.** 2% *per annum* above the then applicable rate.<br><br>(DIP Agreement, §§ 1.01, 2.07) |

---

[8]    The Alternate Base Rate is, for any day, a fluctuating rate per annum (rounded upward, if necessary, to the nearest 1/100th of 1%) equal to the highest of (a) the DIP Agent's prime rate in effect on such day and (b) the Federal Funds Effective Rate in effect on such day *plus* 0.50% and (c) the Adjusted LIBOR Rate for an Interest Period of one month beginning on such day (or if such day is not a Business Day, on the immediately preceding Business Day) *plus* 100 basis points. *See* DIP Agreement, § 1.01.

[9]    The Adjusted LIBOR Rate is, with respect to any Eurodollar Borrowing for any Interest Period, the higher of (i) (a) an interest rate per annum (rounded upward, if necessary, to the nearest 1/100th of 1%) determined by the Administrative Agent to be equal to the LIBOR Rate for such Eurodollar Borrowing in effect for such Interest

| MATERIAL TERMS OF THE DIP FINANCING | |
|---|---|
| **DIP Commitments**<br><br>*Fed. R. Bankr. P.*<br>*4001(c)(1)(B);*<br><br>*D.N.J. LBR 4001-4,*<br>*Appendix § I.A.2(c)* | **DIP Agreement.** Total aggregate loan commitment of $250 million to be disbursed as:<br>• Revolving DIP Loan:      $125 million<br>• Term DIP Loan:            $125 million<br>• Initial Revolving Commitment: the lesser of (a) the sum of (x) $20,000,000 plus (y) the then applicable Existing LC Maximum Amount plus (z) the then applicable Day Club CapEx LC Maximum Amount  and (b) such lower amount as the Court may order.<br><br>(DIP Agreement, §§ 1.01, 2.01) |
| **Letters of Credit**<br><br>*Fed. R. Bankr. P.*<br>*4001(c)(1)(B);*<br><br>*D.N.J. LBR 4001-4,*<br>*Appendix § I.A.2(c),*<br>*(h)* | Upon the Closing Date, the Existing LC and the Day Club CapEx LC (together, the "Existing Letters of Credit") shall each be deemed to have been issued pursuant to the DIP Agreement.<br><br>The Borrower may request the issuance of Letters of Credit for itself or for the support of its or its Restricted Subsidiaries' obligations at any time and from time to time during the Revolving Commitment Period, and the Issuing Bank agrees to issue Letters of Credit requested in accordance with the DIP Agreement.<br><br>A Letter of Credit shall be issued, amended, renewed or extended only if (and upon issuance, amendment, renewal or extension of each Letter of Credit the Borrower shall be deemed to represent and warrant that), after giving effect to such issuance, amendment, renewal or extension (i) the LC Exposure shall not exceed the sum of (x) $1,000,000 plus (y) the then applicable Existing LC Maximum Amount plus (z) the then applicable Day Club CapEx LC Maximum Amount and (ii) the sum of the total Revolving Credit Exposures shall not exceed the total Revolving Commitments.<br><br>(DIP Agreement, § 2.18) |
| **Funding Conditions**<br><br>*Fed. R. Bankr. P.*<br>*4001(c)(1)(B);*<br><br>*D.N.J. LBR 4001-4,*<br>*Appendix § I.A.2(d)* | **Conditions to Effectiveness.** Usual and customary for financings of this type, including, without limitation: (a) delivery of executed Loan Documents to the DIP Agent; (b) receipt, by the DIP Agent, of certificates of good standing, copies of Organizational Documents, board resolutions authorizing execution, delivery, and performance of the Loan Documents, and a certification that certain conditions to credit extension have been satisfied and no event or circumstance is reasonably expected to result in a Material Adverse Effect; (c) receipt, by the Agent and DIP Lenders, of the Approved Budget; (d) receipt by the DIP Arranger, DIP Agent, Steering Committee, Issuing Bank and DIP Lenders, of all Fees and other amounts due and payable on or prior to the Closing Date; (e) receipt, by the Collateral Agent, of evidence that it has a perfected Lien on, and security interest in, the Collateral; (f) receipt, by the Collateral Agent, of flood hazard determinations and evidence of insurance (with the Collateral Agent as an additional insured or loss payee); (g) receipt, by the DIP Lenders, of all information required for United States Patriot Act compliance; (h) lack of any order, judgment, or decree of any Governmental Authority restraining any DIP Lender from making DIP Loans or participating in the LC Exposure; (i) receipt of all necessary or advisable Gaming Approvals and Governmental Authority and third party approvals and/or consents; (j) delivery, by the Borrower, of an original, duly executed Note, if requested by any DIP Lender; (k) lack of any pending or threatened litigation, proceeding or investigation that would prohibit, enjoin or contest the transactions contemplated by the Loan Documents or could have a Material Adverse Effect; (l) [Reserved]; (m) aggregate |

Period divided by (b) 1 minus the Statutory Reserves (if any) for such Eurodollar Borrowing for such Interest Period and (ii) 1.00%. *See* DIP Agreement, § 1.01.

| MATERIAL TERMS OF THE DIP FINANCING |
| --- |

unused Revolving Commitments equal to at least $30 million after giving effect to the funding of the DIP Loans and deemed issuance of Letters of Credit at the Closing Date; (n) the Restructuring Support Agreement has been duly executed by the Loan Parties and each other party thereto, all conditions to its effectiveness have been satisfied or waived, and it is in full force and effect, subject to any necessary Court approvals; (o) a disclosure statement, Acceptable Reorganization Plan, Plan Related Documents, and other material definitive documents have been filed with the Court in form and substance satisfactory to the Agents, the Issuing Bank and the Steering Committee, and solicitation for the Acceptable Reorganization Plan has commenced; (p) the Interim DIP Order (which shall include agreed upon intercreditor provisions) has been entered by the Court, in full force and effect, and not vacated, stayed, revised, modified or amended in any manner without the prior written consent of the Agents, the Issuing Bank and the DIP Lenders; (q) the Filing Date for each Loan Party has occurred, and the First Day Orders sought by the Loan Parties have been entered by the Court in form and substance satisfactory to the DIP Agent in its sole discretion; (r) all orders entered by, and documents filed with, the Court pertaining to cash management and adequate protection, are in form and substance satisfactory to the Agents, the Issuing Bank and the Lenders in their reasonable discretion; (s) the Declaration of Covenants and Restrictions has been executed by each party having an interest in the Coverage Ratio Properties; and (t) receipt of an executed Exit Facility Engagement Letter and Exit Facility Fee Letter.

**Final Effective Date**. The obligations of the Revolving Lenders to make Revolving DIP Loans and of each Issuing Bank to issue Letters of Credit pursuant to the DIP Agreement in an aggregate amount in excess of the Interim Availability Amount will not become effective until: (a) (i) The Interim Order shall be in full force and effect and shall not have been stayed, reversed, vacated, rescinded, modified or amended in any respect; (ii) the Administrative Agent and the Lenders shall have received a certified copy of the Final Order which, in any event, shall have been entered by the Bankruptcy Court no later than April 24, 2013 (or such later date agreed to by the Required Lenders in their sole discretion) and at the time of any such extension of credit the Final Order shall be in full force and effect, and shall not have been vacated, stayed, reversed, modified or amended in any respect without the prior written consent of the Administrative Agent and the Required Lenders; and (iii) if either the Interim Order or the Final Order is the subject of a pending appeal in any respect, none of the making of such extensions of credit, the grant of Liens and Superpriority Claims pursuant to Section 3.26 or otherwise hereunder or the performance by the Borrower or any Guarantor of any of their respective obligations under any of the Loan Documents shall be the subject of a presently effective stay and (b) the Closing Date has occurred.

**Each Credit Extension**. The obligations of the Revolving Lenders to make Revolving DIP Loans and of each Issuing Bank to issue Letters of Credit pursuant to the DIP Agreement is subject to the following conditions: (a) The representations and warranties of the Loan Parties in Article III of the DIP Agreement or any other Loan Document are true and correct in all material respects on and as of the date of the date of such Borrowing or the date of issuance, amendment, renewal or extension of such Letter of Credit, as applicable, except to the extent that such representation or warranty (i) specifically refers to an earlier date, in which case it is true and correct in all material respects as of such earlier date or (ii) is qualified as to materiality, in which case it is true and correct in all respects; (b) At the time of and immediately after giving effect to such Borrowing or the issuance, amendment, renewal or extension of such Letter of Credit, as applicable, no Default or Event of Default has occurred and is continuing; (c) The sum of the aggregate amount of the outstanding Revolving Loans *plus* the aggregate outstanding LC Exposure does not exceed the aggregate Revolving Commitments then in effect; (d) With respect to any Loan or Letter of

| MATERIAL TERMS OF THE DIP FINANCING | |
|---|---|
| | Credit the proceeds of which will be used to finance Day Club CapEx and Amenities CapEx, the Administrative Agent has received such reports or other data from the Financial Advisor related to the use of proceeds of such Loan or Letter of Credit as the Administrative Agent has reasonably requested; (e) Except with respect to the Closing Date Borrowing, Administrative Agent has received a Borrowing Request or notice requesting the issuance, amendment, renewal or extension of a Letter of Credit in accordance with the requirements of the DIP Agreement; and (f) With respect to making any Revolving Loan or the issuance, amendment, renewal or extension of any Letter of Credit, the Administrative Agent has received satisfactory evidence that ACHA Approval has been received if required pursuant to applicable Law.<br><br>(DIP Agreement, §§ 4.01, 4.02, 4.03) |
| **Fees**<br>*Fed. R. Bankr. P.*<br>*4001(c)(1)(B);*<br><br>*D.N.J. LBR 4001-4,*<br>*Appendix § I.A.2(e)* | Other than the DIP Agent Fee, which is in substitution of the annual 2013 agent fee due under the 2012 Credit Agreement, there are no new fees associated with the DIP Agreement. The fees provided for below represent a continuation (or in the case of the DIP Agent Fee, in substitution) of the fees set forth in the 2012 Credit Agreement.<br><br>**DIP Agent Fee.** An amount agreed upon between the Borrower and the DIP Agent.<br><br>**Revolving Commitment Fee.** To the Administrative Agent for the account of each Revolving Lender a commitment fee, which shall accrue at 4.00% per annum on the average daily unused amount of the Revolving Commitment of such Revolving Lender during the period from and including the Closing Date to but excluding the Revolving Commitment Termination Date<br><br>**Letter of Credit Fee.** (a) to the Administrative Agent for the account of each Revolving Lender a participation fee with respect to its participations in Letters of Credit ("Letter of Credit Fees"), which shall accrue at the same Applicable Margin used to determine the interest rate applicable to Eurodollar Revolving Borrowings on the average daily amount of such Revolving Lender's LC Exposure (excluding any portion thereof attributable to unreimbursed LC Disbursements) during the period from and including the Closing Date to but excluding the later of the Revolving Commitment Termination Date and the date on which such Revolving Lender ceases to have any LC Exposure, and (b) to each Issuing Bank a fronting fee, which shall accrue at a rate equal to 0.25% per annum on the average daily amount of the LC Exposure arising from or related to Letters of Credit issued by it (excluding any portion thereof attributable to unreimbursed LC Disbursements) during the period from and including the Closing Date to but excluding the later of the Revolving Commitment Termination Date and the date on which there ceases to be any LC Exposure, as well as such Issuing Bank's standard administrative fees with respect to the issuance, amendment, renewal or extension of any Letter of Credit or processing of drawings thereunder<br><br>(DIP Agreement, §§ 1.01, 2.06) |
| **Budget Provisions**<br>*D.N.J. LBR 4001-4,*<br>*Appendix § I.A.2(d)* | There is a limitation on the use of DIP Facility proceeds in accordance with the Approved Budget. |
| **Liens, Priorities**<br>**and Adequate**<br>**Protection**<br>*Fed. R. Bankr. P.* | Each Loan Party represents and warrants to the DIP Agent and each of the Lenders that the Secured Obligations are, subject to the Carve-Out and the Orders:<br><br>• pursuant to section 364(c)(1) of the Bankruptcy Code, entitled (without filing a proof of |

## MATERIAL TERMS OF THE DIP FINANCING

*4001(c)(1)(B)(i), (ii);*

*D.N.J. LBR 4001-4,*
*Appendix § I.A.2(f)*

claim) to a joint and several Superpriority Claim against the Borrower and each Guarantor, with priority over any and all other obligations, liabilities and indebtedness against the Borrower and each Guarantor, now existing or hereafter arising, of any kind whatsoever, including on the proceeds of avoidance actions following entry of the Final Order (but not the actions themselves), and including any and all administrative expenses or other claims of the kind specified in or arising under sections 105, 326, 328, 330, 331, 503(b), 506(c) (following entry of the Final Order), 507, 546(c), 552(b), 726, 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, whether now in existence or hereafter incurred by the Loan Parties, and will at all times be senior to the rights of the Borrower and each Guarantor, the Borrower's and each Guarantor's estate and any successor trustee, estate representative or any creditor, in any of the Cases or any subsequent cases or proceedings under the Bankruptcy Code (the "Lender Superpriority Claim"), and the Lender Superpriority Claim shall have recourse to and be payable from all prepetition and postpetition assets of the Loan Parties (including, but not limited to, the Collateral but, for the avoidance of doubt, excluding any property over which the creation or granting of such claim would violate any applicable Gaming Laws); such Lender Superpriority Claim in respect of the Revolving Commitments and the Term Loans shall be *pari passu* but subject to the repayment priorities set forth in the DIP Documents;

• pursuant to section 364(c)(2) of the Bankruptcy Code, secured by a perfected first priority lien on all Collateral that is not subject to valid, perfected and non-avoidable Liens as of the Filing Date and such Liens are perfected without the necessity of the execution or filing of mortgages, security agreements, pledge agreements, financing statements or other agreements;

• pursuant to section 364(c)(3) of the Bankruptcy Code, secured by a perfected lien on all Collateral (other than Collateral described in Section 3.26(b) or (d)) that is subject to valid and non-avoidable liens as of the Filing Date that were permitted pursuant to the terms of the Prepetition 2012 Credit Agreement or (with respect to statutory Liens) applicable Laws and which were senior to the Liens under the Prepetition 2012 Credit Agreement and that were either perfected as of the Filing Date or subsequently perfected pursuant to section 546(b) of the Bankruptcy Code, which Liens are junior to such valid, perfected and non-avoidable Liens and are perfected without the necessity of the execution or filing of mortgages, security agreements, pledge agreements, financing agreements or other agreements; and

• pursuant to section 364(d)(1) of the Bankruptcy Code, secured by a perfected first priority, senior priming Lien on all of the Collateral (except the ERGG Proceeds) on which (a) Liens were granted as security for the obligations under or in connection with the Prepetition 2012 Credit Agreement, Term Loan Credit Agreement or the Indenture or (b) Liens were granted as of the Filing Date that were not permitted pursuant to the terms of the 2012 Credit Agreement or (with respect to statutory liens) applicable law or which were junior to the liens that were granted as security for the obligations under or in connection with the Term Loan Credit Agreement, all of which existing liens, rights and interests (the "Primed Liens") will be primed by and made subject and subordinate to the perfected first priority senior liens to be granted to the Collateral Agent for its and the Secured Parties' benefit (the "Priming Liens"), which Priming Liens also prime any Liens granted after the Filing Date to provide adequate protection in respect of any of the Primed Liens, and such Priming Liens are perfected without necessity of the execution or filing of mortgages, security agreements, pledge agreements, financing statements or other agreements. For the avoidance of doubt, notwithstanding Section 3.26(c), the Priming Liens prime and are senior to the Primed Liens.

| MATERIAL TERMS OF THE DIP FINANCING |
|---|

(DIP Agreement, § 3.26)

Except as provided in this Interim Order or the DIP Documents, the DIP Liens will not at any time be (a) made subject or subordinated to, or made *pari passu* with, any other lien, security interest, or claim existing as of the Filing Date (other than the Senior Liens), or created under sections 363 or 364(d) of the Bankruptcy Code or otherwise, or (b) subject to any lien or security interest that is avoided and preserved for the benefit of the Obligors' estates under section 551 of the Bankruptcy Code.

The DIP Liens are fully perfected liens and security interests, effective and perfected upon the Interim Order Entry Date without the necessity of execution by the Obligors of mortgages, security agreements, pledge agreements, financing agreements, financing statements, or other agreements or documents, such that no additional steps need be taken by the DIP Secured Parties to perfect such liens and security interests.

The DIP Liens, DIP Lender Superpriority Claim, and other rights, benefits, and remedies granted under this Interim Order to the DIP Secured Parties will continue in the Chapter 11 Cases, in any superseding case or cases under the Bankruptcy Code resulting from conversion of one or more of the Chapter 11 Cases and following any dismissal of the Chapter 11 Cases, and such liens, security interests, and claims shall maintain their priority as provided in this Interim Order until all the Secured Obligations have been indefeasibly paid in full in cash and completely satisfied and all of the Revolving Credit Commitments have been terminated in accordance with the DIP Documents.

(Interim DIP Order, ¶ 6)

The Prepetition 2012 Credit Agreement Agent, the Prepetition Term Loan Credit Agreement Agent and the Prepetition Second Lien Trustee, for the benefit of themselves and secured parties under the Prepetition 2012 Credit Agreement Documents, the Prepetition Term Loan Credit Documents and the Prepetition Second Lien Indenture Documents, respectively (collectively, the "Adequate Protection Parties"), will be granted as adequate protection (collectively, the "Adequate Protection Obligations"), pursuant to sections 361, 507, 363(e), and 364(d)(1) of the Bankruptcy Code or otherwise, in exchange for the consent of the Prepetition 2012 Credit Agreement Lenders, Prepetition Term Loan Credit Agreement Lenders and the Prepetition Second Lien Noteholders to the priming effectuated by the DIP Facility, consent to the use of the Prepetition Collateral (including Cash Collateral) and the consent to the transactions contemplated by the DIP Facility, on account of and to the extent of any diminution in the value of the prepetition liens and security interests of such party resulting from the imposition of the automatic stay, the use, sale, lease, or grant by the Obligors of the Prepetition Collateral (including, without limitation, Cash Collateral), the priming of the prepetition liens and security interests of the Prepetition 2012 Credit Agreement Lenders, Prepetition Term Loan Credit Agreement Lenders and the Prepetition Second Lien Noteholders and the stay of enforcement of any prepetition security interest arising from section 362 of the Bankruptcy Code, or otherwise, the following:

> Adequate Protection Liens.  The Adequate Protection Parties will be granted effective and perfected as of the Interim Order Entry Date and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements, a security interest in and lien on all Collateral of the Obligors (together, the "Adequate Protection Liens"), subject and subordinate only to (a) the Carve-Out, (b) the DIP Liens, and (c) the Senior Liens. Except with respect to the Carve-Out, the DIP Liens, and any valid and non-

## MATERIAL TERMS OF THE DIP FINANCING

avoidable liens as of the Filing Date that were permitted pursuant to the terms of the Prepetition 2012 Credit Agreement and which were senior to the liens granted in connection with the Prepetition 2012 Credit Documents and that were either perfected as of the Filing Date or subsequently perfected pursuant to section 546(b) of the Bankruptcy Code, Adequate Protection Liens will not, at any time, be (a) made subject to or subordinated to, or made *pari passu* with any other lien, security interest or claim existing as of the Filing Date, or created under sections 363 or 364(d) of the Bankruptcy Code or otherwise or (b) made subject to any lien or security interest that is avoided and preserved for the benefit of the Obligors' estates under section 551 of the Bankruptcy Code, but in each case, will be subject to the Prepetition Intercreditor Agreements.

Superpriority Claim with Respect to the Prepetition Secured Obligations. The Adequate Protection Parties will be granted, as and to the extent provided by section 507(b) of the Bankruptcy Code, a super-priority administrative expense claim against the Debtors' estates on a joint and several basis, senior to all other super-priority claims and other administrative expense claims except the DIP Lender Superpriority Claim and the Carve-Out (such claim, the "Prepetition Debt Adequate Protection Claim"). The Prepetition Debt Adequate Protection Claim will have recourse to and be payable from all Collateral; provided that the Prepetition 2012 Credit Agreement Agent, the Prepetition Term Loan Credit Agreement Agent and the Prepetition Second Lien Trustee shall not receive or retain any payments, property or other amounts in respect of such superpriority claims unless and until the Secured Obligations and the Carve-Out have indefeasibly been paid in cash in full. The Adequate Protection Obligations will be for the benefit of the secured parties under the Prepetition 2012 Credit Agreement Documents, Prepetition Term Loan Credit Agreement Documents on a senior basis and the secured parties under the Prepetition Second Lien Indenture Documents on a junior basis in accordance with the priorities as between such parties as were in effect on the Filing Date in accordance with the Prepetition Intercreditor Agreements.

Except as expressly provided herein and in the Prepetition Intercreditor Agreements, nothing contained in this Interim Order (including, without limitation, the authorization to use any Cash Collateral) will impair or modify any rights, claims or defenses available in law or equity to the Adequate Protection Parties. The consent of the Adequate Protection Parties to the priming of the Prepetition Liens by the DIP Liens (a) is limited solely to the Financing and does not extend to any other postpetition financing the Obligors may subsequently propose to enter into and (b) does not constitute, and will not be construed as constituting, an acknowledgement or stipulation by the Adequate Protection Parties that, absent such consent, their respective interests in the Prepetition Collateral would be adequately protected pursuant to this Interim Order. Nothing in the Interim Order constitutes an admission that the Adequate Protection Parties are not entitled to payment under section 506(b) of the Bankruptcy Code.

(Interim DIP Order, ¶ 10)

| | |
|---|---|
| **Liens on Avoidance Actions**<br>*Fed. R. Bankr. P. 4001(c)(1)(B)(xi)* | Subject to entry of the Final Order, Collateral is defined in both the DIP Agreement and the Interim DIP Order to include the proceeds of the Debtors' claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code, but not the claims or causes of actions themselves.<br><br>(DIP Agreement, §§ 1.01, 3.26; Interim DIP Order, ¶ 6) |

17

| MATERIAL TERMS OF THE DIP FINANCING | |
|---|---|
| **Covenants**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B);*<br><br>*D.N.J. LBR 4001-4, Appendix § I.A.2(h)* | **Affirmative Covenants.**  Usual and customary for financings of this type, including, without limitation:  delivery of financial statements, cash flow forecasts, variance reports, lender conference calls, schedules of project costs, notices of Events of Default, preservation of corporate existence, maintenance of properties, licenses, insurance, and corporate books and records, payment of taxes, compliance with laws, adherence to milestones (as set forth below), and further assurances with respect to collateral.<br><br>(DIP Agreement, §§ 5.01–5.18)<br><br>**Negative Covenants.**  Usual and customary for financings of this type, including, without limitation:   limitations on liens, investments, loans and advances, indebtedness, fundamental changes, changes to the nature of the business, sales of assets, restricted payments, modifications of material documents, affiliate transactions, sale and leaseback transactions, changes in fiscal periods, negative pledge clauses, dividend distributions, restrictions on subsidiaries, issuance of capital stock, zoning and contract changes, development of the Tower II Air Parcel, hedging agreements, bankruptcy investigations, alternative reorganization plans and material contracts, and minimum liquidity.<br><br>(DIP Agreement, §§ 6.01–6.22) |
| **Milestones**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(vi)* | The DIP Agreement milestones set forth below are identical to the milestones set forth pursuant to the Restructuring Support Agreement.<br><br>The Final DIP Order will be entered by the Court on or before April 24, 2013, (b) a combined hearing for consideration of approval of a disclosure statement filed on the Filing Date and the Acceptable Reorganization Plan will have been held on or before May 22, 2013, (c) an order in form and substance reasonably satisfactory to the Agents, the Issuing Bank and the Required Lenders confirming the Acceptable Reorganization Plan will be entered by the Court on or before May 15, 2013; and (d) the Plan Effective Date will have occurred on or before May 30, 2013; underline provided, that such date shall be extended to allow for receipt of any Gaming Approvals required in order to allow the Plan Effective Date to occur to a date on or before June 15, 2013.<br><br>(DIP Agreement, § 5.18) |
| **Allocation of Debt Repayments**<br><br>*D.N.J. LBR 4001-4, Appendix § I.A.2(h)* | Each Borrowing, each payment or prepayment of principal of or interest on any Loan, each payment of fees (other than the fronting fees and administrative fees paid to, and retained by, the Issuing Bank for its own account, and the administrative fees retained by the Agents for their own account), each reduction of the Revolving Commitment, and each payment with respect to LC Exposure and each conversion or continuation of any Loan, will be allocated *pro rata* among the relevant Lenders in accordance with the respective Revolving Commitment Percentage or Term Loan Percentage, as applicable, of such Lenders.<br><br>(DIP Agreement, § 2.14(b)) |

| MATERIAL TERMS OF THE DIP FINANCING | |
|---|---|
| **Events of Default**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B);*<br><br>*D.N.J. LBR 4001-4, Appendix § 1.A.2(g)* | Usual and customary for financings of this type, including, without limitation, non-payment of principal, interest and fees, defaults under affirmative and negative covenants, breaches of representations and warranties, failure to pay certain indebtedness or comply with ERISA rules and regulations, incurrence of certain administrative expenses in excess of $1,000,000, the revocation or suspension or a license or permit, a change of control, events of default relating to effect and validity of liens and Loan Documents, failure to continuously retain an acceptable financial advisor, appointment of a bankruptcy trustee or examiner, conversion or dismissal of these chapter 11 cases, loss of the Debtors' exclusive right to file a plan of reorganization, the entry of certain orders or motions affecting the DIP Orders or DIP Financing, entry of an order granting superpriority claims to other creditors, relief from automatic stay, failure to comply with intercreditor agreements, termination or invalidation of the Restructuring Support Agreement, capital expenditure claims in excess of $10 million (in the aggregate) or general unsecured claims in excess of $70 million (in the aggregate), liquidation or the Borrower's or Guarantors' business or bankruptcy sale of any collateral, and the occurrence of a regulatory event that may prohibit implementation of the Acceptable Reorganization Plan and Exit Facilities within agreed time periods.<br><br>(DIP Agreement, § 8.01) |
| **Acknowledgements**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(iii)* | The Debtors make certain customary stipulations with respect to (a) the aggregate amount of prepetition indebtedness owed with respect to the Prepetition 2012 Credit Agreement, (b) the aggregate amount of prepetition indebtedness owed with respect to the Prepetition Term Loan Credit Agreement, (c) the aggregate amount of prepetition indebtedness owed with respect to the Prepetition Second Lien Notes, (d) the validity and enforceability of the liens and security interests granted with respect to Prepetition Secured Obligations, (e) the binding nature of the Prepetition Secured Obligations in respect of the Debtors, (f) the waiving of claims and defenses against the Prepetition 2012 Credit Agreement Lenders, Prepetition Term Loan Credit Agreement Lenders, and Prepetition Second Lien Noteholders regarding the Prepetition Secured Obligations, (g) the relative priorities of the Prepetition Secured Obligations as set forth in the Prepetition Intercreditor Agreements, and (h) that there are no liens on or security interests in the Collateral except for (i) the Prepetition Liens and, (ii) the Senior Liens.<br><br>(Interim DIP Order, ¶ E) |

| MATERIAL TERMS OF THE DIP FINANCING | |
|---|---|
| **Automatic Stay**<br><br>*Fed. R. Bankr. P.<br>4001(c)(1)(B)(iv);*<br><br>*D.N.J. LBR 4001-4,<br>Appendix § I.A.2(g)* | The automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified without the need for any further order of this Court to:<br><br>(a) require all cash, checks, or other collections or proceeds from Collateral received by any of the Obligors to be deposited in accordance with the requirements of the DIP Documents, and to apply any amounts so deposited and other amounts paid to or received by the DIP Secured Parties under the DIP Documents in accordance with any requirements of the DIP Documents, and<br><br>(b) require mandatory prepayments in accordance with the requirements of the DIP Documents, in each case, without further order of this Court; and<br><br>(c) following an Event of Default under the DIP Documents, allow the DIP Agent to exercise any and all of their rights and remedies in accordance with the terms of the DIP Documents, and to take all actions required or permitted by the DIP Documents without necessity of further Court orders; provided that the DIP Agent shall give three Business Days' prior notice to the Borrower, the U.S. Trustee, and the Creditors' Committee, if any, of such action; provided, further, however, that this Interim Order will not prejudice the rights of any party-in-interest to oppose the exercise of the DIP Secured Parties' remedies; provided, further, that the only issue that may be raised by any entity in opposition thereto will be whether an Event of Default has in fact occurred and is continuing.<br><br>(Interim DIP Order, ¶ 13) |
| **Releases, Waivers, Consents, and Indemnification**<br><br>*Fed. R. Bankr. P.<br>4001(c)(1)(B)(v), (vii-<br>x)* | **Release.** The Obligors forever and irrevocably release, discharge, and acquit the former, current, or future DIP Secured Parties, the Prepetition 2012 Credit Agreement Agent, the Prepetition 2012 Credit Agreement Lenders, the Prepetition Term Loan Credit Agreement Agent, the Prepetition Term Loan Credit Agreement Lenders, the disbursement agent under the DIP Loan Agreement, the Prepetition 2012 Credit Agreement, the Prepetition Term Loan Credit Agreement, the Steering Committee, and each of their respective former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest (collectively, the "Releasees") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description, arising out of, in connection with, or relating to the Financing, the DIP Documents, the Prepetition 2012 Credit Documents, the Prepetition Term Loan Credit Documents and ancillary documentation, guarantees, security documentation and collateral documents executed in support of the Financing, the Prepetition Secured Obligations, or the transactions contemplated hereunder or thereunder.<br><br>(Interim DIP Order, ¶ E)<br><br>**Indemnification.** Usual and customary for financings of this type, including that the Borrower will indemnify the DIP Agent (and any sub agent thereof), the DIP Arranger, each DIP Lender, the Issuing Bank, the Steering Committee and each Related Party of any of the foregoing persons (each such person being called an "Indemnitee") against, and hold |

| MATERIAL TERMS OF THE DIP FINANCING |
| --- |

each Indemnitee harmless from, any and all reasonable and documented, out of pocket losses, claims, damages, liabilities and related expenses (including the fees, charges and disbursements of any Advisors) incurred by any Indemnitee or asserted against any Indemnitee by any party hereto or any third party arising out of, in connection with, or as a result of the DIP Agreement and related transactions and negotiations, the Letters of Credit, the chapter 11 cases, and the DIP Orders.

(DIP Agreement, § 10.03(b))

**Waiver.** Effective upon entry of the Final Order, no person or entity will be entitled, directly or indirectly, to, except as expressly provided by paragraph 4 of the Interim Order with respect to the Carve-Out, charge or recover from the Collateral, whether by operation of section 506(c) of Bankruptcy Code, sections 105 or 552(b) of the Bankruptcy Code, or otherwise, or direct the exercise of remedies or seek (whether by order of this Court or otherwise) to marshal or otherwise control the disposition of Collateral or Property after an Event of Default under the DIP Documents, or termination or breach under the DIP Documents or this Interim Order.

(Interim DIP Order, ¶ 30)

## Extraordinary Provisions of the DIP Loan Agreements

16.    The Debtors are required to conspicuously disclose the terms of any "Extraordinary Provisions" as that term is defined in Appendix § II.A to Local Rule 4001-4. *See* Local Rule 4001-4, Appendix § I.A.4. As discussed herein, the Debtors believe that the facts and circumstances of these chapter 11 cases constitute substantial cause and compelling circumstances warranting approval of these terms.

(1)    **Appendix § II.A.2 to Local Rule 4001-4 – *Roll-up*, DIP Agreement at § 3.12; Interim DIP Order at ¶G.** The Interim DIP Order provides that the outstanding balance of loans and other obligations under the Prepetition 2012 Credit Agreement shall be paid with proceeds of the DIP Facility; provided that, during the Interim Period, the Borrower is authorized only to pay $5.1 towards the principal outstanding balance of such loans for each $1.00 of (a) loans under the DIP Revolving Credit Facility issued to the Borrower that is not used to repay principal amounts outstanding under the Prepetition 2012 Credit Agreement or (b) letters of credit (other than the Existing LC and the Day Club CapEx LC) issued or amended to effect an increase.

(2)    **Appendix § II.A.4 to Local Rule 4001-4) – *Waivers*, Interim DIP Order at ¶18.** The Interim DIP Order provides that, except

21

as provided in the DIP Documents and/or the Interim Order, the Debtors shall be enjoined and prohibited from, at any time during the chapter 11 cases until such time as the DIP Loans have been indefeasibly paid in full, granting liens on or security interests in the Prepetition Collateral or any portion thereof to any other entities, pursuant to section 364(d) of the Bankruptcy Code or otherwise, which liens are junior to, senior to, or *pari passu* with the DIP Liens, the Adequate Protection Liens, and the liens of the Prepetition Secured Lenders.

(3)    **Appendix § II.A.5 to Local Rule 4001-4) – *Section 506(c) Waivers*, Interim DIP Order at ¶30**. The Interim DIP Order provides that, subject to entry of the Final DIP Order, no person or entity shall be entitled, directly or indirectly, to, except as expressly provided by the Interim Order with respect to the Carve-Out, charge or recover from the Prepetition Collateral, whether by operation of sections 506(c), 105, or 552(b) of the Bankruptcy Code, or otherwise, or direct the exercise of remedies or seek (whether by order of the Court or otherwise) to marshal or otherwise control the disposition of the Prepetition Collateral or property after an event of default under the DIP Documents, or termination or breach under the DIP Documents or the Interim Order.

(4)    **Appendix § II.A.6 to Local Rule 4001-4) – *Liens on Avoidance Actions*, DIP Agreement at § 3.26; Interim DIP Order at ¶6**. The Interim DIP Order provides that, subject to entry of the Final DIP Order, the DIP Lenders shall receive fully perfected and unavoidable first-priority senior priming security interests in and liens upon proceeds or property recovered in respect of any Avoidance Actions (but not the Avoidance Actions themselves).

(5)    **Appendix § II.A.7 to Local Rule 4001-4) – *Carve-outs*, Interim DIP Order at ¶4**. The Interim DIP Order provides a carve-out (the "Carve-Out") equivalent to the sum of (a) all fees required to be paid to the clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate; (b) fees and expenses of up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; (c) to the extent allowed, all accrued and unpaid fees, costs and expenses (the "Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328 or 363 of the Bankruptcy Code or any statutory committee (a "Committee") appointed in these cases pursuant to section 1102 of the Bankruptcy Code (collectively, the "Professional Persons") at any time before or on the first Business Day following delivery by the DIP Agent of a Carve-Out Trigger Notice (as defined in the Interim Order), whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice; and (d) after the first Business Day following delivery by the DIP Agent of the Carve-Out Trigger Notice (the "Trigger Date"), to the extent allowed, the payment of Professional Fees

22

of Professional Persons in an aggregate amount not to exceed $2,000,000 incurred on and after the Trigger Date.

**Basis for Relief**

**I.    Revel's Acquisition and Development**

17.    As set forth in the First Day Declaration, which has been filed contemporaneously herewith and which is incorporated herein by reference, the Debtors own and operate Revel, a premier Las Vegas-style, beachfront entertainment resort and casino located on the boardwalk in the south inlet of Atlantic City, New Jersey ("Atlantic City"), the nation's second-largest gambling market.

18.    Debtor Revel AC was formed on February 7, 2011 and, on February 17, 2011, Revel AC consummated the acquisition of Revel Entertainment Group, LLC ("REG"), a Delaware limited liability company, NB Acquisition, LLC ("NB Acquisition"), a New Jersey limited liability company, and Revel Atlantic City, LLC ("Revel Atlantic City," and together with REG and NB Acquisition, "Predecessor Revel"), a New Jersey limited liability company from an affiliate of Morgan Stanley (the "Acquisition").

19.    The New Jersey Economic Stimulus Act of 2009 created and established the Economic Redevelopment and Growth Grant program ("ERG") for the purpose of encouraging redevelopment projects in qualifying economic redevelopment and growth grant incentive areas through the provision of the State of New Jersey and municipal incentive grants derived from certain incremental tax revenues realized at the project site to reimburse developers for certain project financing gap costs.    Recognizing Revel's significant potential to advance the goal of revitalizing Atlantic City, on February 11, 2011, Revel AC, REG, the New Jersey Economic Development Authority, and the Treasurer of the State of New Jersey entered into that certain State Economic Redevelopment and Growth Incentive Grant Agreement (as amended,

23

supplemented, or modified from time to time, the "ERG Agreement"), entitling Revel AC and

REG to receive approximately $261.4 million in ERG grant payments ("ERG Grant Payments"),

in an effort to revitalize Atlantic City. ERG is New Jersey's version of tax increment financing,

which takes a portion of the tax revenue generated by a new project and offers those revenues to

the developer as a subsidy to pursue the development.

20.    On March 26, 2012, following a 3-0 vote of approval, the Debtors were granted a

gaming license by the New Jersey Casino Control Commission. With this final hurdle passed,

Revel opened its doors to the public on April 2, 2012, becoming the first new casino in Atlantic

City in nine years.

## II.    Prepetition Financing

21.    As of the Petition Date, the Debtors have outstanding prepetition debt obligations

of approximately $1.5 billion, consisting of amounts due under the (a) 2012 Credit Agreement;

(b) Term Loan Credit Agreement; and (c) Second Lien Notes (each as defined below). These

obligations are discussed in turn.

### A.    Initial Financing

22.    On February 17, 2011, the Debtors consummated a $1.15 billion financing,

consisting of a term loan facility and the issuance of warrants and second lien notes.

#### 1.    Term Loan Facility

23.    The term loan facility consists of an $850 million, six-year senior secured tranche

B term loan facility (the "Term Loan Facility") as evidenced by that certain credit agreement

dated as of February 17, 2011 (as amended to date, and as it may hereafter be amended,

supplemented or modified from time to time, the "Term Loan Credit Agreement") by and among

Revel AC, as borrower, Revel AC, LLC, Revel Atlantic City, REG, and NB Acquisition

(collectively, the "Guarantors"), the lenders party thereto (the "Existing Lenders"), J.P. Morgan

24

Securities, as lead arranger and syndication agent, Morgan Stanley & Co. Incorporated, as joint bookrunning managers, and JPMorgan, in its capacities as administrative agent and collateral agent (the "Term Loan Agent").

24.    The loans under the Term Loan Facility have an annual interest rate which, at Revel AC's option, can be either: (a) a base rate plus a margin of 6.50%; or (b) the Eurodollar rate (not to be less than 1.50% per annum) plus a margin of 7.50%. All borrowings under the Term Loan Facility are required to be repaid on the final maturity date of the facility (February 17, 2017), and obligations under the Term Loan Facility are guaranteed by the Guarantors. The obligations and guarantees under the Term Loan Facility are secured by a first priority security interest in substantially all of the Debtors' assets (other than the proceeds of the Second Lien Notes and the ERG Proceeds), subject to certain exceptions set forth in the definitive documentation for the Term Loan Facility.

25.    As of March 13, 2013, the aggregate outstanding principal amount under the Term Loan Credit Agreement was $895,700,000.00 and accrued and unpaid interest thereon was $25,545,375.00.

### 2.    Second Lien Notes

26.    The second lien notes due 2018 (the "Second Lien Notes," and the holders of these Second Lien Notes, the "Noteholders") were issued under that certain indenture dated as of February 17, 2011 (as amended to date, and as it may hereafter be amended, supplemented or modified from time to time, the "Indenture"), by and among the Debtors, the Guarantors, and U.S. Bank National Association, as trustee (the "Second Lien Notes Indenture Trustee"). These Second Lien Notes are secured by a second lien on all or substantially all of the Debtors' assets, but enjoy an exclusive first lien on certain ERG Proceeds (as defined below) designated for their

benefit (as described in the ERG Agreement), and a collateral assignment of the ERG Agreement
(which items of collateral do not secured the Term Loan Facility).

27.    Pursuant to the Indenture and Section VII(1)(a) of the ERG Agreement, the
Debtors pledged and assigned as security to Notes Indenture Trustee for the benefit of the
holders of the Notes their right, title, and interest in and to the ERG Agreement, including up to
the lesser of $70 million or the aggregate principal amount outstanding under the Second Lien
Notes of the proceeds of the ERG Grant Payments ("ERG Proceeds") remitted to a separate
escrow account (the "ERG Pledged Account").    Section VII(1)(d) of the ERG Agreement
provides that upon an Event of Default under the Indenture, the Debtors may release the ERG
Proceeds from the ERG Pledged Account solely to pay amounts due under the Second Lien
Notes

28.    As of March 13, 2013, the aggregate outstanding principal amount under the
Indenture was estimated to be approximately $365,741,000.00 and accrued and unpaid interest
thereon was $21,456,805.33.

### 3.    Warrants

29.    On February 17, 2011, the Debtors issued 152,200 units (the "Units"), each
consisting of a warrant (a "Warrant" and, collectively, the "Warrants" and, the holders of the
warrants, the "Warrant Holders") to purchase 1,000 shares of common stock of Revel AC, par
value $0.0001 per share ("Common Stock"), subject to certain adjustments, pursuant to the
Warrant Agreement, dated as of February 17, 2011 (as amended to date, and as it may hereafter
be amended, supplemented or modified from time to time, the "Warrant Agreement"), by and
between Revel AC and U.S. Bank National Association, and $2,000 principal amount of Revel
AC's Second Lien Notes.

30.     The net proceeds from the offering, together with the net proceeds of the $850.0

million Term Loan Facility, were used in part to fund the acquisition of Predecessor Revel and to

pay costs and expenses related to the financing.  The approximately $1.0 billion of net proceeds

remaining were deposited in one or more accounts and were used to finance the construction and

opening of Revel and are being used to, among other things, prefund the quarterly interest

payments for the Term Loan Facility and finance the initial operations of Revel, pursuant to the

terms and subject to the conditions of that certain master disbursement agreement governing the

usage of the Debtors' construction accounts controlled by the disbursement agent thereunder.

### 4.      Intercreditor Agreements

#### (1)      First Lien Intercreditor Agreement

31.     Revel AC, the Term Loan Agent, and the 2012 Agent (as defined herein) are

parties to that certain intercreditor agreement (as amended to date, and as it may hereafter be

amended, supplemented or modified from time to time, the "First Lien Intercreditor

Agreement"), dated as of May 3, 2012, attached hereto as **Exhibit F**.  The First Lien

Intercreditor Agreement assigned relative priorities to claims arising under the 2012 Credit

Agreement (as defined herein) and the Term Loan Facility.  Specifically, the First Lien

Intercreditor Agreement provides that claims arising under the Term Loan Facility are junior to

claims arising under the 2012 Credit Agreement.  The First Lien Intercreditor Agreement also

imposes certain limitations on:  (a) the rights and remedies available to the holders of claims

arising under the Term Loan Facility in an event of default under the Term Loan Facility; (b) the

ability of holders of claims arising under the Term Loan Facility to challenge the validity or

priority of liens arising under the 2012 Credit Agreement; (c) the ability of holders of claims

arising under the Term Loan Facility to object to the use of cash collateral or debtor in

possession financing under sections 363 or 364 of the Bankruptcy Code consented to or provided

by one or more of the 2012 Lenders (as defined herein); and (d) the extent to which holders of claims arising under the Term Loan Facility may be entitled to request adequate protection during a bankruptcy proceeding.

32.     Specifically, in the event of a bankruptcy proceeding, subject to certain limited exceptions, the holders of claims arising under the Term Loan Facility have agreed not to object to use of Cash Collateral permitted by the 2012 Lenders and to subordinate their liens in the Shared Collateral (as defined in the Second Lien Intercreditor Agreement) to secure postpetition financing consented to or provided by one or more of the 2012 Lenders.

(1)     **Second Lien Intercreditor Agreement**

33.     Revel AC, the Term Loan Agent, and the Second Lien Notes Indenture Trustee are parties to that certain intercreditor agreement (as amended to date, and as it may hereafter be amended, supplemented or modified from time to time, the "Second Lien Intercreditor Agreement," and together with the First Lien Intercreditor Agreement, the "Intercreditor Agreeements"), dated as of February 17, 2011, attached hereto as **Exhibit G**. The Second Lien Intercreditor Agreement assigned relative priorities to claims arising under the Term Loan Facility and the Indenture.[10]  Specifically, the Second Lien Intercreditor Agreement provides that, other than with respect tot Notes Separate Collateral, claims arising under the Indenture are junior to claims arising under the Term Loan Facility.  The Second Lien Intercreditor Agreement also imposes certain limitations on: (a) the rights and remedies available to the Noteholders in an event of default under the Indenture; (b) the Noteholders' ability to challenge the validity or priority of liens arising under the Term Loan Facility; (c) the Noteholders' ability to object to

---

[10]     Additionally, the Second Lien Intercreditor Agreement explicitly acknowledges that the Term Loan Credit Agreement permits the Debtors to incur certain revolving credit facilities in the future and allows for the obligations under such facilities to be secured on an equal and ratable basis as the loans extended under the Term Loan Facility.

28

the use of cash collateral or debtor in possession financing under sections 363 or 364 of the Bankruptcy Code consented to or provided by one or more of the Existing Lenders; and (d) the extent to which the Noteholders may be entitled to request adequate protection during a bankruptcy proceeding.

34.    Specifically, in the event of a bankruptcy proceeding, the Noteholders have agreed, subject to certain exceptions, not to object to use of Cash Collateral permitted by the Existing Lenders and to subordinate their liens in the Collateral (as defined in the Second Lien Intercreditor Agreement) to secure postpetition financing consented to or provided by one or more of the Existing Lenders. Specifically, section 6.1 of the Intercreditor Agreement provides that:[11]

> Until the Discharge of First Lien Obligations[12] has occurred, if the Company or any other Pledgor Party shall be subject to any Insolvency or Liquidation Proceeding and the [Term Loan Agent] shall desire to permit the use of cash collateral (other than the Notes Separate Collateral) on which the [Term Loan Agent] or any other creditor has a Lien or to permit the Company or any other Pledgor Party to obtain financing, whether from the First Lien Secured Parties[13] or any other entity, under Section 363 or Section 364 of Title 11 of the United States Code or any similar Bankruptcy Law, then the [Second Lien Notes Indenture Trustee], on behalf of itself and the [Noteholders], agrees that it will
>
> (a) raise no objection to such use of cash collateral (other than the Notes Separate Collateral) or DIP Financing; provided (a) that the [Noteholders] are granted the right to seek adequate protection, and if such adequate

---

[11]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Second Lien Intercreditor Agreement.

[12]  Pursuant to the Second Lien Intercreditor Agreement, this term is defined to mean "the Secured Obligations (as defined in the First Lien Credit Agreement) and any Revolving Credit Obligations (as defined in the First Lien Security Documents); provided that the aggregate principal amount of loans and letters of credit constituting First Lien Obligations shall not exceed the amount of loans and letters of credit permitted under the [Indenture]." Second Lien Intercreditor Agreement, § 1.1.

[13]  Pursuant to the Second Lien Intercreditor Agreement, this term is defined to mean ""at any relevant time, the holders of First Lien Obligations at such time, including without limitation the First Lien Lenders and the agents under the First Lien Credit Agreement." Second Lien Intercreditor Agreement, § 1.1.

PHIL1 2707478v.1

protection is not granted, [Second Lien Notes Indenture Trustee] may object to such DIP Financing, or as permitted in Section 6.3 hereof,

(b) agrees that notice received two calendar days prior to the entry of an order approving such usage of such cash collateral or approving such financing shall be adequate notice,

(c) with respect to any DIP Financing the [Second Lien Notes Indenture Trustee] and [Noteholders] may object to any DIP Financing when the interest rate, advances rates, lending limits and sublimits are not, as reasonably determined by the [Term Loan Agent], commercially reasonable under the circumstances and

(d) to the extent the Liens securing the First Lien Obligations are subordinated or pari passu with such DIP Financing, the [Second Lien Notes Indenture Trustee] will subordinate its Liens in the Collateral to (x) the Liens securing such DIP Financing (and all obligations relating thereto), (y) any adequate protection provided to the [Term Loan Agent] or the First Lien Secured Parties or (z) any "carve-out" agreed by the [Term Loan Agent] or First Lien Secured Parties.

*See* Second Lien Intercreditor Agreement, § 6.1.

35.    Additionally, section 6.3 of the Second Lien Intercreditor Agreement provides that "if the First Lien Secured Parties (or any subset thereof) are granted adequate protection in the form of additional collateral in connection with any DIP Financing, then the [Second Lien Notes Indenture Trustee], on behalf of itself or any of the [Noteholders], may seek or request adequate protection in the form of a Lien on such additional collateral, which Lien will be subordinated to the Liens securing the First Lien Obligations and such DIP Financing (and all obligations relating thereto) on the same basis as the other Liens securing the Second Lien Obligations are so subordinated to the First Lien Obligations under [the Second Lien Intercreditor Agreement]."

**B.     Incremental Financing**

**5.     Term Loan Facility Amendment**

36.     On May 3, 2012, Revel AC entered into amendments to the Term Loan Facility.
The amendments to the Term Loan Facility provided for (a) an additional $50 million of term
loan commitments that was borrowed and (b) amendments and waivers to certain provisions of
the Term Loan Credit Agreement to allow for additional project costs, which were expected to be
funded in part by such term loans. The term loans funded under these commitments bear interest
at the same interest rate applicable to the original term loans, mature at the same date as the
original term loans, and amortize at the same rate as the original term loans.

**6.     2012 Credit Agreement**

37.     Also on May 3, 2012, Revel AC, as borrower, J.P. Morgan Securities, as sole lead
arranger and sole bookrunner, JPMorgan, as administrative and collateral agent (the "2012
Agent"), and the lenders party thereto (collectively, the "2012 Lenders," and together with the
Existing Lenders and the Noteholders, the "Prepetition Secured Lenders") entered into a
revolving credit facility (as amended to date, and as it may hereafter be amended, supplemented
or modified from time to time, the "2012 Credit Agreement"), which, as amended, permits up to
$125 million in revolving loan commitments (the "Revolver"). The revolving loans under the
Revolver bear interest at a rate per annum which, at Revel AC's option, can be either: (a) a base
rate (subject to a floor of 2%) plus a margin of 6.50%; or (b) the Eurodollar rate (subject to a
floor of 1%) plus a margin of 7.50%. The Revolver also carries an unused line fee of 400 basis
points. In addition, the 2012 Credit Agreement includes a $125 million term loan (the "2012
Term Loan"). The term loans under the 2012 Term Loan bear interest at a rate per annum which,
at Revel AC's option, can be either: (a) a base rate (subject to a floor of 2%) plus a margin of
8.00%; or (b) the Eurodollar rate (subject to a floor of 1%) plus a margin of 9.00%. All

31

borrowings under the 2012 Credit Agreement are required to be repaid by May 22, 2015, and the obligations under the 2012 Credit Agreement are guaranteed by Revel AC's wholly owned subsidiaries other than SI LLC, an unrestricted subsidiary under the 2012 Credit Agreement. Revel AC's obligations under the 2012 Credit Agreement and the guarantees thereof are generally secured by a first priority or "first out" security interest in substantially all of the Debtors' assets (other than funds constituting proceeds of the Term Loan Facility and the Second Lien Notes), subject to certain exceptions set forth in the definitive documentation for the 2012 Credit Agreement. Proceeds of the 2012 Credit Facility have been used to repay outstanding revolving loans and to fund the construction of amenities at the resort, including a new "high limit slot ultra-lounge" and an expanded players' club and eatery options.

38.     As of March 13, 2013, the aggregate outstanding principal amount under the 2012 Credit Agreement was approximately $192 million, which amounts may increase due to additional revolving loan borrowings, the issuance of letters of credit, and/or accrual of interest thereon (in addition to accrued and unpaid fees and interest as of March 13, 2013, in the amount of $950,054.08).

**III.     Initial Operations**

39.     The Debtors' initially hoped that Revel's opening would pull the Atlantic City casino industry out of the five-year slump created by a sluggish economy and competition from casinos in surrounding states. After opening its doors on April 2, 2012, however, the Debtors incurred gross operating losses of $35 million and $37 million in the second and third quarters of 2012, respectively. As a result, in August 2012, Moody's Investor Services ("Moody's") and Standard and Poor's ("S&P") downgraded the Debtors' credit to Caa2 and CCC, respectively, basing their decisions on the belief that the Debtors' revenues and earnings were significantly

32

below the rate necessary for the Debtors to maintain an adequate level of liquidity and support their debt burden.

40.     On August 20, 2012, the Debtors requested that the lenders under the 2012 Credit Agreement increase the commitments under the Revolver in order for Revel to continue operations, which such lenders provided on August 22, 2012. Unfortunately, shortly after obtaining this new credit, Revel was forced to close for six days, from October 28, 2012 to November 3, 2012 due to Superstorm Sandy.

41.     In November 2012, New Jersey casino officials warned federal regulators about the Debtors' growing debt load of more than $1.4 billion, which they believed could lead to bankruptcy or foreclosure if revenues did not increase in the foreseeable future. Atlantic City officials noted that the Debtors owed $12 million in unpaid property taxes, and approximately $51 million to contractors. In an effort to obtain liquidity to operate, on December 27, 2012, the Debtors sought and received an additional $150 million from their lenders through an amendment to the 2012 Credit Agreement. As noted above, these new funds included a $125 term million term loan and a $25 million increase to an existing $100 million revolving loan. With this new liquidity, the Debtors had sufficient proceeds to (a) satisfy their property tax obligations to Atlantic City, (b) broaden and expand a number of critical casino amenities, and (c) add lower-priced and quick serve restaurants.

42.     Despite these further extensions of credit, in early 2013, Moody's and S&P further downgraded the Debtors' credit rating to Caa3 and CC, respectively, based on concerns regarding whether the Debtors would have enough revenue to service its indebtedness obligations.

33

43.     In January 2013, the Debtors earned slightly less than $8 million in gaming revenue.  The January earnings results constituted a drop of 19% from December and marked the second worst month of revenues in Revel's nine-month history.  Furthermore, for fiscal year 2012, the Debtors' earnings before interest, taxes, depreciation and amortization was ($111.1 million), and the Debtors did not have the capacity to service their $1.5 billion in outstanding debt.

44.     On February 17, 2013, the Debtors' board of directors authorized the Debtors to appoint Dennis E. Stogsdill of Alvarez & Marsal North America, LLC (A&M), the Companies' restructuring advisor, as Chief Restructuring Officer of the Debtors, subject to regulatory approval.  Such regulatory approval was granted as of February 22, 2013.

45.     On March 13, 2013, the Debtors announced that they had appointed Jeffrey Hartmann as Revel AC's Interim Chief Executive Officer, subject to regulatory approval.  Mr. Hartmann, a veteran of the gaming, hospitality and leisure industries for more than 20 years, possesses a solid understanding of the Debtors' business, having worked with the Debtors on a consultancy basis since the beginning of 2013.  On March 19, 2013, the New Jersey Casino Control Commission approved Mr. Hartmann's appointment as Interim Chief Executive Officer of the Debtors.

## IV.    The Debtors' Marketing Efforts for Postpetition Financing[14]

### A.     Prepetition Negotiations with Lenders

46.     As discussed above, the Debtors' financial and operational challenges created a "perfect storm" that the Debtors were unable to weather.  Recognizing these challenges at the

---

[14]   This subsection describes the Debtors' efforts to obtain financing, the basis on which the Debtors determined that the proposed financing is on the best terms available, and the material facts bearing on the issue of whether the credit is being extended in good faith.

outset, throughout 2012, the Debtors commenced negotiations with their secured lenders to obtain incremental extensions of credit to enable the Debtors to finalize the build-out of Revel, expand the casino amenities, and provide liquidity until the Debtors could achieve normalized operations. Despite these efforts, the Debtors have not generated sufficient revenues to meet their ongoing and substantial debt obligations.

47.    As described in the Klein Declaration, in early 2013, the Debtors retained A&M, Kirkland & Ellis LLP ("Kirkland"), and Moelis & Company ("Moelis," and collectively with Kirkland and A&M, the "Advisors") as their strategic, legal, and financial advisors, respectively, to assist with their evaluation of strategic alternatives, including a potential restructuring transaction. In the months leading up to the Petition Date, the Debtors worked closely with their Advisors to explore the capital markets, as well as explore options with the Debtors' current lenders, in an effort to refinance and/or restructure the Debtors' prepetition debt obligations. For several months, the Debtors and their Advisors devoted their efforts to identifying and considering potential transactions that would allow the Debtors to (a) refinance their prepetition debt obligations, (b) amend and extend their various prepetition credit agreements, and/or (c) obtain external or third party debtor-in-possession financing in the event that the Debtors determined to commence cases under chapter 11 of the Bankruptcy Code. Klein Declaration, ¶ 10-11.

48.    As the Debtors and their Advisors engaged potential sources of financing, they learned that the potential lender universe was drastically limited by the fact that the Debtors' assets were heavily encumbered (with multiple tranches of secured debt obligations) and the Debtors' balance sheet was substantially overleveraged. Further, any external financing may have required certain consents from the Debtors' prepetition secured lenders as a condition to

35

effectiveness (if advanced outside chapter 11), or would have resulted in a contested and costly priming fight (if advanced inside chapter 11).

49.     After duly considering other potential sources of financing, the Debtors, upon consultation and advice from their Advisors, determined that a financing package from their current lenders was far and away the most viable—if not only—alternative. Accordingly, the Debtors and their Advisors entered into extensive, arm's-length negotiations with a steering committee of their key creditors (the "Steering Committee"), the Term Loan Agent, and their respective advisors regarding the terms of a potential restructuring of the Debtors' obligations under the prepetition credit facilities and the Indenture. As negotiations progressed, however, the Debtors quickly learned that their current lenders were either no longer willing to provide credit to the Debtors or no longer amenable to further advances of credit in the absence of a comprehensive balance sheet restructuring.

### B.    The Restructuring Support Agreement and the DIP Financing

50.     In response to the Debtors' depressed financial performance and declining financial condition, and after thoroughly evaluating their options and the limited sources of financing available, the Debtors determined that it was in the best interests of the business to agree to terms for a comprehensive restructuring to be effectuated through the commencement of cases under chapter 11 of the Bankruptcy Code. To that end, in the weeks leading up to the commencement of these chapter 11 cases, the Debtors and their Advisors engaged in weeks of good faith negotiations with their key creditor constituencies regarding the terms and structure of a potential restructuring of the Debtors' funded debt obligations and the advancement of postpetition DIP Financing.

51.     These negotiations proved successful and culminated in the execution of the Restructuring Support Agreement, which embodies an agreement between the Debtors and the

Consenting Debtholders with respect to the terms of a potential chapter 11 plan of reorganization and postpetition DIP Financing package and post-emergence exit facility. The Debtors announced that they had reached this agreement with their Consenting Debtholders through a press release dated as of February 19, 2013.

52.     To the extent any 2012 Credit Agreement lenders do not ratably participate as DIP Lenders, such 2012 Credit Agreement lenders will only be repaid by the proceeds of the Second Lien Exit Facility (as defined in the Joint Prepackaged Plan). The Debtors and their Advisors believe that the DIP Facility is the best financing alternative available to the Debtors, as it provides sufficient liquidity to maintain operations up to the Debtors' peak business season in an attractive financing package with market terms comparable to those in similar debtor-in-possession financing packages. Klein Declaration, ¶ 16-18, 21. Additionally, after carefully and diligently considering the Debtors' liquidity needs, the Debtors, upon consultation with their Advisors, have determined that the budget set forth in the DIP Financing will adequately allow the Debtors to operate throughout the pendency of these chapter 11 cases. Finally, the Debtors are confident the proposed DIP Financing has been extended in good faith. The Debtors have extensive experience with the DIP Lenders and the DIP Lenders have consistently supported the Debtors' business through its construction and development and have a demonstrated interest in the Debtors' success.

53.     Furthermore, the Restructuring Support Agreement also sets forth a proposed restructuring of the Debtors' other debt obligations. The Existing Lenders, who hold approximately $923 million in loans outstanding under the Term Loan Credit Agreement, will receive 100% of new common equity of the Debtors, which will be issued in connection with a debt-for-equity exchange in full and final satisfaction of such Existing Lenders' claims, liens,

and rights under the Term Loan Credit Agreement (subject to dilution by the Management

Incentive Plan and pursuant to the terms of a New Stockholders Agreement Term Sheet (both as

defined in the Joint Prepackaged Plan). Additionally, in full and final satisfaction of the

approximately $388 million in outstanding obligations under the Second Lien Notes, the

Noteholders will receive their pro rata share of contingent rights to the payment of any ERG

Proceeds that are remitted to the ERG Pledged Account, up to an aggregate amount of $70

million, in accordance with the terms and conditions set forth in a Contingent Payment Rights

Term Sheet (all as defined in the Joint Prepackaged Plan) and the ERG Agreement.[15]

###    C.    The Exit Facilities

54.    In an effort to restructure and right-size the Debtors' balance sheet, the Joint

Prepackaged Plan and the *Disclosure Statement for the Joint Plan of Reorganization of Revel

AC, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the

"Disclosure Statement") contemplate (a) a first lien exit facility comprised of a revolving credit

facility in the amount of approximately $75 million with availability as of the Effective Date

sufficient to pay transaction expenses, provide the Debtors with working capital to run their

business, and fund certain capital expenditures (the "First Lien Exit Facility") and (b) a second

lien exit facility comprised of term loans in the aggregate amount of approximately $260 million,

the proceeds of which will be used to pay transaction expenses and repay the DIP facility in full

in cash (the "Second Lien Exit Facility," and together with the First Lien Exit Facility, the "Exit

Facilities").

55.    To ensure that the Exit Facilities are fully subscribed and the necessary funds will

be advanced to the Debtors upon emergence from chapter 11, the Debtors have requested that

---

[15]    All Warrants will be extinguished and existing Warrant Holders will not receive or retain on account of such interests any property under the Joint Prepackaged Plan.

J.P. Morgan Securities agree to continue structuring, arranging, and syndicating the Exit Facilities.[16] To this end, subject to the Court's approval for the Debtors to enter into the Exit Facility Letters, J.P. Morgan Securities has agreed to continue using commercially reasonable efforts to assemble a syndicate of financial institutions to advance the funds that will comprise Exit Facilities.[17]

56.     The Exit Facility Letters memorialize the agreement between Revel AC, JPMorgan, and J.P. Morgan Securities. In addition to the arrangement and syndication services to be performed, the Exit Facility Engagement Letter provides for terms and conditions customary for similar engagements entered into under similar circumstances. Additionally, the Exit Facility Fee Letter, which the Debtors are seeking the Court's approval to file under seal, sets forth certain fees that are usual and customary for services of this type provided pursuant to the Exit Facility Engagement Letter.

57.     After consultation with their Advisers, the Debtors have determined that the contemplated Exit Facilities will provide sufficient liquidity to maintain the Debtors' operations upon emergence and have been appropriately structured such that the Debtors can satisfy their debt servicing obligations in the ordinary course of business. Furthermore, after carefully considering the proposed terms set forth in the Exit Facility Letters, the Debtors, upon consultation with their Advisors, have determined that such terms are reasonable and customary.

---

[16]  J.P. Morgan Securities commenced its syndication efforts before the Petition Date. The Exit Facility Engagement Letter expressly provides that its provisions shall apply, *mutatis mutandis*, to J.P. Morgan Securities' prepetition syndication efforts.

[17]  For the avoidance of doubt, the Exit Facilities to be arranged by J.P. Morgan Securities will not be provided on an underwritten basis.

### D.    Solicitation of the Joint Prepackaged Plan and the Commencement of these Chapter 11 Cases

58.    As noted above, the Debtors have determined that prolonged chapter 11 cases would severely and irreparably damage their ongoing business operations and threaten their viability as a going concern.

59.    To that end, the Debtors, in coordination and cooperation with the Consenting Debtholders, have sought to commence solicitation of the Joint Prepackaged Plan in advance of the commencement of these chapter 11 cases.

60.    On or about March 13, 2013, prior to the Petition Date and in accordance with the applicable provisions of the Bankruptcy Code, the Debtors caused a copy of the Joint Prepackaged Plan, Disclosure Statement, and accompanying ballots (collectively, the "Solicitation Package") to be delivered to the Holders of 2012 Credit Agreement Claims, Term Loan Credit Agreement Claims, and Second Lien Note Claims (each as defined in the Joint Prepackaged Plan).[18]    Furthermore, in an effort to effectuate a smooth and consensual proceeding, in the days leading up to the Petition Date, the Debtors and their lenders engaged in good faith discussions with the U.S. Trustee with respect to the nature and extent of the relief requested by this Motion and through the Debtors' Joint Prepackaged Plan.  As a result, the Debtors have tailored the relief sought in the interim period to comply with the U.S. Trustee's requests and will further seek to coordinate and cooperate with their stakeholders and the U.S. Trustee throughout the pendency of these prepackaged chapter 11 cases.

61.    The prepackaged nature of the Joint Prepackaged Plan allows the Debtors to exit chapter 11 quickly, while the DIP Financing and the provisions of the Joint Prepackaged Plan

---

[18]    In connection with this Motion, and contemporaneously herewith, the Debtors have filed a motion seeking approval of the adequacy of the Disclosure Statement, approval of the Solicitation Package, and confirmation of the Joint Prepackaged Plan.

allow the Debtors to meet their working capital needs and de-lever their balance sheet. Furthermore, although the solicitation periods have yet to lapse, the Debtors have already received majority support from each of their credit constituencies entitled to vote to accept or reject the Joint Prepackaged Plan and have prudently commenced these chapter 11 cases now in order to facilitate a smooth and expeditious exit from chapter 11.

## Supporting Authority

**I.     The Debtors Should Be Authorized to Obtain Postpetition Financing through the DIP Documents**

### A.     Entering into the DIP Documents Is an Exercise of the Debtors' Sound and Reasonable Business Judgment

62.    The Court should authorize the Debtors, as an exercise of the Debtors' sound business judgment, to enter into the DIP Documents, obtain access to the DIP Facility, and to continue using the Cash Collateral.

63.    Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances as described in greater detail below. Provided that an agreement to obtain secured credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance with its sound business judgment in obtaining such credit. See, e.g., Trans World Airlines, Inc. v. Travellers Int'l AG (In re Trans World Airlines, Inc.), 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment."); In re Barbara K. Enters., Inc., No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest"); In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("Cases consistently reflect

41

that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); In re Farmland Indus., Inc., 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that approval of postpetition financing requires, inter alia, an exercise of "sound and reasonable business judgment"); see also Bray v. Shenandoah Fed. Sav. & Loan Assoc. (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986) (stating that "[t]he statute imposes no duty to seek from every possible lender before concluding that such credit is unavailable").

64.    Specifically, to determine whether the business judgment standard is met, a court is "required to examine whether a reasonable business person would make a similar decision under similar circumstances." In re Exide Techs., 340 B.R. 222, 239 (Bankr. D. Del. 2006); see also In re Curlew Valley Assocs., 14 B.R. 506, 513-14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code") (internal citation omitted).

65.    It is well-recognized that the appropriateness of a proposed postpetition financing facility must be considered in light of current market conditions. Indeed, courts often recognize that where there are few lenders likely, able, or willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom., Anchor Sav. Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); see also In re Garland Corp., 6 B.R. 456, 461 (B.A.P. 1st Cir. 1980) (secured credit under

42

section 364(c)(2) authorized, after notice and a hearing, upon showing that unsecured credit unobtainable); In re Stanley Hotel, Inc., 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); Ames, 115 B.R. at 37-40 (noting that a debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b) and holding that the debtor made reasonable efforts to satisfy the standards of section 364(c) where it approached four lending institutions, was rejected by two, and selected the most favorable of the two offers it received).

66.     Rather, a debtor must demonstrate that it made a reasonable effort to seek credit from other sources available under sections 364(a) and 364(b) of the Bankruptcy Code. See Snowshoe, 789 F.2d at 1088; see also In re Plabell Rubber Prods., Inc., 137 B.R. 897, 899-900 (Bankr. N.D. Ohio 1992).

67.     The Debtors' execution of the DIP Documents is an exercise of their sound business judgment that warrants approval by the Court. As discussed above and in the Klein Declaration, prior to the Petition Date, the Debtors and their Advisors undertook an analysis of the Debtors' projected financing needs during the pendency of these chapter 11 cases, and determined that the Debtors would require significant postpetition financing to support their operational and restructuring activities. Further, the Debtors' ability to pay their employees, vendor, and suppliers, and accommodate their customers and patrons, in the ordinary is dependent upon their having access to sufficient liquidity to seamlessly continue their operations. Accordingly, the Debtors negotiated the DIP Documents with the DIP Lenders in good faith, at arm's-length, and with the assistance of their Advisors, to obtain the required postpetition financing on the best terms favorable to the Debtors. Based on the advice of their Advisors, and

the Debtors' own analysis, the Debtors have determined in their sound business judgment that the DIP Documents provide a sufficient amount of financing on more favorable terms than any other reasonably available alternative. As discussed in the Klein Declaration, the Debtors' Advisors have widely canvassed the market to find interested parties to participate in the DIP Financing and have assisted the Debtors in negotiations with their prepetition lenders to obtain the best terms available with respect to the DIP Agreement.

68. Specifically, as noted above, the DIP Facility will provide the Debtors with access to an aggregate amount of $250 million after entry of the Final DIP Order, which the Debtors and their Advisors have independently determined should be sufficient to continue the Debtors' ongoing operations and reorganization activities through the pendency of these chapter 11 cases. Additionally, the DIP Agreement provides for fees in addition to those already set forth in the 2012 Credit Agreement (other than the DIP Agent Fee, which is paid in substitution of the annual 2013 agent fee due under the 2012 Credit Agreement). Finally, the DIP Documents provide the Debtors with access to the Cash Collateral, which relieves the Debtors of the cost of borrowing additional amounts to replace that cash.

### 1.    The Roll-Up of Obligations under the 2012 Credit Agreement is Appropriate

69. As discussed above, the DIP Loans provided by the proposed DIP Facility will be used, in part, to refinance the Debtors' outstanding obligations under the 2012 Credit Agreement over time during the interim period. Indeed, the DIP Lenders were only willing to extend postpetition financing to the Debtors on the condition that proceeds of the DIP Facility would be used to roll-up the obligations outstanding under the 2012 Credit Agreement. As discussed in the Klein Declaration, the DIP Facility was the only postpetition financing available to the Debtors given their substantial amount of secured debt and lack of unencumbered assets.

70.     In carefully considering the proposed DIP Agreement, the Debtors determined that this transactional structure would enable them to avoid costly intercreditor disputes and an unnecessary—and likely futile—priming fight, as well as avoid the accrual of interest payments under the 2012 Credit Agreement (potentially at default rates) pursuant to § 506(b) of the Bankruptcy Code. Furthermore, the proposed roll-up would not prejudice the Debtors' estates because it merely replaces one first-out senior secured credit facility with another and provides approximately $40 million in new funds which will enable the Debtors to smoothly navigate the chapter 11 process. The DIP Facility will provide critical working capital necessary to cover the costs of administering these chapter 11 cases and carrying the Debtors safely into their peak summer season.

71.     Courts in this jurisdiction and others have approved financing facilities that, like the DIP Facility proposed herein, provide for the roll-up of prepetition financing facilities. See, e.g., In re The Newark Group, No. 10-27694 (Bankr. D. N.J. June 10, 2010) (approving debtor-in-possession financing consisting of (a) $50 million revolving loan (used to pay in full $42.1 million outstanding under the existing prepetition credit facility) and (b) $110 million term loan (used to pay in full $73.6 million outstanding under separate prepetition credit facility)); see also In re School Specialty, Inc., No. 13-10125 (Bankr. D. Del. Jan. 31, 2013) (approving $155 million debtor-in-possession financing consisting of $60 million in new money funding); In re Daffy's, Inc., No. 12-13312 (Bankr. S.D.N.Y. Aug. 2, 2012) (approving $10 million debtor-in-possession financing consisting of $2.5 million in new money funding); In re NEC Holdings, Corp., No. 10-11890 (Bankr. D. Del. June 11, 2010) (approving debtor-in-possession financing consisting of a $138.96 million loan, used in part to roll-up $109.64 of prepetition debt, which consisted of (a) $70.6 million due under a prepetition revolver and (b) $39.04 million due under

45

a prepetition term loan); In re Uno Rest. Holdings Corp., No. 10-10209 (Bankr. S.D.N.Y. Jan. 20, 2010) (approving debtor-in-possession financing consisting of a $52 million credit facility composed of (a) up to $25 million in revolving commitments and (b) up to $27 million in term loan commitments used, in part, to roll-up approximately $33.9 million due under a prepetition credit facility); In re The Walking Co., No. 09-15138 (Bankr. C.D. Cal. Dec. 16, 2009) (approving debtor-in-possession financing consisting of a $30 million credit facility used, in part, to pay down approximately $25 million due under a prepetition credit facility); In re Dayton Superior Corp., No. 09-11351 (Bankr. D. Del. Apr. 21, 2009) (approving debtor-in-possession financing consisting of a $165 million credit facility used, in part, to roll-up approximately $102 million due under a prepetition revolving credit facility and outstanding letters of credit under that facility); In re Pacific Energy Res., Ltd., No. 09-10785 (Bankr. D. Del. Mar. 10, 2009) (approving debtor-in-possession financing consisting of a $183 million loan used, in part, to roll-up approximately $142.7 in debt due under a prepetition facility and first lien loan); In re Ritz Camera Ctrs. Inc., No. 09-10617 (Bankr. D. Del. Feb. 25, 2009) (approving debtor-in-possession financing consisting of a $85 million loan used, in part, to roll-up $54.53 million due under a prepetition revolver); In re Tronox Inc., No. 09-10156 (Bankr. S.D.N.Y. Jan. 13, 2009) (approving debtor-in-possession financing consisting of a $125 million credit facility used, in part, to roll-up approximately $79.5 million due under a prepetition credit agreement); In re Mervyn's Holdings LLC, No. 08-11586 (Bankr. D. Del. July 31, 2008) (approving debtor-in-possession financing consisting of a $465 million loan used, in part, to roll-up approximately $329.4 million due with respect to first-lien debt obligations); In re Holley Performance Prod., Inc., No. 08-10256 (Bankr. D. Del. Feb. 12, 2008) (approving debtor-in-possession financing consisting of $60 million credit facility used, in part, to roll-up $40.34 million due under a

prepetition credit agreement); In re Buffets Holdings, Inc., No. 08-10141 (Bankr. D. Del. Jan. 23,

2008) (approving debtor-in-possession financing consisting of an $85 million new money facility

and a $300 million roll-over facility providing for roll-up and conversion of up to $300 million

of prepetition obligations into postpetition debt under the debtor-in-possession credit

agreement).[19]    Accordingly, the Debtors submit that the roll-up of the 2012 Credit Agreement

contemplated herein is appropriate under the circumstances.

### 2.    The Roll-Up of Existing Letters of Credit is Appropriate

72.    The DIP Agreement and the proposed Interim DIP Order contemplate a roll-up of

the Existing Letters of Credit issued and outstanding under the 2012 Credit Agreement.

Conversion of the Existing Letters of Credit into postpetition obligations is appropriate under the

circumstances.  The DIP Lenders would not have agreed to renew the Existing Letters of Credit

upon their maturity postpetition unless such renewals were entitled to additional protections as

postpetition obligations.  Thus, absent the roll-up of the Existing Letters of Credit, the Debtors

would have required additional capacity under the DIP Agreement to maintain letters of credit

necessary to the Debtors' businesses and operations.  As a consequence of the roll-up, renewed

letters of credit will not diminish the DIP Facility, enhancing the Debtors liquidity.

73.    Courts have approved debtor-in-possession financing agreements containing

similar provisions providing for the roll-up of existing letters of credit. See, e.g., In re RDA

Holding Co., No. 13-22233 (Bankr. S.D.N.Y. Feb. 21, 2013); In re Daffy's, No. 12-13312

(Bankr. S.D.N.Y. Aug. 2, 2012); In re Patriot Coal Corp., No. 12-12900 (Bankr. S.D.N.Y. July

11, 2012); In re Aleris Int'l, Inc., No. 09-10478 (Bankr. D. Del. Feb. 13, 2009); In re U.S.

Concrete, Inc., No 10-11407 (Bankr. D. Del. Apr. 30, 2010); In re Dayton Superior Corp., No.

---

[19]    Because of the voluminous nature of the orders cited herein, such orders are not attached to this motion.  Copies
of these orders are available upon request to the Debtors' proposed counsel.

09-11351 (Bankr. D. Del. Apr. 21, 2009); In re Fomex Int'l Inc., No. 09-10560 (Bankr. D. Del.

Feb. 20, 2009); In re Tronox Inc., No. 09-10156 (Bankr. S.D.N.Y. Jan. 13, 2009); In re ACG

Holdings, No. 08-10890 (Bankr. D. Del. May 7, 2008). Accordingly, the Debtors submit that the

roll-up of Existing Letters of Credit is appropriate under the circumstances.

### 3.    The Scope of the Carve-Out is Appropriate

74.    The proposed DIP Facility subjects the security interests and administrative

expense claims of the DIP Lender, as well as the Adequate Protection Liens (as defined and

discussed below), to the Carve-Out. Similar carve-outs for professional fees have been found to

be reasonable and necessary to ensure that a debtor's estate and any statutory committee can

retain assistance from counsel. See Ames, 115 B.R. at 40. The DIP Facility does not directly or

indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers by

restricting the services for which professionals may be paid in these cases. See Ames, 115 B.R.

at 38 (observing that courts insist on carve-outs for professionals representing parties-in-interest

because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest

are sorely prejudiced"). Additionally, the Carve-Out protects against administrative insolvency

during the course of these chapter 11 cases by ensuring that assets remain for the payment of

professional fees of the Debtors and a committee of unsecured creditors, if any, notwithstanding

the grant of superpriority and administrative liens and claims under the DIP Facility.

75.    Importantly, the Carve-Out set forth in the Interim DIP Order (a) does not cause

disparate treatment with respect to the professionals retained by any Committee and the

professionals retained by the Debtors, (b) includes the fees of the U.S. Trustee and the reasonable

expenses of Committee members and any trustee appointed under section 726(b) of the

Bankruptcy Code, and (c) does not impair the ability of any party to object to such fees,

expenses, reimbursement or compensation. Additionally, while the proposed Carve-Out does not

include, apply to, or will available for any fees or expenses incurred by any party in connection

with the investigation of any claims against any of the DIP Lenders, DIP Agent, Prepetition

Secured Lenders, Term Loan Agent, or Second Lien Notes Indenture Trustee, it provides for an

Investigation Budget of up to $25,000 be utilized by any Committee, if one is appointed, to

investigate any such claims.  Courts in this jurisdiction have approved investigatory budgets

identical to that set forth in the Interim DIP Order.  See In re Wave2Wave Commc'n, No. 12-

13896 (Bankr. D.N.J. Mar. 19, 2012) (approving $25,000 investigatory budget); see also In re

Conexant Systems, Inc., No 13-10367 (Bankr. D. Del. Mar. 1, 2013) (same); In re School

Specialty, Inc., No. 13-10125 (Bankr. D. Del. Jan. 31, 2013) (same)

76.     Accordingly, the Debtors submit that the proposed Carve-Out comports with the

standard set forth in this Court's Local Rules.

### 4.     The Proposed Budget is Appropriate

77.     As described above, the Debtors' access to Cash Collateral and DIP Loans under

the DIP Facility will be subject to the Budget.

78.     After diligent consideration of all known circumstances, and upon consultation

with their Advisors, the Debtors believe, in their reasonable business judgment, that the proposed

Budget is achievable and will allow the Debtors to operate in chapter 11 without the accrual of

unpaid liabilities.   Furthermore, the Debtors believe that the Budget will be adequate,

considering all available assets, to pay all administrative expenses due or accruing during the

period covered by the DIP Facility and the Budget.  Accordingly, the Debtors submit that the

proposed Budget is appropriate.

### 5.     The Payment of Fees under the DIP Agreement is Appropriate

79.     The fees and charges to be paid to the DIP Lenders and DIP Agent, as expressly

provided for in the DIP Agreement, are reasonable and appropriate under the circumstances.  In

fact, the DIP Agreement imposes no fees above those already set forth in the 2012 Credit

Agreement (other than the DIP Agent Fee, which is paid in substitution of the annual 2013 agent

fee due under the 2012 Credit Agreement).

80.     Courts routinely authorize debtor-in-possession lenders to impose fees beyond the

explicit liens and rights specified in section 364 of the Bankruptcy Code. See In re Defender

Drug Stores, Inc., 145 B.R. 312, 316 (9th Cir. BAP 1992) (approving financing facility pursuant

to section 364 of the Bankruptcy Code that included a lender "enhancement fee").  Moreover,

such fees are often permitted where the associated financing is, in the debtor's business

judgment, beneficial to the debtors' estates.    See, e.g., In re Aleris Int'l. Inc., No. 09-10478

(Bankr. D. Del. Mar. 18, 2009) (approving a 3.5% front-end net adjustment against each lender's

initial commitment); In re Dura Auto. Sys., Inc., No. 06-11202 (Bankr. D. Del. Jan. 30, 2008)

(approving a 2.5% fee related to refinancing and extending a postpetition financing facility); see

also In re Great Atl. & Pac. Tea Co., No. 10 24549 (Bankr. S.D.N.Y. Jan. 11, 2011) (approving

3% letter of credit fee); In re InSight Health Services Holdings Corp., No. 10 16564 (AJG)

(Bankr. S.D.N.Y. Jan. 4, 2011) [Docket No. 105] (approving 2.5% DIP closing fee); In re Lear

Corp., No. 14326 (ALG) (Bankr. S.D.N.Y. August 4, 2009) (approving 5.0% up front fee and a

1.0% exit/conversion fee); In re Tronox Inc., No. 09-10156 (Bankr. S.D.N.Y. Feb. 9, 2009)

(approving an up-front 3% facility fee).

81.     Here, the DIP Lenders have opted to forgo a customary provision of debtor-in-

possession financing packages. Accordingly, the Court should authorize the Debtors to continue

to pay the DIP Agent Fee, the Revolving Commitment Fee, and the Letter of Credit Fee provided

under the 2012 Credit Agreement, as set forth above, in accordance with the terms and

conditions of the DIP Agreement. See DIP Agreement, §§ 1.01, 2.06.

50

**B.      The Debtors Should Be Authorized to Obtain Postpetition Financing Secured by First Priority Priming Liens**

82.      Pursuant to section 364(c) of the Bankruptcy Code, a court may authorize a debtor to incur debt that is: (a) entitled to a superpriority administrative expense status; (b) secured by a lien on otherwise unencumbered property; or (c) secured by a junior lien on encumbered property if the debtor cannot obtain postpetition credit on an unsecured basis, as an administrative expense priority or secured solely by junior liens on the debtor's assets. See 11 U.S.C. § 364(c).[20]   To satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986) ("The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable."); Pearl-Phil GMT (Far East) Ltd v. Caldor Corp., 266 B.R. 575, 584 (S.D.N.Y. 2001) (authorizing superpriority administrative expenses where debtor could not obtain credit as an administrative expense).

83.      In addition to authorizing financing under section 364(c) of the Bankruptcy Code, courts also may authorize a debtor to obtain postpetition credit secured by a lien that is senior or equal in priority to existing liens on the encumbered property, without the consent of the existing

---

[20]    Specifically, section 364(c) of the Bankruptcy Code provides, in pertinent part, that:

> If the trustee [or debtor in possession] is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt - (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title; (2) secured by a junior lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S. C.§ 364(c).

51

lienholders, if the debtor cannot otherwise obtain such credit and the interests of existing lienholders are adequately protected. See 11 U.S.C. § 364(d)(1).

84.    When determining whether to authorize a debtor to obtain credit secured by a "priming" lien as authorized by section 364(d) of the Bankruptcy Code, courts focus on whether the transaction will enhance the value of the Debtors' assets. Courts consider a number of factors, including, without limitation:

> (a)    whether alternative financing is available on any other basis (i.e., whether any better offers, bids or timely proposals are before the court);
>
> (b)    whether the proposed financing is necessary to preserve estate assets and is necessary, essential and appropriate for continued operation of the debtors' business;
>
> (c)    whether the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtors and proposed lender(s); and
>
> (d)    whether the proposed financing agreement was negotiated in good faith and at arm's length and entry therein is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors.

See, e.g., Ames, 115 B.R. at 37–39; Bland v. Farmworker Creditors, 308 B.R. 109, 113-14 (S.D. Ga. 2003); Farmland Indus., 294 B.R. at 862–79, In re Lyondell Chem. Co., No. 09-10023 (Bankr. S.D.N.Y. Mar. 5, 2009); Barbara K. Enters., 2008 WL 2439649 at *10; see also 3 Alan N. Resnick & Henry J. Sommer, COLLIER ON BANKRUPTCY ¶ 364.04[1] (16th ed.). The DIP Documents satisfy each of these factors.

85.    First, as described above, the Debtors and their Advisors determined that the DIP Lenders offered the best option for obtaining the postpetition financing the Debtors require. The Debtors conducted arm's-length negotiations with the DIP Lenders regarding the terms of the DIP Facility, and those agreements reflect the most favorable terms on which the DIP Lenders

52

were willing to offer financing. The Debtors are not able to obtain financing secured by first priority priming liens—either from third party lenders or from any of the Debtors' other creditor constituencies—on equal or better terms from those offered by the DIP Lenders.

86.     Second, the Debtors need the funds to be provided under the DIP Facility to preserve the value of their estates for the benefit of all creditors and other parties in interest. Specifically, the Debtors need the funds to be provided under the DIP Facility to seamlessly maintain operations in the months leading up to their peak summer season. Absent the DIP Facility and use of the Cash Collateral, the Debtors will be unable to operate their business or prosecute these chapter 11 cases, and the their suppliers and vendors may refuse to provide the necessary goods and services necessary to operate Revel, thus irreparably impairing the Debtors' goodwill with customers and patrons at a time when such goodwill is critical. This could result in an immediate liquidity crisis and may force the Debtors to cease operations, which will destroy the Debtors' hopes of reorganizing and deteriorate significant going concern value. Providing the Debtors with the liquidity necessary to preserve their going concern value through the pendency of these chapter 11 cases is thus in the best interest of all stakeholders.

87.     Third, upon entry of the Final DIP Order, the DIP Facility will provide the Debtors with access to $250 million in postpetition financing, which the Debtors and their Advisors have independently determined is sufficient and, necessary to allow the Debtors to maintain their operations and their relationships with key constituents notwithstanding the commencement of these chapter 11 cases. The DIP Orders also provide the Debtors with continued use of the Cash Collateral, which will maintain the Debtors' ability to access liquidity in the same accounts as prior to the Petition Date, without the disruption or delay that would result if the Debtors were required to set aside that cash and re-fund their accounts with new

postpetition borrowings.[21]  Accordingly, the terms of the DIP Documents and the DIP Orders are

reasonable and adequate to support the Debtors' operations and restructuring activities through

the pendency of these chapter 11 cases.

88.    Fourth, as described in greater detail above and in the Klein Declaration, the

Debtors and the DIP Lenders negotiated the DIP Documents in good faith and at arm's-length,

and the Debtors' entry into the DIP Documents is an exercise of their sound business judgment

and is in the best interests of their estates, creditors, and other parties in interest.

## C.     The Interests of the Prepetition Secured Lenders Are Adequately Protected

89.    A debtor may obtain postpetition credit "secured by a senior or equal lien on

property of the estate that is subject to a lien only if" the debtor, among other things, provides

"adequate protection" to those parties whose liens are primed.  See 11 U.S.C. § 364(d)(1)(B).

What constitutes adequate protection is decided on a case-by-case basis, and adequate protection

may be provided in various forms, including payment of adequate protection fees, payment of

interest, or granting of replacement liens or administrative claims.  See, e.g., In re Tudor Motor

Lodge Associates, Ltd. P'ship, 102 B.R. 936, 953 (Bankr. D. N.J. 1989) ("[T]he concept of

adequate protection is . . . susceptible to differing applications over a wide range of factual

situations."); In re AGI Software, Inc., 199 B.R. 850, 860-61 (Bankr. D.N.J. 1995) (recognizing

that replacement liens and entitlement to an administrative expense are some examples of

adequate protection); In re Continental Airlines Inc., 154 B.R. 176, 180-181 (Bankr. D. Del.

1993); see also In re Mosello, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("the determination of

adequate protection is a fact-specific inquiry . . . left to the vagaries of each case"); In re Realty

---

[21]   The Debtors have filed a *Motion for Entry of Interim and Final Orders (A)  Authorizing (I) Continued Use of
the Existing Cash  Management System, (II) Maintenance  of Existing Bank Accounts, and (III) Continued Use
of Existing Business Forms, (B) Granting Administrative Priority Status to Post Petition Intercompany Claims,
and (C) Authorizing Continued Performance under Intercompany Arrangements and Historical Practices*
contemporaneously herewith.

Sw. Assocs., 140 B.R. 360 (Bankr. S.D.N.Y. 1992); In re Beker Indus. Corp., 58 B.R. 725, 736

(Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each

case, but its focus is protection of the secured creditor from diminution in the value of its

collateral during the reorganization process") (internal citation omitted).

90. Furthermore, courts have noted that the purpose of adequate protection is to

"preserve the secured creditor's position at the time of the bankruptcy." In re Dunes Casino

Hotel, 69 B.R. 784, 793 (Bankr. D.N.J. 1986); cf. In re Tudor Motor Lodge Assocs., Ltd. P'ship,

102 B.R. 936, 954 (Bankr. D.N.J. 1989) (considering adequate protection in the context of a

motion for relief from stay and noting that "adequate protection is meant to preserve the status

quo of the entity with an interest in the debtor's property during a reasonable length of time").

Additionally, adequate protection "is also grounded in the belief that secured creditors should not

be deprived of the benefit of their bargain." In re Dispirito, 371 B.R. 695, 698 (Bankr. D.N.J.

2007) (internal citations omitted). Indeed, "[t]he Congressional purpose of this [adequate

protection] is to ensure that the secured creditor receives in value essentially what he bargained

for." In re Nashua Trust Co., 73 B.R. 423, 430 (Bankr. D. N.J. 1987) (internal quotations

omitted). That determination of value, which is "intended to have broad scope in the context of

providing adequate protection," must be "left to case-by-case interpretation and development . . .

in light of facts of each case and general equitable principles." Id. (citing H.R.Rep. No. 595 at

339, 1978 U.S. Code Cong. & Ad. News at 6295).

91. The Debtors have offered—and the vast majority of their lenders have

affirmatively accepted—a fair and reasonable adequate protection package to the Prepetition

Secured Lenders. As noted above, the Prepetition Secured Lenders shall receive the Adequate

Protection Liens and the Prepetition Debt Adequate Protection Claim (together, the "Adequate

Protection") as adequate protection for the diminution in value of the Prepetition Collateral. Such Adequate Protection will be for the benefit of the 2012 Agent and the 2012 Lenders under the 2012 Credit Agreement, on a first-out senior basis, the Term Loan Agent and Existing Lenders under the Term Loan Credit Agreement, on a senior basis, and the Second Lien Notes Indenture Trustee and Noteholders under the Indenture, on a junior basis, in accordance with the priorities as among such Prepetition Secured Lenders as were in effect on the Petition Date pursuant to the Intercreditor Agreement.

92.     The Adequate Protection summarized above and set forth in the DIP Orders is fair and reasonable, and is sufficient to satisfy the requirements of section 364(d)(1)(B) of the Bankruptcy Code. An overwhelming majority of the Existing Lenders have voted to accept the Joint Prepackaged Plan (and were party to the Restructuring Support Agreement), through which the Existing Lenders will become the residual owners of the Debtors' business enterprise. Additionally, the Term Loan Agent has consented to the Adequate Protection contemplated herein through its execution of the Restructuring Support Agreement.

93.     With respect to the Noteholders, the Adequate Protection contemplated herein is consistent with the pertinent provisions of the Second Lien Intercreditor Agreement, and offers the Noteholders greater protection than that which is provided therein. Specifically, section 6.3 of the Second Lien Intercreditor Agreement provides the Noteholders with a lien on any additional collateral subordinate to the liens of the Term Loan Agent and 2012 Agent. The Debtors' financial condition has rendered them devoid of unencumbered collateral to offer their Prepetition Secured Lenders. As an alternative, the Debtors submit that the Adequate Protection Liens and Prepetition Debt Adequate Protection Claim—both of which courts have independently been deemed adequate protection—serve to adequately protect the Noteholders'

interests throughout the short duration of these prepackaged chapter 11 cases. Additionally, because the terms of the DIP Agreement and the Joint Prepackaged Plan do not disturb the Noteholders' first priority lien on the ERG Proceeds, the Debtors submit that the economic value of the Noteholders' Prepetition Collateral is preserved.[22]    As a result, the Adequate Protection proposed herein will not deprive the Noteholders of the "benefit of their bargain" within the meaning of this Court's jurisprudence. See Dispirito, 371 B.R. at 698. Rather, they stand to receive in value essentially what they bargained for. Accordingly, the Court should find that the Adequate Protection is fair and reasonable and satisfies the requirements of section 364(d)(1)(B) of the Bankruptcy Code.

94.    Furthermore, it is well-settled in this this jurisdiction and others that intercreditor agreements are enforceable. See In re TCI 2 Holdings, LLC, 428 B.R. 117, 140 (Bankr. D.N.J. 2010) (finding section 510 provides that a "subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law"); In re Elec. Components Int'l, Inc., No. 10-11054, 2010 WL 66347116, at *8 (Bankr. D. Del. Apr. 27, 2010) (finding an "intercreditor agreement constitutes a 'subordination agreement' under section 510 and is enforceable on its terms"); In re Curtis Ctr. Ltd. P'ship, 192 B.R. 648, 660 (Bankr. E.D. Pa. 1996) (finding "the language of the subordination agreement is plain and unambiguous. The terms of this pre-petition agreement are fully enforceable in this Bankruptcy case pursuant to 11 U.S.C. § 510(a)"); see also In re Boston Generating, LLC, 440 B.R. 302, 318 (Bankr. S.D.N.Y. 2010) (finding an "[i]ntercreditor [a]greement is an enforceable agreement under section 510(a) of the Bankruptcy Code to the extent that it is a subordination agreement"); In re Erickson Retirement Cmty, LLC, 425 B.R.

---

[22]    Indeed, the Intercreditor Agreement explicitly subordinates the Noteholders' lien in the Debtors' other assets to the liens of the Existing Lenders and a future revolving loan lien.

309, 314 (Bankr. N.D. Tex. 2010) (finding "subordination agreements are fully enforceable");

Ion Media Networks, Inc., 419 B.R. 585, 595 (Bankr. S.D.N.Y. 2009) (finding intercreditor

agreements are enforceable contracts under section 510(a) "and the Court will not disturb the

bargained-for rights and restrictions governing the second lien debt"); In re Aerosol Packaging,

LLC, 362 B.R. 43, 46 (Bankr. N.D. Ga. 2006) (finding that "unless the [s]ubordination

[a]greement is not enforceable under applicable nonbankruptcy law, the [s]ubordination

[a]greement should be enforced by its terms.").

## II.    The Debtors Should Be Authorized to Use the Cash Collateral

95.    Section 363(c) of the Bankruptcy Code restricts a debtor's use of a secured

creditor's cash collateral. Specifically, that provision provides, in pertinent part, that:

> The trustee may not use, sell, or lease cash collateral . . . unless—
>
> (A) each entity that has an interest in such cash collateral consents; or
>
> (B) the court, after notice and a hearing, authorizes such use, sale, or lease
> in accordance with the provisions of this section [363].

11 U.S.C. § 363(c)(2). Further, section 363(e) provides that "on request of an entity that has an

interest in property . . . proposed to be used, sold or leased, by the trustee, the court, with or

without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide

adequate protection of such interest." 11 U.S.C. § 363(e).

96.    The Debtors have satisfied the requirements of sections 363(c)(2) and (e), and

should be authorized to use the Cash Collateral.

97.    First, pursuant to the Restructuring Support Agreement, the Existing Lenders have

consented to the Debtors' use of the Cash Collateral. In addition, the Noteholders and the

Existing Lenders are deemed to consent to the use of the Cash Collateral according to the terms

of the Intercreditor Agreements. See First Lien Intercreditor Agreement at § 2.05(b); Second

Lien Intercreditor Agreement at § 6.2. As noted above, courts in this jurisdiction and others have generally held that intercreditor agreements are enforceable. See, e.g., TCI 2 Holdings, LLC, 428 B.R. at 140; Elec. Components Int'l, Inc., No. 10-11054, 2010 WL 66347116, at *8; Curtis Ctr. Ltd. P'ship, 192 B.R. at 660; see also Boston Generating, 440 B.R. at 318; Erickson Retirement Cmty, 425 B.R. at 314; Ion Media Networks, 419 B.R. at 595; Aerosol Packaging, 362 B.R. at 46.

98.    Second, even in the absence of consent, the Prepetition Secured Lenders' interests in the Cash Collateral are adequately protected in satisfaction of section 363(e) of the Bankruptcy Code.[23]  As described above, the Debtors are providing the Prepetition Secured Lenders with Adequate Protection, which is fair and reasonable, and adequately protects the Prepetition Secured Lenders' interests in the Prepetition Collateral from diminution caused by the DIP Facility, including by the Debtors' use of the Cash Collateral pursuant to the terms thereof. Accordingly, the Court should authorize the Debtors to use the Cash Collateral under section 363(c)(2) of the Bankruptcy Code. In addition, the Noteholders and Existing Lenders are prohibited from objecting to the use of Cash Collateral because the First Lien Lenders have consented to such use on the terms provided herein. See First Lien Intercreditor Agreement at § 2.05(b); Second Lien Intercreditor Agreement at § 6.1.

**III.    The DIP Lenders Should Be Deemed Good Faith Lenders under Section 364(e)**

99.    Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) provides that:

---

[23]    The Debtors are not aware of any entity other than the Debtors, the Revolver Lenders, and the Prepetition Secured Lenders that has or purports to have an interest in the Cash Collateral.

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

100. As explained in detail herein and in the First Day Declaration and the Klein Declaration, the DIP Documents are the result of the Debtors' reasonable and informed determination that the DIP Lenders offered the most favorable terms on which to obtain needed postpetition financing, and of extended arm's-length, good faith negotiations between the Debtors and the DIP Lenders. The terms and conditions of the DIP Documents are fair and reasonable, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code. Further, no consideration is being provided to any party to the DIP Documents other than as described herein. Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

## IV.    Modification of the Automatic Stay Is Warranted

101. The proposed Interim DIP Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the DIP Agent to exercise, upon the occurrence and during the continuation of any Event of Default, all rights and remedies provided for in the DIP Agreement, and to take various actions without further order of or application to the Court. However, the DIP Agent must provide the Debtors and various other parties, including the U.S. Trustee, with three business days notice

60

prior to exercising any enforcement rights or remedies in respect of the Collateral or upon a shorter period of time after notice and a hearing.

102.    Stay modification provisions of this sort are ordinary and usual features of DIP financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances.    Accordingly, the Court should modify the automatic stay to the extent contemplated by the DIP Agreement and the proposed DIP Orders.

**V.    Approval of the DIP Financing on an Interim Basis is Necessary to Prevent Immediate and Irreparable Harm**

103.    The Court may grant interim relief in respect of a motion filed pursuant to section 363(c) or 364 of the Bankruptcy Code where, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." FED. R. BANKR. P. 4001(b)(2), (c)(2).    In examining requests for interim relief under this rule, courts generally apply the same business judgment standard applicable to other business decisions. See Ames, 115 B.R. at 36.

104.    Bankruptcy Rule 4001(c)(2) governs the procedures for obtaining authorization to obtain postpetition financing and provides, in relevant part:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than [15] days after service of the motion.  If the motion so requests, the court may conduct a hearing before such [15] day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

105.    In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions. See, e.g., Ames Dep't Stores, 115 B.R. at 36; Simasko, 47 B.R. at 449.  Under this standard, the Debtors' request for entry of the DIP Orders, in the time periods and for the financing amounts requested herein, is appropriate.  Moreover, courts in this jurisdiction and others have granted similar relief in other

61

chapter 11 cases. See, e.g., In re The Newark Group, No. 10-27694 (Bankr. D.N.J. June 10, 2010); In re THCR/LP Corp., No. 04-46898 (Bankr. D.N.J. Nov. 22, 2004); see also In re Nebraska Book Co., No. 11-12005 (Bankr. D. Del. June 29, 2011); In re Corrozi-Fountainview, LLC, No. 10-11090 (Bankr. D. Del. June 6, 2011); In re Ambassadors Int'l, Inc., No. 11-11002 (Bankr. D. Del. Apr. 28, 2011); In re Appleseed's Intermediate Holdings LLC, No. 11-10160 (Bankr. D. Del. Feb. 23, 2011); In re Atrium Corp., No. 10-10105 (Bankr. D. Del. Mar. 17, 2010); In re The Majestic Star Casino, LLC, No. 09-14136 (Bankr. D. Del. Nov. 30, 2009); In re ACG Holdings, Inc., No. 08-11467 (Bankr. D. Del. Jul. 16, 2008); In re Hilex Poly Holding Co. LLC, No. 08-10890 (Bankr. D. Del. May 7, 2008); In re Holley Performance Prods. Inc., No. 08-10256 (Bankr. D. Del. Feb. 12, 2008); In re Remy Worldwide Holdings, Inc., No. 07-11481 (Bankr. D. Del. Oct. 10, 2007); In re Foamex Int'l Inc., No. 05-12685 (Bankr. D. Del. Sept. 20, 2005).

106.    The Debtors and their estates will suffer immediate and irreparable harm if the interim relief requested herein, including authorizing the Debtors to use the Cash Collateral and to borrow under the DIP Facility is not granted promptly after the Petition Date.  The Debtors lack a sufficient source of postpetition liquidity to support them into their peak season other than the DIP Facility.  To operate their business in the ordinary course, the Debtors require access to the DIP Facility to maintain operations during the pendency of these chapter 11 cases and provide the necessary working capital sufficient to support their business activities.  Moreover, absent approval of the DIP Financing, the Debtors would be forced to cease operations and incur the attendant deterioration of goodwill.  Access to the DIP Facility will instead allow the Debtors to send a signal to their employees, vendors, suppliers, customers, and patrons that the Debtors

are committed to maintaining their business operations in the ordinary course while they effectuate a financial restructuring with the support of their key creditor constituencies.

## VI.    The Debtors Should Be Authorized to Enter into the Exit Facility Letters

### A.    Entering into the Exit Facility Letters Is an Exercise of the Debtors' Sound and Reasonable Business Judgment

107.    The Court should authorize the Debtors, as an exercise of the Debtors' sound business judgment, to enter into the Exit Facility Letters.

108.    Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ." 11 U.S.C. § 363(b)(1).  The use, sale, or lease of property of the estate, other than in the ordinary course of business, is authorized in this jurisdiction when a "sound business purpose" justifies such action.  See In re Summit Global Logistics, Inc., 08-11566, 2008 WL 819934 (Bankr. D.N.J. Mar. 26, 2008); In re United Healthcare Sys., Inc., 97-1159 (NHP), 1997 WL 176574 (D.N.J. Mar. 26, 1997); see also In re Jasmine, Ltd., 258 B.R. 119, 123 (D.N.J. 2000) ("[A] court deciding whether to approve a settlement in bankruptcy relies heavily on the trustee, and under normal circumstances the court would defer to the trustee's judgment so long as there is a legitimate business justification.") (internal quotations omitted): In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (D. Del. 1999); In re Indus. Valley Refrig. & Air Cond. Supplies, 77 B.R. 15, 21 (Bankr. E.D. Pa. 1987).

109.    When a valid business justification exists, the law vests the debtor's decision to use property out of the ordinary course of business with a strong presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650,

656 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993). The business judgment rule

therefore shields a debtor's management from judicial second-guessing, and mandates that a

court approve a debtor's business decision unless that decision is a product of bad faith or gross

abuse of discretion. See Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc., 756 F.2d

1043, 1047 (4th Cir. 1985), cert. denied, 475 U.S. 1057 (1986).

110.    Courts have routinely authorized a debtor's entry into arrangement letters and the

incurrence of obligations in connection with exit financing on the basis of a debtor's reasonable

business judgment. See, e.g., In re OTC Holdings Corp., No. 10-12636 (Bankr. D. Del. Nov. 23,

2010) (approving payment of fees for arrangement of exit facility); In re AbitiBowater Inc., No.

09-11296 (Bankr. D. Del. Aug. 24, 2010) (authorized debtors to enter into, execute, deliver and

perform under exit financing agreements and all related documents and agreements thereto); In

re Smurfit-Stone Container Corp., No. 09-10235 (Bankr. D. Del. Jan. 14, 2010) (approving

arrangement fee and related arrangement letter for exit facility); In re Buffets Holdings, Inc., No.

08-10141 (Bankr. D. Del. Mar. 4, 2009) (approving engagement letter and fees for arranging of

exit facility); In re Sea Containers Ltd., No. 06-11156 (Bankr. D. Del. Nov. 20, 2007) (approving

payment of funds to potential exit lenders to cover costs of negotiation with potential additional

exit lenders); see also In re Pliant Corp., No. 06-10001 (Bankr. D. Del. May 5, 2006) (approving

diligence fees of potential exit lenders prior to commitment); In re Meridian Automotive

Systems - Composite Operations, Inc., No. 05-11168 (Bankr. D. Del. June 16, 2005) (same).

111.    Entry into and performance under the Exit Facility Letters are in the best interests

of the Debtors' estates and represents a sound exercise of the Debtors' business judgment. The

Exit Facility Letters are the product of good faith and arm's-length negotiations among the

Debtors, J.P. Morgan Securities, and JPMorgan, and the terms of the Exit Facility Letters are fair

and reasonable in light of the type of transaction and the size of the proposed financings and reflect market terms and conditions. Furthermore, the Exit Facilities contemplated by the Exit Facility Letters are a key component of the Debtors' emergence from chapter 11. Entry into the Exit Facility Letters will complete the process of securing the critical exit financing necessary for the Debtors to emerge from chapter 11 as contemplated under the Joint Prepackaged Plan.

112.    For these reasons, the Debtors respectfully submit that entering into the Exit Facility Letters is well within their business judgment and is in the best interests of the Debtors' estates and creditors.

## VII.    Authority to Enter into the Exit Facility Letters on an Interim Basis is Necessary to Prevent Immediate and Irreparable Harm

113.    As described above, the Debtors are seeking authority pursuant to this Motion to enter into the Exit Facility Letters during the first 21 days of these chapter 11 cases. Under Bankruptcy Rule 6003, the Court may authorize the Debtors to use property of the estate within the first 21 days of these chapter 11 cases to the extent such relief is necessary to avoid immediate and irreparable harm to the Debtors' estates. See FED. R. BANKR. P. 6003(b). Immediate and irreparable harm exists where the absence of relief would impair a debtor's ability to reorganize or threaten the debtor's future as a going concern. See In re Ames Dep't Stores, Inc., 115 B.R. 34, 36 n.2 (Bankr. S.D.N.Y. 1990) (discussing the elements of "immediate and irreparable harm" in relation to Bankruptcy Rule 4001).

114.    As described above, the Debtors' blueprint for a smooth and expeditious emergence from chapter 11 with the wherewithal to seamlessly continue operations post-emergence depends upon the Debtors' ability to obtain commitments from lenders willing to provide funding for the Exit Facilities as soon as possible. Moreover, the Debtors' execution and delivery of the Exit Facility Letters is an express condition to the effectiveness of the DIP

Agreement, as the DIP Financing and the Exit Facilities together represent an integrated financial package to support the Debtors through chapter 11 and upon their emergence from bankruptcy. Indeed, as noted above, the Restructuring Support Agreement is contingent upon the Court's entry of the Interim DIP Order no later than March 28, 2013. If the Debtors cannot achieve this milestone, the obligation of the Consenting Debtholders to support the restructuring of the Debtors pursuant to the Restructuring Support Agreement will expire. Accordingly, the Debtors respectfully submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and seek authority to enter into the Exit Facility Letters pursuant to the Interim Order.

### **Request for a Final Hearing**

115.    Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date, which is no sooner than 14 days after the date of this Motion and no later than 25 days after the Petition Date, to hold a hearing to consider entry of the Final DIP Order and the permanent approval of the relief requested in this Motion.[24] The Debtors also request authority to serve a copy of the signed Interim DIP Order, which fixes the time and date for the filing of objections, if any, to entry of the Final DIP Order, by first class mail upon the notice parties listed below, and further request that the Court deem service thereof sufficient notice of the hearing on the Final DIP Order under Bankruptcy Rule 4001(c)(2).

### **Waiver of Bankruptcy Rules Regarding Notice and Stay of an Order**

116.    To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and any stay of an order granting the relief requested herein pursuant to Bankruptcy Rules 6004(h), 7062, 9014, or otherwise.

---

[24]    The DIP Documents require that the Final DIP Order be entered no later than 25 days after the Petition Date.

PHIL1 2707478v.1

117.    As described above, any delay in the Debtors obtaining the relief requested herein may undermine the purpose of that relief—to provide the Debtors with the liquidity necessary to keep their business afloat throughout the pendency of these chapter 11 cases. Accordingly, the Court should waive the stay period provided for in Bankruptcy Rule 6004(h), and order that the Debtors are immediately authorized to enter inter the DIP Documents and access the DIP Facility as described in this Motion.

## Waiver of Memorandum of Law

118.    In accordance with Local Rule 9013-2, no brief is being filed in support of this Motion because the legal principles involved are not novel or in dispute and are adequately set forth in the Motion.

## Notice

119.    The Debtors have provided notice of this motion to: (a) the Office of the United States Trustee for the District of New Jersey; (b) the entities listed on the Consolidated List of Creditors Holding the 50 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) counsel to the administrative and collateral agent under the Debtors' 2011 term loan credit agreement, 2012 credit agreement and debtor in possession financing credit agreement; (d) the trustee under the Debtors' 2011 second lien notes indenture; (e) counsel to the steering committee of lenders under the Debtors' 2011 term loan credit agreement; (f) the Office of the Attorney General for the State of New Jersey; (g) the New Jersey Division of Gaming Enforcement; (h) the New Jersey Casino Control Commission, (i) the Office of the Governor for the State of New Jersey; (j) the United States Attorneys' Office for the District of New Jersey; (k) the United States Attorney General; (l) the Internal Revenue Service; and (m) the Securities and Exchange Commission. In light of the nature of the relief requested in this Motion, the Debtors respectfully submit that no further notice is necessary.

PHIL1 2707478v.1

## <u>No Prior Request</u>

120.    No prior motion for the relief requested herein has been made to this or any other court.

*[Remainder of page intentionally left blank.]*

PHIL1 2707478v.1

WHEREFORE, for the reasons set forth herein and in the First Day Declaration and the Klein Declaration, the Debtors respectfully request that the Court enter the DIP Orders as provided herein, granting the relief requested herein and other and further relief as may be appropriate.

Dated: March 25, 2013        /s/ Morton R. Branzburg
Camden, New Jersey      **KLEHR HARRISON HARVEY BRANZBURG LLP**
457 Haddonfield Road, Suite 510
Cherry Hill, New Jersey 08002
Telephone:    (215) 568-6060
Morton R. Branzburg (MB 7251)
Domenic E. Pacitti (DP 1792)
Carol Ann Slocum (CS 2818)

**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
James H.M. Sprayregen, P.C. (*pro hac vice* admission pending)
Marc Kieselstein, P.C. (*pro hac vice* admission pending)
Nicole L. Greenblatt (*pro hac vice* admission pending)

*Proposed Co-Counsel to the Debtors
and Debtors in Possession*