**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| | ) | Case No. 13-[_____] (___) |
| REVEL AC, INC., *et al.*,[1] | ) | |
| | ) | |
| | ) | |
| Debtors. | ) | Jointly Administered |

**JOINT PLAN OF REORGANIZATION OF REVEL AC, INC. AND ITS DEBTOR
AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

James H.M. Sprayregen, P.C. (*pro hac vice* admission pending)
Marc Kieselstein, P.C. (*pro hac vice* admission pending*)*
Nicole L. Greenblatt (*pro hac vice* admission pending*)*
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022-4611
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

-and-

Morton R. Branzburg (MB 7251)
Domenic E. Pacitti (DP 1792)
Carol Ann Slocum (CS 2818)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
457 Haddonfield Road, Suite 510
Cherry Hill, New Jersey 08002-2220
Telephone:      (215) 568-6060
Facsimile:      (856) 486-4875

*Proposed Co-Counsel to the Debtors
and Debtors in Possession*

Dated: March 13, 2013

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer identification number, are: Revel AC, Inc. (3856); Revel AC, LLC (4456); Revel Atlantic City, LLC (9513); Revel Entertainment Group, LLC (2321); and NB Acquisition LLC (9387).  The location of parent Debtor Revel AC, Inc.'s corporate headquarters and the Debtors' service address is:  550 Boardwalk, Atlantic City, New Jersey 08401.

K&E 25446293

**TABLE OF CONTENTS**

**Page**

ARTICLE I.  DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW .................................................................................... 1

    A.  Defined Terms. ................................................................................................... 1
    B.  Rules of Interpretation. .................................................................................... 11
    C.  Computation of Time. ...................................................................................... 11
    D.  Governing Law. ................................................................................................ 11
    E.  Reference to Monetary Figures. ...................................................................... 12
    F.  Reference to the Debtors or the Reorganized Debtors. ................................... 12

ARTICLE II.  ADMINISTRATIVE CLAIMS AND OTHER UNCLASSIFIED CLAIMS ........................... 12

    A.  Administrative Claims. ..................................................................................... 12
    B.  Priority Tax Claims. ......................................................................................... 13
    C.  Intercompany Interests. ................................................................................... 14
    D.  Statutory Fees. ................................................................................................. 14

ARTICLE III.  CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS .......................... 14

    A.  Classification of Claims and Interests. ........................................................... 14
    B.  Summary of Classification. ............................................................................. 14
    C.  Treatment of Claims and Interests. ................................................................. 15
    D.  Special Provision Governing Claims that are Not Impaired. .......................... 18
    E.  Elimination of Vacant Classes. ....................................................................... 18
    F.  Acceptance or Rejection of the Plan. ............................................................... 18
    G.  Confirmation Pursuant to Sections 1129(a) (10) and 1129(b) of the Bankruptcy Code. ........................................................................................... 18
    H.  Subordinated Claims. ...................................................................................... 18

ARTICLE IV.  MEANS FOR IMPLEMENTATION OF THE PLAN ......................................................... 19

    A.  Sources of Cash for Plan Distributions. ......................................................... 19
    B.  Exit Facilities. ................................................................................................. 19
    C.  Issuance and Distribution of New Equity Interests. ....................................... 19
    D.  Contingent Payment Rights ............................................................................ 20
    E.  Restructuring Transactions. ............................................................................ 21
    F.  Corporate Existence. ....................................................................................... 21
    G.  Vesting of Assets in the Reorganized Debtors. .............................................. 21
    H.  Cancellation of Existing Securities. ................................................................ 22
    I.  Corporate Action. ............................................................................................ 22
    J.  New Certificates of Incorporation and New By-Laws. ................................... 23
    K.  The Executive Transition Agreement. ............................................................ 23
    L.  Directors and Officers of the Reorganized Debtors and Reorganized Revel. .......... 24
    M.  Effectuating Documents; Further Transactions. ............................................. 24
    N.  Management Incentive Program. ..................................................................... 24
    O.  New Employment Agreements. ....................................................................... 24
    P.  Exemption from Certain Taxes and Fees. ....................................................... 24
    Q.  D&O Liability Insurance Policies. ................................................................... 25
    R.  Preservation of Causes of Action. ................................................................... 25

K&E 25446293

ARTICLE V.      TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES .................. 25

      A.    Assumption and Rejection of Executory Contracts and Unexpired Leases............. 25
      B.    Claims Based on Rejection of Executory Contracts or Unexpired Leases. ............ 26
      C.    Cure of Defaults for Executory Contracts and Unexpired Leases Assumed. .......... 26
      D.    Insurance Policies. ...................................................................................................... 27
      E.    Modifications, Amendments, Supplements, Restatements, or Other
          Agreements............................................................................................................... 27
      F.    Reservation of Rights. ............................................................................................... 27
      G.    Nonoccurrence of Effective Date. ............................................................................ 27
      H.    Contracts and Leases Entered Into After the Petition Date. .................................... 27

ARTICLE VI.     PROVISIONS GOVERNING DISTRIBUTIONS.................................................. 28

      A.    Timing and Calculation of Amounts to Be Distributed. .......................................... 28
      B.    Disbursing Agent........................................................................................................ 28
      C.    Rights and Powers of Disbursing Agent.................................................................... 28
      D.    Delivery of Distributions and Undeliverable or Unclaimed Distributions. ............. 28
      E.    Manner of Payment. .................................................................................................. 29
      F.    Section 1145 Exemption............................................................................................ 30
      G.    Section 4(a)(2) Exemption......................................................................................... 30
      H.    Compliance with Tax Requirements. ........................................................................ 30
      I.    Allocations................................................................................................................. 30
      J.    Setoffs and Recoupment. .......................................................................................... 30
      K.    Claims Paid or Payable by Third Parties. ................................................................. 31

ARTICLE VII.    PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND
              DISPUTED CLAIMS .................................................................................................. 31

      A.    Allowance of Claims. ................................................................................................ 31
      B.    Claims Administration Responsibilities. ................................................................... 31
      C.    Estimation of Claims. ................................................................................................ 32
      D.    Adjustment to Claims Without Objection. ................................................................ 32
      E.    Time to File Objections to Claims.............................................................................. 32
      F.    Disallowance of Claims.............................................................................................. 32
      G.    Amendments to Claims. ............................................................................................ 33
      H.    No Distributions Pending Allowance. ....................................................................... 33
      I.    Distributions After Allowance................................................................................... 33

ARTICLE VIII.   SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ...................... 33

      A.    Compromise and Settlement of Claims, Interests, and Controversies. .................... 33
      B.    Discharge of Claims and Termination of Interests. .................................................. 33
      C.    Release of Liens. ....................................................................................................... 34
      D.    Releases by the Debtors.............................................................................................. 34
      E.    Releases by Holders. ................................................................................................. 34
      F.    Liabilities to, and Rights of, Governmental Units. ................................................... 35
      G.    Exculpation................................................................................................................. 35
      H.    Injunction................................................................................................................... 35
      I.    Subordination Rights Under the Intercreditor Agreement........................................ 36
      J.    Term of Injunctions or Stays. .................................................................................... 36

ii

ARTICLE IX. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN .................................................................................................................... 37

  A. Conditions Precedent to Confirmation. ...................................................... 37
  B. Conditions Precedent to the Effective Date. .............................................. 37
  C. Waiver of Conditions. ................................................................................ 38
  D. Effect of Failure of Conditions. ................................................................. 38

ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ........................... 38

  A. Modification and Amendments. .................................................................. 38
  B. Effect of Confirmation on Modifications. .................................................. 38
  C. Revocation or Withdrawal of Plan. ........................................................... 38

ARTICLE XI. RETENTION OF JURISDICTION ................................................................ 39

ARTICLE XII. MISCELLANEOUS PROVISIONS ........................................................ 40

  A. Regulatory Requirements. .......................................................................... 40
  B. Immediate Binding Effect. .......................................................................... 40
  C. Additional Documents. ............................................................................... 41
  D. Statutory Committee and Cessation of Fee and Expense Payment ........................ 41
  E. Reservation of Rights. ................................................................................ 41
  F. Successors and Assigns. ............................................................................. 41
  G. Notices. ........................................................................................................ 41
  H. Entire Agreement. ....................................................................................... 42
  I. Exhibits. ...................................................................................................... 42
  J. Severability of Plan Provisions. .................................................................. 43
  K. Votes Solicited in Good Faith. ................................................................... 43
  L. Closing of Chapter 11 Cases. ..................................................................... 43
  M. Conflicts. ..................................................................................................... 43

K&E 25446293

**INTRODUCTION**

Revel AC, Inc. *("*Revel AC*")* and its debtor affiliates, as debtors and debtors in possession (each, a "Debtor" and, collectively, the "Debtors"), propose this joint plan of reorganization (the "Plan") for the resolution of the Claims (as such term is defined below) against and Interests (as such term is defined below) in each of the Debtors pursuant to chapter 11 of the Bankruptcy Code (as such term is defined below). Capitalized terms used in the Plan and not otherwise defined shall have the meanings ascribed to such terms in Article I.A.

Holders of Claims and Interests (as such terms are defined below) should refer to the Disclosure Statement (as such term is defined below) for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information and projections of future operations, as well as a summary and description of this Plan.

**ARTICLE I.
DEFINED TERMS, RULES OF INTERPRETATION,
COMPUTATION OF TIME, AND GOVERNING LAW**

*A.     Defined Terms.*

As used in this Plan, capitalized terms have the meanings ascribed to them below.

1.     *"2012 Credit Agreement"* means that certain credit agreement, dated as of May 3, 2012 (as amended, supplemented, or modified from time to time), by and among Revel AC, as borrower, the Guarantors, the lenders party thereto, JPMorgan Chase Bank, N.A., in its capacities as administrative agent, collateral agent and issuing bank, and J.P. Morgan Securities LLC, as sole lead arranger and sole bookrunner.

2.     *"2012 Credit Agreement Agent"* means JPMorgan Chase Bank, N.A., in its capacities as administrative agent, collateral agent, disbursement agent, and issuing bank under the 2012 Credit Agreement and any other capacities thereunder or related thereto, including any capacity held by any of its Affiliates.

3.     *"2012 Credit Agreement Claims*" means any Claim derived from, based upon, relating to, or arising from the 2012 Credit Agreement.

4.     *"Accrued Professional Compensation"* means, at any given time, all accrued, contingent, and/or unpaid fees and expenses rendered allowable before the Effective Date by any retained Professional in the Chapter 11 Cases that the Bankruptcy Court has not denied by Final Order, except such fees that are reasonably incurred by the 2012 Credit Agreement Agent, the Term Loan Agent, the DIP Facility Agent, the Exit Facility Agents, and the Steering Committee; provided, however, that any such fees and expenses (x) have not been previously paid (regardless of whether a fee application has been Filed for any such amount) and (y) have been applied against any retainer that has been provided to such Professional. To the extent that the Bankruptcy Court or any higher court of competent jurisdiction denies or reduces by a Final Order any amount of a Professional's fees or expenses, then those reduced or denied amounts shall no longer constitute Accrued Professional Compensation.

5.     *"Administrative Claim"* means any Claim for costs and expenses of administration pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors (such as wages, salaries or commissions for services and payments for goods and other services and leased premises); and (b) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of the Judicial Code.

6.     *"Administrative Claims Bar Date"* means the date that is 30 days after entry of the Confirmation Order.

7.     *"Administrative Claims Objection Deadline"* means the date that is 60 days after the Effective Date.

K&E 25446293

8. *"Affiliate"* has the meaning set forth in section 101(2) of the Bankruptcy Code.

9. *"Agents"* means, collectively, the 2012 Credit Agreement Agent, the Term Loan Agent, the DIP Facility Agent, and the First Lien Exit Agent.

10. *"Allowed"* means with respect to any Claim, except as otherwise provided herein: (a) a Claim that either is not a Disputed Claim or has been allowed by a Final Order; (b) a Claim that is allowed (i) pursuant to the terms of the Plan, (ii) in any stipulation that is approved by the Bankruptcy Court, or (iii) pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection herewith; (c) a Claim relating to a rejected Executory Contract or Unexpired Lease that either (i) is not a Disputed Claim or (ii) has been allowed by a Final Order; or (d) a Claim as to which a Proof of Claim has been timely Filed and as to which no objection has been Filed by the Claims Objection Deadline.

11. *"Ballot"* means the form or forms distributed to certain Holders of Claims by which such parties may indicate acceptance or rejection of the Plan.

12. *"Bankruptcy Code"* means title 11 of the United States Code, 11 U.S.C. §§101-1532.

13. *"Bankruptcy Court"* means the United States Bankruptcy Court for the District of New Jersey having jurisdiction over the Chapter 11 Cases or any other court having jurisdiction over the Chapter 11 Cases, including, to the extent of the withdrawal of the reference under 28 U.S.C. § 157, the United States District Court for the District of New Jersey.

14. *"Bankruptcy Rules"* means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

15. *"Business Day"* means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)(6)).

16. *"Cash"* means the legal tender of the United States of America.

17. *"Causes of Action"* means any action, claim, cause of action, controversy, demand, right, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured, or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law. Causes of Action also include: (a) any right of setoff, counterclaim, or recoupment and any claim for breaches of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to sections 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state law fraudulent transfer claim.

18. *"Chapter 11 Cases"* means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code and (b) when used with reference to all Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

19. *"Claim"* means any claim, as such term is defined in section 101(5) of the Bankruptcy Code, against a Debtor.

20. *"Claims Bar Date"* means, for each General Unsecured Claim in excess of $2.5 million, the date that is 45 days after the Petition Date.

21. *"Claims Objection Deadline"* means, for each General Unsecured Claim in excess of $2.5 million, (a) 75 days after the Effective Date or (b) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for objecting to certain Claims.

2

22.	*"Claims Register"* means the official register of General Unsecured Claims in excess of $2.5 million maintained by Epiq Bankruptcy Solutions, LLC, retained as the Debtors' notice, claims, and solicitation agent.

23.	*"Class"* means a class of Claims or Interests as set forth in Article III pursuant to section 1122(a) of the Bankruptcy Code.

24.	*"Confirmation"* means the entry of the Confirmation Order on the docket of the Chapter 11 Cases, subject to all conditions specified in Article IX.A having been satisfied or waived pursuant to Article IX.C.

25.	*"Confirmation Date"* means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

26.	*"Confirmation Hearing"* means the confirmation hearing held by the Bankruptcy Court pursuant to section 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

27.	*"Confirmation Order"* means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code in form and substance reasonably acceptable to the Requisite Consenting Lenders, the Term Loan Agent and, solely to the extent adversely affecting their economic interests, the Requisite Consenting 2012 Facility Lenders.

28.	*"Consenting Debtholders"* means the Holders of Claims that are party to the Restructuring Support Agreement.

29.	*"Consummation"* means the occurrence of the Effective Date.

30.	*"Contingent Payment Rights"* means the treatment for Holders of Second Lien Note Claims as described in Article IV.D herein, and in the Contingent Payment Rights Term Sheet.

31.	*"Contingent Payment Rights Term Sheet"* means the term sheet attached as Exhibit I to the Disclosure Statement that sets forth the material terms of the Contingent Payment Rights.

32.	*"Committee"* means any official committee (and all subcommittees thereof) appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

33.	*"Cure Claim"* means a Claim based upon a Debtor's default under an Executory Contract or Unexpired Lease at the time such contract or lease is assumed by the Debtor pursuant to section 365 of the Bankruptcy Code.

34.	*"Cure Notice"* means a notice of a proposed amount to be paid on account of a Cure Claim in connection with an Executory Contract or Unexpired Lease to be assumed under the Plan pursuant to section 365 of the Bankruptcy Code, which notice shall include (a) procedures for objecting to proposed assumptions of Executory Contracts and Unexpired Leases, (b) Cure Claims to be paid in connection therewith, and (c) procedures for resolution by the Bankruptcy Court of any related disputes.

35.	*"D&O Liability Insurance Policies"* means all insurance policies for directors', managers', and officers' liability maintained by the Debtors as of the Petition Date.

36.	*"Debtor"* means one of the Debtors, in its individual capacity as a debtor and debtor in possession in the Chapter 11 Cases.

37.	*"Debtors"* means, collectively: (a) Revel AC, Inc.; (b) Revel AC, LLC; (c) Revel Atlantic City, LLC; (d) Revel Entertainment Group, LLC; and (d) NB Acquisition LLC.

38.     *"DIP Facility"* means the revolving and term loan facilities provided under the DIP Credit Agreement and related documents.

39.     *"DIP Facility Agent"* means JPMorgan Chase Bank, N.A., in its capacity as the administrative agent, collateral agent, disbursement agent, and issuing bank for the DIP Facility under the DIP Facility Credit Agreement, together with its successor and assigns in such capacity.

40.     *"DIP Facility Claim"* means any Claim derived from, based upon, relating to, or arising from the DIP Facility under the DIP Facility Credit Agreement and related documents, including any Claims on account of issued and undrawn letters of credit.

41.     *"DIP Facility Credit Agreement"* means the agreement governing the senior secured super-priority priming debtor in possession credit facility, dated as of [•] among the Debtors, the DIP Facility Lenders and JPMorgan Chase Bank, N.A., in its capacities as administrative agent, collateral agent, and issuing bank (as amended, restated, supplemented, or otherwise modified from time to time).

42.     *"DIP Facility Lender"* means the institutions party from time to time as "Lenders" for the DIP Facility under the DIP Facility Credit Agreement.

43.     *"DIP Order"* means the final order of the Bankruptcy Court, in form and substance reasonably acceptable to the DIP Facility Lenders and the DIP Facility Agent, authorizing, *inter alia,* the Debtors to enter into the DIP Facility Credit Agreement and incur postpetition obligations thereunder.

44.     *"Disbursing Agent"* means the Reorganized Debtors or the Entity or Entities selected by the Debtors or Reorganized Debtors and identified in the Plan Supplement, as applicable, to make or facilitate distributions contemplated under the Plan.

45.     *"Disclosure Statement"* means the Disclosure Statement for the Joint Plan of Reorganization of Revel AC, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code, dated March 13, 2013, as amended, supplemented, or modified from time to time, in form and substance reasonably acceptable to the Requisite Consenting Lenders, the Term Loan Agent and, solely to the extent adversely affecting their economic interests, the Requisite Consenting 2012 Facility Lenders, including all exhibits and schedules thereto and references therein that relate to the Plan, and that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules and any other applicable law.

46.     *"Disputed"* means, with respect to any Claim or Interest, any Claim or Interest that is (a) disputed under the Plan, or subject to a timely objection and/or request for estimation in accordance with section 502(c) of the Bankruptcy Code and Bankruptcy Rule 3018, which objection and/or request for estimation has not been withdrawn or determined by a Final Order, (b) improperly asserted, by the untimely or otherwise improper filing of a Proof of Claim as required by order of the Bankruptcy Court, or (c) that is disallowed pursuant to section 502(d) of the Bankruptcy Code.  A Claim or Administrative Claim that is Disputed as to its amount shall not be Allowed in any amount for purposes of distribution until it is no longer a Disputed Claim.

47.     *"Distribution Date"* means, with respect to a Claim that is Allowed as of the Effective Date, the date that is as soon as practicable after the Effective Date, but no later than 30 days after the Effective Date.

48.     *"Distribution Record Date"* means the date that the Confirmation Order is entered by the Bankruptcy Court; <u>provided</u>, however, that such Distribution Record Date shall not apply to any publicly held securities.

49.     *"Effective Date"* means the date selected by the Debtors that is a Business Day after the Confirmation Date on which (a) the conditions to the occurrence of the Effective Date have been met or waived pursuant to Article IX.B and Article IX.C and (b) no stay of the Confirmation Order is in effect.

4

50. *"Employee"* means an individual that is an employee, manager, or officer of any of the Debtors, employed by the Debtors on a salary or hourly basis, who serves in such capacity.

51. *"Entity"* means an entity as such term is defined in section 101(15) of the Bankruptcy Code.

52. *"Estate"* means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

53. *"Exculpated Claim"* means any Claim related to any act or omission derived from, based upon, related to, or arising from the Debtors' in- or out-of-court restructuring efforts, the Chapter 11 Cases, formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan (including any term sheets related thereto), or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Plan, the filing of the Chapter 11 Cases, the pursuit of Consummation, and the administration and implementation of the Plan, including (a) the Restructuring Support Agreement, (b) the issuance of the New Equity Interests, and (c) the distribution of property under the Plan or any other agreement.

54. *"Exculpated Party"* means each of: (a) the Debtors; (b) the Reorganized Debtors; (c) the 2012 Credit Agreement Agent; (d) the Term Loan Agent; (e) the DIP Facility Agent; (f) the DIP Lenders; (g) the Exit Facility Agents; (h) the Exit Lenders; (i) the Consenting Debtholders; (j) the Steering Committee; (k) J.P. Morgan Securities LLC, in its capacity as sole lead arranger and sole bookrunner under the 2012 Credit Agreement, lead arranger, syndication agent, and joint bookrunning manager under the Term Loan Credit Agreement, and sole lead arranger and sole bookrunner under the DIP Facility Credit Agreement and First Lien Exit Facility; and (l) with respect to each of the foregoing entities in clauses (a) through (k), such Entities' predecessors, successors and assigns, subsidiaries, Affiliates, managed accounts or funds, current and former officers, directors, principals, members, partners, shareholders employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, advisory board members, and other professionals, and such Persons' respective heirs, executors, estates, servants, and nominees.

55. *"Executive Transition Agreement"* means the agreement, attached as Exhibit J to the Disclosure Statement and as described in Article IV.K of this Plan, governing the transition of the Debtors' Executives (as defined herein).

56. *"Executory Contract"* means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

57. *"Exit Facilities"* means, collectively, the First Lien Exit Facility and the Second Lien Exit Facility.

58. *"Exit Credit Agreements"* means, collectively, the First Lien Exit Credit Agreement and the Second Lien Exit Credit Agreement.

59. *"Exit Facility Agents"* means, collectively, the First Lien Exit Agent and the Second Lien Exit Agent.

60. *"Exit Facilities Term Sheet"* means a term sheet, which is an exhibit to the Restructuring Support Agreement and Disclosure Statement, between the Reorganized Debtors as borrowers, the First Lien Exit Agent, and the Exit Lenders, setting forth the material terms of the Exit Facilities.

61. *"Exit Lenders"* means those "Lenders" under (and as defined in) each of the Exit Credit Agreements.

62. *"Federal Judgment Rate"* means the federal judgment rate in effect as of the Petition Date.

63. *"Fee Claim"* means a Claim for Accrued Professional Compensation.

64. *"File," "Filed,"* or *"Filing"* means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

65. *"Final Order"* means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice.

66. *"First Lien Exit Agent"* means JPMorgan Chase Bank, N.A. or such other financial institution in its capacity as administrative agent, collateral agent, and issuing bank under the First Lien Exit Credit Agreement.

67. *"First Lien Exit Credit Agreement"* means that certain agreement governing the First Lien Exit Facility, dated on or about the Effective Date by and among the Reorganized Debtors, the lenders party thereto, and the First Lien Exit Agent, in its capacities as administrative agent, collateral agent, and issuing bank (as amended, restated, supplemented, or otherwise modified from time to time).

68. *"First Lien Exit Facility"* means that exit credit facility secured by a first-priority lien on and security interests in the Reorganized Debtors' assets, which facility shall be consistent in all material respects with the Exit Facilities Term Sheet and in form and substance reasonably acceptable to the Requisite Consenting Lenders, the Term Loan Agent and, solely to the extent affecting their economic interests, the Requisite Consenting 2012 Facility Lenders to be executed and delivered by the parties thereto on or about, and as a condition to the Effective Date.

69. *"General Unsecured Claim"* means any Unsecured Claim that is not (a) an Administrative Claim, (b) a Priority Tax Claim, (c) an Priority Non-Tax Claim, (d) a Second Lien Note Claim, (e) a section 510(b) Claim, (f) a Fee Claim, or (g) an Intercompany Claim.

70. *"Governmental Unit"* means a governmental unit as defined in section 101(27) of the Bankruptcy Code.

71. *"Guarantors"* means Revel AC, LLC, Revel Atlantic City, LLC, Revel Entertainment Group, LLC, and NB Acquisition LLC, each in its capacity as guarantor under the 2012 Credit Agreement, Term Loan Credit Agreement, and Indenture.

72. *"Holder"* means an Entity holding a Claim or an Interest.

73. *"Impaired"* means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

74. *"Indenture"* means that certain indenture, dated as of February 17, 2011 (as amended, supplemented, or modified from time to time), for an initial issuance of $304,400,000 of Second Lien Notes at 12% interest, by and among Revel AC, the Guarantors, and the Second Lien Notes Indenture Trustee.

75. *"Intercompany Claim"* means any Claim held by a Debtor against another Debtor.

76. *"Intercompany Interest"* means an Interest in a Debtor held by another Debtor.

6

K&E 25446293

77.      *"Intercreditor Agreement"* means that certain intercreditor agreement dated as of February 17, 2011 (as amended, supplemented, or modified from time to time), between the Term Loan Agent and the Second Lien Notes Indenture Trustee).

78.      *"Interests"* means any equity security in a Debtor as defined in section 101(16) of the Bankruptcy Code, including all issued, unissued, authorized, or outstanding shares of capital stock of the Debtors together with any warrants, options, or contractual rights to purchase or acquire such equity securities at any time and all rights arising with respect thereto.

79.      *"Internal Revenue Code"* means the Internal Revenue Code of 1986, as amended from time to time.

80.      *"Judicial Code"* means title 28 of the United States Code, 28 U.S.C. §§ 1-4001.

81.      *"Lender Voting Deadline"* means 4:00 p.m. (prevailing Eastern Time) on March 20, 2013.

82.      *"Lien" me*ans a lien as defined in section 101(37) of the Bankruptcy Code.

83.      *"Management Incentive Program"* means that certain post-Effective Date equity incentive program, on the terms and conditions that shall be decided upon by the New Revel Board, which shall provide for grants of options and/or restricted units or equity reserved for management, directors, and employees in an amount of the New Equity Interests to be issued by the Reorganized Debtors sufficient to properly incentivize the senior management to each of the Reorganized Debtors.

84.      *"New Boards"* mean, collectively, the New Revel Board and the New Subsidiary Boards.

85.      *"New By-Laws"* means the form of the by-laws of each of Reorganized Revel and the Reorganized Debtors, which forms shall be included in the Plan Supplement.

86.      *"New Certificates of Incorporation"* means the form of the certificates of incorporation of Reorganized Revel and the Reorganized Debtors, which forms shall be included in the Plan Supplement.

87.      *"New Equity Interests"* means a certain number of common shares in the capital of Reorganized Revel authorized pursuant to the Plan, of which up to approximately 7.5 million shares shall be initially issued and outstanding as of the Effective Date.

88.      *"New Employment Agreements"* means the employment agreements, if any, between Reorganized Revel and members of the Debtors' management team with any such agreements to be included in the Plan Supplement.

89.      *"New Revel Board"* means the initial board of directors of Reorganized Revel.

90.      *"New Stockholders Agreement"* means the stockholders agreement for Reorganized Revel, substantially in the form included in the Plan Supplement, consistent in all material respects with the New Stockholders Agreement Term Sheet and in form and substance reasonably acceptable to the Steering Committee.

91.      *"New Stockholders Agreement Term Sheet"* means a term sheet, which is an exhibit to the Disclosure Statement, setting forth the material terms of the New Stockholders Agreement.

92.      *"New Subsidiary Boards"* means, with respect to each of the Reorganized Debtors other than Reorganized Revel, the initial board of directors or member, as the case may be, of each such Reorganized Debtor.

7

93.        *"Noteholder Voting Deadline"* means 4:00 p.m. (prevailing Eastern Time) on April 10, 2013.

94.        *"Other Secured Claim"* means any Secured Claim that is not (a) a 2012 Credit Agreement Claim, (b) a DIP Facility Claim, (c) a Term Loan Credit Agreement Claim, or (d) a Second Lien Note Claim.

95.        *"Person"* means a person as such term as defined in section 101(41) of the Bankruptcy Code.

96.        *"Petition Date"* means the date on which each of the Debtors commenced the Chapter 11 Cases.

97.        *"Plan"* means this Joint Plan of Reorganization of Revel AC, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code, including the Plan Supplement (as modified, amended, or supplemented from time to time), which is incorporated herein by reference.

98.        *"Plan Securities"* means (a) the New Equity Interests and (b) the Contingent Payment Rights, each of which shall be distributed by the Reorganized Debtors pursuant to the terms of the Plan.

99.        *"Plan Supplement"* means the compilation of documents and forms of documents, schedules, and exhibits to the Plan to be Filed by the Debtors no later than five days before the Confirmation Hearing on notice to parties in interest, and additional documents Filed before the Effective Date as supplements or amendments to the Plan Supplement, all such documents being in form and substance reasonably acceptable to the Requisite Consenting Lenders, the Term Loan Agent and, solely to the extent adversely affecting their economic interests, the Requisite Consenting 2012 Facility Lenders, including the following:  (a) the New By-Laws; (b) the New Certificates of Incorporation; (c) the Rejected Executory Contract and Unexpired Lease List (d) a list of retained Causes of Action, if any; (e) subject to the terms of Article IV.M, the Management Incentive Program; (f) the identification of any Disbursing Agent other than the Reorganized Debtors; (g) the First Lien Exit Credit Agreement; (h) the Second Lien Exit Credit Agreement; (i) the New Employment Agreements, if any; and (j) the New Stockholders Agreement.  Any reference to the Plan Supplement in this Plan shall include each of the documents identified above as (a) through (j).  The Debtors shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date in accordance with Article IX.B hereof and the terms set forth herein relating to necessary consent.

100.        *"Priority Non-Tax Claims"* means any Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

101.        *"Priority Tax Claim"* means any Claim of the kind specified in section 507(a)(8) of the Bankruptcy Code.

102.        *"Professional"* means an Entity:  (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code, but excluding the advisors and professionals for the 2012 Credit Agreement Agent, the Term Loan Agent, the DIP Facility Agent, the Exit Facility Agents, and the Steering Committee.

103.        *"Proof of Claim"* means a written proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

104.        *"Pro Rata"* means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of all Allowed Claims in that Class.

8

105.    *"Reinstated"* means, with respect to Claims and Interests, the treatment provided for in section 1124 of the Bankruptcy Code.

106.    *"Rejected Executory Contract and Unexpired Lease List"* means the list (as may be amended), as determined by the Debtors or the Reorganized Debtors and in form and substance reasonably acceptable to the Requisite Consenting Lenders and the Term Loan Agent, of Executory Contracts and Unexpired Leases (including any amendments or modifications thereto) that will be rejected by the Reorganized Debtors pursuant to the provisions of Article V.A and which shall be included in the Plan Supplement.

107.    *"Rejection Claim"* means a Claim arising from the rejection of an Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code.

108.    *"Released Party"* means each of:  (a) the 2012 Credit Agreement Agent; (b) the Term Loan Agent; (c) the DIP Facility Agent; (d) the DIP Lenders; (e) the Exit Facility Agents; (f) the Exit Lenders; (g) the Consenting Debtholders; (h) the Steering Committee; (i) J.P. Morgan Securities LLC, in its capacities as sole lead arranger and sole bookrunner under the 2012 Credit Agreement, lead arranger, syndication agent, and joint bookrunning manager under the Term Loan Credit Agreement, and sole lead arranger and sole bookrunner under the DIP Facility Credit Agreement and First Lien Exit Facility; and (j) with respect to each of the foregoing entities in clauses (a) through (i), such Entities' predecessors, successors and assigns, subsidiaries, Affiliates, managed accounts or funds, current and former officers, directors, principals, members, partners, shareholders employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, advisory board members and other professionals, and such Persons' respective heirs, executors, estates, servants, and nominees.

109.    *"Reorganized Revel"* means Revel AC, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date, it being understood that, as of the Effective Date, Reorganized Revel shall be a corporation organized under the laws of the state of Delaware.

110.    *"Reorganized Debtors"* means the Debtors, or any successor thereto, by merger, consolidation or otherwise, on or after the Effective Date.

111.    *"Requisite Consenting 2012 Facility Lenders"* has the meaning assigned to such term in the Restructuring Support Agreement.

112.    *"Requisite Consenting Lenders"* has the meaning assigned to such term in the Restructuring Support Agreement.

113.    *"Requisite Consenting Noteholders"* has the meaning assigned to such term in the Restructuring Support Agreement.

114.    *"Restructuring Support Agreement"* means the agreement, effective as of February 19, 2013, among the Debtors and Consenting Debtholders, to support, and (as applicable) vote in favor of, this Plan, as amended by that certain First Amendment to Restructuring Support Agreement, dated as of March 8, 2013, and as amended by that certain Second Amendment to Restructuring Support Agreement, dated as of March 13, 2013.

115.    *"Second Lien Exit Agent"* means the administrative agent, collateral agent, and any other applicable capacities under the Second Lien Exit Credit Agreement, which shall be selected and identified on or before the Plan Supplement Filing Date (as defined in the Disclosure Statement), which selection shall be subject to the reasonable consent of the Steering Committee.

116.    *"Second Lien Exit Credit Agreement"* means that certain agreement governing the Second Lien Exit Facility, dated on or about the Effective Date by and among the Reorganized Debtors, the lenders party thereto, and the Second Lien Exit Agent (as amended, restated, supplemented or otherwise modified from time to time).

K&E 25446293

117.    *"Second Lien Exit Facility"* means that exit credit facility secured by second-priority liens on and security interests in the Reorganized Debtors' assets, which facility shall be consistent in all material respects with the Exit Facilities Term Sheet and in form and substance reasonably acceptable to the Requisite Consenting Lenders, the Term Loan Agent and, solely to the extent affecting their economic interests, the Requisite Consenting 2012 Facility Lenders to be executed and delivered by the parties thereto on or about, and as a condition to the Effective Date.

118.    *"Second Lien Note Claim"* means any Claim derived from, based upon, relating to, or arising from the Indenture.

119.    *"Second Lien Note Claim Contingent Payment Rights Agreement"* means an agreement governing the issuance and distribution of the Contingent Payment Rights pursuant to the terms of the Contingent Payment Rights Term Sheet.

120.    *"Second Lien Notes"* means those certain 12% Second Lien Notes due 2018 issued pursuant to the Indenture.

121.    *"Second Lien Notes Indenture Trustee"* means U.S. Bank National Association, in its capacity as trustee under the Indenture.

122.    *"Secured"* means when referring to a Claim:  (a) secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or (b) Allowed as such pursuant to the Plan.

123.    *"Securities Act"* means the Securities Act of 1933, 15 U.S.C. 77a-77aa, together with the rules and regulations promulgated thereunder.

124.    *"Security"* means a security as defined in section 2(a)(1) of the Securities Act.

125.    *"Steering Committee"* means the steering committee of Term Loan Lenders formed by the Term Loan Agent, and any successors or assigns thereof.

126.    *"Term Loan Agent"* means JPMorgan Chase Bank, N.A., in its capacities as administrative agent, collateral agent and disbursement agent under the Term Loan Credit Agreement and any other capacities thereunder or related thereto, including any capacity held by any of its Affiliates.

127.    *"Term Loan Credit Agreement"* means that certain credit agreement, dated as of February 17, 2011 (as amended, supplemented, or modified from time to time), by and among Revel AC, as borrower, the Guarantors, the Term Loan Lenders, J.P. Morgan Securities LLC, as lead arranger and syndication agent, Morgan Stanley & Co. Incorporated, as joint bookrunning managers, and JPMorgan Chase Bank, N.A., in its capacities as administrative agent and collateral agent.

128.    *"Term Loan Credit Agreement Claims"* means any Claim derived from, based upon, relating to, or arising from the Term Loan Credit Agreement.

129.    *"Term Loan Lenders"* means the lenders party to the Term Loan Credit Agreement.

130.    *"Treasury Regulations"* means regulations (including temporary and proposed) promulgated under the Internal Revenue Code.

131.    *"Unexpired Lease"* means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

K&E 25446293

132.   *"Unsecured Claim"* means any Claim that is neither Secured nor entitled to priority under the Bankruptcy Code or an order of the Bankruptcy Court, including any Claim arising from the rejection of an Executory Contract or Unexpired Lease under section 365 of the Bankruptcy Code.

133.   *"Unsecured Claims Cap"* means a $45 million baseline amount for ordinary course payables that excludes construction claims and related cash in escrow as agreed to between the Debtors and the Steering Committee prior to the Petition Date, and claims that may be covered by insurance.

134.   *"U.S. Trustee"* means the United States Trustee for the District of New Jersey.

135.   *"Warrant Agreement"* means that certain warrant agreement, dated as of February 17, 2011 (as amended, supplemented, or modified from time to time), by and between Revel AC and U.S. Bank National Association.

136.   *"Warrant Claims"* means any Claim derived from, based upon, relating to, or arising from the Warrant Agreement.

B.     *Rules of Interpretation.*

For purposes of this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) any reference herein to an existing document, schedule or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and the Bankruptcy Rules; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (10) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (11) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (12) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; and (13) any immaterial effectuating provisions may be interpreted by the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further Bankruptcy Court order.

C.     *Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

D.     *Governing Law.*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control);

11

provided, however, that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated in New York shall be governed by the laws of the state or province of incorporation of the applicable Debtor or Reorganized Debtor, as applicable; provided, further, however, that nothing in this Article I.D shall be construed to limit the applicability of relevant state gaming regulations with respect to the Debtors' gaming businesses.

E.      *Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

F.      *Reference to the Debtors or the Reorganized Debtors.*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS AND OTHER UNCLASSIFIED CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims, DIP Facility Claims, and Intercompany Interests have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III.

A.      *Administrative Claims.*

1.      Administrative Claims.

Except with respect to Administrative Claims that are Fee Claims and except to the extent that a Holder of an Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment with respect to such Holder, each Holder of an Allowed Administrative Claim shall be paid in full in Cash on the later of:  (a) on or as soon as reasonably practicable after the Effective Date if such Administrative Claim is Allowed as of the Effective Date; (b) on or as soon as reasonably practicable after the date such Administrative Claim is Allowed; and (c) the date such Allowed Administrative Claim becomes due and payable, or as soon thereafter as is practicable; provided, however, that Allowed Administrative Claims that arise in the ordinary course of the Debtors' business shall be paid in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.  Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim previously Allowed by Final Order.  For purposes of this Plan, all Administrative Claims arising or granted under the DIP Order shall be deemed Allowed by Final Order.

2.      DIP Facility Claims

On or before the Effective Date, (a) Holders of DIP Facility Claims shall receive payment in full in Cash of all DIP Facility Claims or shall have such DIP Facility Claims refinanced or converted in accordance with the terms of the DIP Facility Credit Agreement and the Exit Credit Agreements except to the extent that any Holder of DIP Facility Claims agrees to a different treatment, and (b) the fees, expenses, costs and other charges of the DIP Facility Agent and its advisors and professionals shall receive payment in full in Cash on account of such Claims. Notwithstanding anything to the contrary contained herein, the liens and security interests securing the DIP Facility Claims shall continue in full force and effect until the DIP Facility Claims have been paid in full in Cash on the Effective Date or refinanced by (or converted into) the Exit Facilities, unless any Holder of DIP Facility Claims agrees to a different treatment; provided that, notwithstanding anything to the contrary herein, the DIP Facility Claims and the fees, expenses, costs and other charges of the DIP Facility Agent and its advisors and professionals shall not be waived, discharged, or released unless and until such claims are paid in full in Cash on the Effective Date, or, solely with respect to the DIP Facility Claims, unless and until the DIP Facility Claims are refinanced or

12

K&E 25446293

converted in accordance with the terms of the DIP Facility Credit Agreement and the Exit Credit Agreements; and provided, further, that, unless otherwise agreed, any letters of credit issued under the DIP Facility or issued under the 2012 Credit Agreement and deemed to be issued under the DIP Facility shall be deemed to be issued under the First Lien Exit Facility or cash collateralized at 103% of any letter of credit exposure.  Any and all indemnification obligations that are provided in connection with the DIP Facility Credit Agreement shall continue and be in effect with the same force and to the same extent as if made in connection with the execution and entry into the Exit Credit Agreements.

3.      Professional Compensation.

(a)      Fee Claims.

Professionals asserting a Fee Claim for services rendered before the Confirmation Date must File and serve on the Debtors and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order, or any other applicable order of the Bankruptcy Court, an application for final allowance of such Fee Claim no later than 20 days after the Effective Date.  Objections to any Fee Claim must be Filed and served on the Reorganized Debtors and the requesting party no later than 40 days after the Effective Date. To the extent necessary, the Plan and the Confirmation Order shall amend and supersede any previously entered order regarding the payment of Fee Claims. For the avoidance of doubt, this Article II.A.2 of the Plan shall not apply to any fees and expenses (including attorney's fees and fees for other retained professionals, advisors and consultants) of the 2012 Credit Agreement Agent, the Term Loan Agent, the DIP Facility Agent, the Exit Facility Agents, and the Steering Committee incurred in connection with the Chapter 11 Cases, the negotiation and formulation of the Plan, DIP Facility and Exit Facilities and related documents, and all transactions set forth herein or necessary to implement and consummate the Plan (whether incurred before or after the Petition Date).

(b)      Post-Confirmation Date Fees and Expenses.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Reorganized Debtors shall, in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court, subject to the terms of the DIP Order, pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation and Consummation of the Plan incurred by the Reorganized Debtors through and including the Effective Date. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional for services rendered or expenses incurred after the Confirmation Date in the ordinary course of business without any further notice to any party or action, order, or approval of the Bankruptcy Court.

4.      Administrative Claim Bar Date.

Except as otherwise provided in this Article II.A, requests for payment of Administrative Claims must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date. Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date.  Objections to such requests, if any, must be Filed and served on the Reorganized Debtors and the requesting party no later than the Administrative Claims Objection Deadline.

B.      *Priority Tax Claims.*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Allowed Priority Tax Claim, each holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive, on the Distribution Date, at the option of the Debtors, one of the following treatments:  (1) Cash in an amount equal to the amount of such Allowed Priority Tax Claim, plus interest at the rate determined under applicable nonbankruptcy law

13

K&E 25446293

and to the extent provided for by section 511 of the Bankruptcy Code; (2) Cash in an aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period of time not to exceed five years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, plus interest at the rate determined under applicable nonbankruptcy law and to the extent provided for by section 511 of the Bankruptcy Code; or (3) such other treatment as may be agreed upon by such holder and the Debtors or otherwise determined upon an order of the Bankruptcy Court.

C.       *Intercompany Interests.*

Intercompany Interests shall be Reinstated on the Effective Date.

D.       *Statutory Fees.*

Notwithstanding anything to the contrary contained herein, on the Effective Date, the Debtors shall pay, in full in Cash, any fees due and owing to the U.S. Trustee at the time of Confirmation.  On and after the Effective Date, Reorganized Revel shall pay the applicable U.S. Trustee fees for each of the Reorganized Debtors until the entry of a final decree in each such Debtor's Chapter 11 Case or until each such Chapter 11 Case is converted or dismissed.

**ARTICLE III.**
**CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**

A.       *Classification of Claims and Interests.*

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims and Interests.  All Claims and Interests, except for Administrative Claims, DIP Facility Claims, and Priority Tax Claims, are classified in the Classes set forth in this Article III.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released, or otherwise satisfied before the Effective Date.

B.       *Summary of Classification.*

The classification of Claims and Interests against each Debtor (as applicable) pursuant to the Plan is as set forth below.  The Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors.  All of the potential Classes for the Debtors are set forth herein.  Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Classes shall be treated as set forth in Article III.E hereof.  For all purposes under the Plan, each Class will contain sub-Classes for each of the Debtors (*i.e.*, there will be five (5) sub-Classes in each Class and many of such sub-Classes may be vacant).

| Class | Claim/Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | 2012 Credit Agreement Claims | Impaired / Not Impaired | Entitled to Vote / Deemed to Accept |
| 2 | Term Loan Credit Agreement Claims | Impaired | Entitled to Vote |
| 3 | Second Lien Note Claims | Impaired | Entitled to Vote |
| 4 | Priority Non-Tax Claims | Not Impaired | Deemed to Accept |
| 5 | Other Secured Claims | Not Impaired | Deemed to Accept |
| 6 | General Unsecured Claims | Not Impaired | Deemed to Accept |
| 7 | Intercompany Claims | Not Impaired | Deemed to Accept |
| 8 | Warrant Claims | Impaired | Deemed to Reject |

14

K&E 25446293

| Class | Claim/Interest | Status | Voting Rights |
|---|---|---|---|
| 9 | Interests | Impaired | Deemed to Reject |

*C.*      *Treatment of Claims and Interests.*

To the extent a Class contains Allowed Claims or Allowed Interests with respect to a particular Debtor, the treatment provided to each Class for distribution purposes is specified below:

1.      Class 1 - 2012 Credit Agreement Claims

(a)      *Classification:* Class 1 consists of 2012 Credit Agreement Claims.

(b)      *Allowance:* The 2012 Credit Agreement Claims shall be Allowed.

(c)      *Treatment:* Except to the extent that a Holder of a 2012 Credit Agreement Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of the 2012 Credit Agreement Claims, upon the closing of the DIP Facility, each Holder of a 2012 Credit Agreement Claim shall receive on a Pro Rata basis payment in full in Cash from the proceeds of the DIP Facility (only to the extent such Holder is a DIP Lender) or the Second Lien Exit Facility, as applicable, and any letters of credit issued under the 2012 Credit Agreement shall be deemed to be issued under the DIP Facility, and any letters of credit issued under the DIP Facility shall be deemed to be issued under the First Lien Exit Facility or cash collateralized at 103% of any letter of credit exposure.

(d)      *Voting:* Class 1 is Impaired by the Plan and may vote to accept or reject the Plan; <u>provided</u>, however, that upon entry of the DIP Order and the repayment of the 2012 Credit Agreement Claims in full pursuant to the terms of the DIP Order, members of Class 1 who are DIP Lenders shall become unimpaired, each such Holder of a Class 1 2012 Credit Agreement Claim shall be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and any votes cast by such Holders of such 2012 Credit Agreement Claims shall be disregarded.

2.      Class 2 - Term Loan Credit Agreement Claims

(a)      *Classification:* Class 2 consists of Term Loan Credit Agreement Claims.

(b)      *Allowance:*  The Term Loan Credit Agreement Claims shall be Allowed.

(c)      *Treatment:* Except to the extent that a Holder of a Term Loan Credit Agreement Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of the Term Loan Credit Agreement Claims, each Holder of a Term Loan Credit Agreement Claim shall receive its Pro Rata share of 100% of the New Equity Interests (subject to dilution by the Management Incentive Plan).

(d)      *Voting:* Class 2 is Impaired.  Therefore, Holders of Class 2 Term Loan Credit Agreement Claims are entitled to vote to accept or reject the Plan.

K&E 25446293

3. Class 3 - Second Lien Note Claims.

(a) *Classification:* Class 3 consists of Second Lien Note Claims.

(b) *Allowance:* The Second Lien Note Claims shall be Allowed.

(c) *Treatment:* In exchange for full and final satisfaction, settlement, release, and discharge of the Second Lien Note Claims, each Holder of such Allowed Second Lien Note Claim shall receive its Pro Rata share of the Contingent Payment Rights.

(d) *Voting:* Class 3 is Impaired by the Plan. Therefore, Holders of Class 3 Second Lien Note Claims are entitled to vote to accept or reject the Plan.

4. Class 4 - Priority Non-Tax Claims.

(a) *Classification:* Class 4 consists of Priority Non-Tax Claims.

(b) *Treatment:* Except to the extent that a Holder of an Allowed Priority Non-Tax Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Priority Non-Tax Claim, each Holder of such Allowed Priority Non-Tax Claim shall be paid in full in Cash on or as reasonably practicable after (i) the Effective Date, (ii) the date on which such Priority Non-Tax Claim against the Debtors becomes an Allowed Priority Non-Tax Claim, or (iii) such other date as may be ordered by the Bankruptcy Court.

(c) *Voting:* Class 4 is not Impaired by the Plan, and each Holder of a Class 4 Priority Non-Tax Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 4 Priority Non-Tax Claims are not entitled to vote to accept or reject the Plan.

5. Class 5 - Other Secured Claims.

(a) *Classification:* Class 5 consists of Other Secured Claims.

(b) *Treatment:* Except to the extent that a Holder of an Other Secured Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Allowed Other Secured Claim, each Holder of such Allowed Other Secured Claim shall receive one of the following treatments, in the sole discretion of the applicable Debtor: (i) the Debtors or the Reorganized Debtors shall pay such Allowed Other Secured Claims in full in Cash, including the payment of any interest required to be paid under section 506(b) of the Bankruptcy Code; (ii) the Debtors or the Reorganized Debtors shall deliver the collateral securing any such Allowed Other Secured Claim; or (iii) the Debtors or the Reorganized Debtors shall otherwise treat such Allowed Other Secured Claim in any other manner such that the Claim shall be rendered not Impaired.

(c) *Voting:* Class 5 is not Impaired by the Plan, and each Holder of a Class 5 Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 5 Other Secured Claims are not entitled to vote to accept or reject the Plan.

16

6.      Class 6 - General Unsecured Claims.

(a)     *Classification:* Class 6 consists of General Unsecured Claims.

(b)     *Treatment:* Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each General Unsecured Claim, each Holder of such Allowed General Unsecured Claim shall receive one of the following treatments, in the sole discretion of the applicable Debtor: (i) such Allowed General Unsecured Claim shall be Reinstated; (ii) the Debtors or the Reorganized Debtors shall pay such Allowed General Unsecured Claim in the ordinary course of business; or (iii) the Debtors or the Reorganized Debtors shall pay such General Unsecured Claim in full in Cash, including interest at the contractual rate, upon the later of (A) the Effective Date, (B) the date on which such General Unsecured Claim against the Debtors becomes an Allowed General Unsecured Claims, (C) or such other date as may be ordered by the Bankruptcy Court.

(c)     *Voting:* Class 6 is not Impaired by the Plan, and each Holder of a Class 6 General Unsecured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 6 General Unsecured Claims are not entitled to vote to accept or reject the Plan.

7.      Class 7 - Intercompany Claims.

(a)     *Classification:* Class 7 consists of Intercompany Claims.

(b)     *Treatment:* No distribution shall be made on account of Intercompany Claims. On the Effective Date, or as soon thereafter as practicable, all Intercompany Claims shall be reinstated in full or in part or cancelled or discharged in full or in part, in each case, to the extent determined appropriate by the Reorganized Debtors.  The Debtors and the Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan.  Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors historical intercompany account settlement practices.

(c)     *Voting:* Class 7 is not Impaired by the Plan, and each Holder of a Class 7 Intercompany Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 7 Intercompany Claims are not entitled to vote to accept or reject the Plan.

8.      Class 8 - Warrant Claims.

(a)     *Classification:* Class 8 consists of Warrant Claims.

(b)     *Treatment:* Holders of Warrant Claims shall not receive any distribution on account of such Warrant Claims. On the Effective Date, the Interests of all Existing Warrant Holders shall be cancelled and discharged.

(c)     *Voting:* Class 8 is Impaired and Holders of Class 8 Warrant Claims are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of

17

the Bankruptcy Code.  Therefore, Holders of Class 8 Warrant Claims are not entitled to vote to accept or reject the Plan.

9.    Class 9 - Interests.

(a)    *Classification:* Class 9 consists of Interests.

(b)    *Treatment:* Holders of Interests shall not receive any distribution on account of such Interests. On the Effective Date, Interests shall be cancelled and discharged.

(c)    *Voting:* Class 9 is Impaired and Holders of Class 9 Interests are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Class 9 Interests are not entitled to vote to accept or reject the Plan.

D.    *Special Provision Governing Claims that are Not Impaired.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' rights in respect of any Claims that are not Impaired, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Claims that are not Impaired.

E.    *Elimination of Vacant Classes.*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

F.    *Acceptance or Rejection of the Plan.*

1.    Voting Classes.

Classes 1, 2, and 3 are Impaired under the Plan and are entitled to vote to accept or reject the Plan.

2.    Presumed Acceptance of the Plan.

Classes 4, 5, 6, and 7 are not Impaired under the Plan, and the Holders in such Classes are deemed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

3.    Presumed Rejection of Plan.

Classes 8 and 9 are Impaired and shall receive no distribution under the Plan. The Holders in such Classes are deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

G.    *Confirmation Pursuant to Sections 1129(a) (10) and 1129(b) of the Bankruptcy Code.*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims.  The Debtors shall seek Confirmation pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.

H.    *Subordinated Claims.*

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative

18

priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.      *Sources of Cash for Plan Distributions.*

All consideration necessary for the Reorganized Debtors to make payments or distributions pursuant hereto shall be obtained from the Second Lien Exit Facility or other Cash from the Debtors, including Cash from business operations.  Further, the Debtors and the Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan.  Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

B.      *Exit Facilities.*

On the Effective Date, the Reorganized Debtors are authorized to execute and deliver those documents necessary or appropriate to satisfy the conditions to effectiveness of the Exit Facilities, the terms, conditions, and covenants of each of which shall be structured in a manner consistent with the Exit Facilities Term Sheet, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any person.

The Second Lien Exit Facility shall provide sufficient new Cash to repay the DIP Facility in full (excluding any letters of credit being continued under the First Lien Exit Facility).  The First Lien Exit Facility shall be a revolving credit facility that will provide sufficient available funds as of the Effective Date to provide the Reorganized Debtors with working capital necessary to run their businesses and to fund certain capital expenditures (each such use in accordance with the Exit Facilities Term Sheet).  Any letters of credit issued under the DIP Facility or issued under the 2012 Credit Agreement and deemed to be issued under the DIP Facility shall be deemed to be issued under the First Lien Exit Facility or cash collateralized at 103% of any letter of credit exposure.

C.      *Issuance and Distribution of New Equity Interests.*

The issuance of the New Equity Interests by Reorganized Revel, including options, stock appreciation rights, or other equity awards, if any, in connection with the Management Incentive Program, is authorized without the need for any further corporate action and without any further action by the Holders of Claims or Interests.

On the Effective Date, an initial number of approximately 7.5 million shares of New Equity Interests shall be issued and, as soon as reasonably practicable thereafter, distributed to Holders of Claims in Class 2, subject to dilution with respect to any shares issued pursuant to the Management Incentive Program.

All of the shares of New Equity Interests issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance of the New Equity Interests under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

Upon the Effective Date, Reorganized Revel shall be a private company governed by the New Stockholders Agreement.  The New Stockholders Agreement shall be adopted on the Effective Date and shall be deemed to be valid, binding, and enforceable in accordance with its terms, and each holder of New Equity Interests shall be bound

19

thereby.  The Holders of Claims in Class 2 shall be required to execute the New Stockholders Agreement before receiving their respective distributions of the New Equity Interests under the Plan.

*D.*      *Contingent Payment Rights*

The issuance of the Contingent Payment Rights by the Reorganized Debtors is authorized without the need for any further corporate action and without any further action by the Holders of Claims or Interests.

The New Jersey Economic Stimulus Act of 2009 created and established the Economic Redevelopment and Growth ("ERG") Grant program for the purpose of encouraging redevelopment projects in qualifying economic redevelopment and growth grant incentive areas through the provision of the State of New Jersey and municipal incentive grants derived from certain incremental tax revenues realized at the project site to reimburse developers for certain project financing gap costs.  On February 11, 2011, Revel, Revel Entertainment Group, LLC, ("REG") the New Jersey Economic Development Authority, and the Treasurer of the State of New Jersey entered into that certain State Economic Redevelopment and Growth Incentive Grant Agreement (as amended, supplemented, or modified from time to time, the "ERG Agreement"), entitling Revel and REG to receive approximately $261.4 million in ERG grant payments ("ERG Grant Payments").

Pursuant to Section VII(1)(a) of the ERG Agreement, the Debtors are authorized to pledge and assign as security their right, title, and interest in and to the ERG Agreement, including, without limitation, up to $70 million of the ERG Grant Payments by the payment thereof, in the manner provided in the ERG Agreement, to a separate escrow account (the "ERG Pledged Account") to be established with an independent financial institution.  The ERG Agreement includes that such pledge, assignment, and ERG Pledged Account is to be a credit enhancement to the Holders of Second Lien Notes in the event that the aggregate original principal amount of the Second Lien Notes is at least $75 million to finance a portion of the costs to complete the project that is the subject of the ERG Agreement.

The Debtors issued an aggregate original principal amount of $304.4 million of the Second Lien Notes on February 17, 2011.  Pursuant to the Indenture, the ERG Pledged Account is to hold 45 percent of the ERG Grant Payments in an aggregate amount not to exceed at any time the lesser of $70 million or the aggregate principal amount outstanding under the Second Lien Notes at such time (the "ERG Proceeds").  The ERG Agreement provides that the ERG Pledged Account shall be funded by the remittance of a sum equal to 45 percent of the annual ERG Grant Payments as and when such ERG Grant Payments are reimbursed to the Debtors under the ERG Agreement.  The funding of the ERG Pledged Account as provided in the ERG Agreement shall continue until the ERG Pledged Account has a balance equal to the lesser of $70 million or the then outstanding aggregate principal amount of the Second Lien Notes.  As of March 13, 2013, the ERG Pledged Account has a balance of zero dollars. The Reorganized Debtors intend to fund the ERG Pledged Account by the remittance of a sum equal to 45 percent of the annual ERG Grant Payments as and when such ERG Grant Payments are reimbursed to the Reorganized Debtors under the ERG Agreement up to a maximum of $70 million.  The ERG Agreement shall not be modified by the Plan.

Section VII(1)(d) of the ERG Agreement provides that ERG Proceeds may only be released to the Holders of Second Lien Notes upon an Event of Default under the Indenture, at which time the ERG Proceeds may be released to the Holders of Second Lien Notes solely to pay principal, interest and other amounts due and payable under the Second Lien Notes. If the Debtors File Chapter 11 bankruptcy petitions commencing the Chapter 11 Cases it will constitute an Event of Default under the Indenture, although such Event of Default will be unenforceable once the Chapter 11 Cases commence.

Based on the above, on the Effective Date, and in accordance with the Contingent Payment Rights Term Sheet, the Reorganized Debtors shall issue Contingent Payment Rights to Holders of Second Lien Note Claims on a Pro Rata basis.  From the Effective Date to the earlier of (a) twenty years after the State of New Jersey reimburses the Debtors with the first ERG Grant Payment, except with respect to ERG Proceeds reimbursed pursuant to section III.5 of the ERG Agreement (such ERG Proceeds may be released upon the expiration of the applicable statute of limitations pursuant to section III.5 of the ERG Agreement), and (b) when the ERG Proceeds disbursed on account of the Contingent Payment Rights equal an aggregate amount of $70 million (the "Expiration Date"), each Holder of Contingent Payment Rights shall be entitled to receive its Pro Rata share of ERG Proceeds that are remitted to the

20

K&E 25446293

ERG Pledged Account. Such Pro Rata payment to Holders of Contingent Payment Rights shall be made within thirty days after such ERG Proceeds are remitted to the ERG Pledged Account. If no such distributions are required to be made prior to the Expiration Date, the Contingent Payment Rights will terminate and cease to exist and Holders thereof will receive no value on account of the Contingent Payment Rights. The Contingent Payment Right shall only have recourse to the ERG Proceeds remitted to the ERG Pledged Account up to an aggregate amount of $70 million and shall not have recourse to the Reorganized Debtors.

The Reorganized Debtors shall maintain a register, which may be the Reorganized Debtors, identifying each Holder of the Contingent Payment Rights and the amount of the Contingent Payment Rights held by such Holder. The Contingent Payment Rights may be transferred or assigned by a Holder thereof only upon prior notice by such Holder to the Reorganized Debtors and pursuant to a form of assumption and assignment agreement (such form to be an exhibit to the Second Lien Note Claim Contingent Payment Rights Agreement); provided, however, that any fee, cost, tax, assessment, expense or other charge assessed, levied or imposed by any governmental unit or agency or division thereof upon the sale, transfer, assignment or other disposition of the Contingent Payment Rights shall not be borne by the Reorganized Debtors and shall be the sole responsibility of the transferor of such Contingent Payment Rights.

The Contingent Payment Rights shall not entitle Holders thereof to vote, receive dividends or be deemed for any purpose the Holder of any securities of the Reorganized Debtors in connection with holdings of the Contingent Payment Rights, nor shall Contingent Payment Rights confer or be construed to confer any of the rights of a stockholder of the Reorganized Debtors or any right to vote for the election of directors or upon any matter submitted to stockholders at any meeting thereof, or to give or withhold consent to any corporate action, or to receive notice of meetings or other actions affecting stockholders.

E.      *Restructuring Transactions.*

On the Effective Date, or as soon as reasonably practicable thereafter, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the Plan, including: (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; and (4) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

F.      *Corporate Existence.*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and by-laws (or other analogous formation or governing documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation or governing documents) are amended by the Plan or otherwise. To the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

G.      *Vesting of Assets in the Reorganized Debtors.*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all property in each Estate, all Causes of Action, and any

21

property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances, except for Liens securing each of the Exit Facilities. On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

H.      *Cancellation of Existing Securities.*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date: (1) the obligations of the Debtors under the 2012 Credit Agreement, the DIP Facility Credit Agreement, the Term Loan Credit Agreement, the Second Lien Notes, and any other certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan) shall be cancelled solely as to the Debtors, and the Reorganized Debtors shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan) shall be released and discharged; provided, however, notwithstanding Confirmation or the occurrence of the Effective Date, any such indenture or agreement that governs the rights of the Holder of a Claim shall continue in effect solely for purposes of enabling Holders of Allowed Claims to receive distributions under the Plan as provided herein; provided, further, however, that the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan or result in any expense or liability to the Reorganized Debtors, except to the extent set forth in or provided for under this Plan.  On and after the Effective Date, all duties and responsibilities of the 2012 Credit Agreement Agent, the DIP Administrative Agent, the Term Loan Agent, and the Second Lien Notes Indenture Trustee, as applicable, shall be discharged unless otherwise specifically set forth in or provided for under the Plan.

I.      *Corporate Action.*

Upon the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including:  (1) execution and entry into each of the Exit Facilities; (2) the issuance of the Contingent Payment Rights; (3) the distribution of the New Equity Interests; (4) selection of the directors and officers for the Reorganized Debtors; (5) implementation of the restructuring transactions contemplated by this Plan, as applicable; (6) adoption of the Management Incentive Program, if applicable; (7) adoption or assumption, as applicable, of the agreements with existing management, if any; and (8) all other actions contemplated by the Plan (whether to occur before on or after the Effective Date).  All matters provided for in the Plan involving the corporate structure of the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors or officers of the Debtors or the Reorganized Debtors.  On or (as applicable) before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors (as applicable) shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, including the Exit Credit Agreements and any and all related and ancillary agreements, documents, and filings, New Equity Interests, Contingent Payment Rights, and any and all other agreements, documents, securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by this Article IV shall be effective notwithstanding any requirements under non-bankruptcy law.  The issuance of the New Equity Interests shall be exempt from the requirements of section 16(b) of the Securities Exchange Act of 1934 (pursuant to Rule 16b-3 promulgated thereunder) with respect to any acquisition of such securities by an officer or director (or a director deputized for purposes thereof) as of the Effective Date.

22

K&E 25446293

*J.*      *New Certificates of Incorporation and New By-Laws.*

On or immediately before the Effective Date, the Reorganized Debtors will file their respective New Certificates of Incorporation with the applicable Secretaries of State and/or other applicable authorities in their respective states, provinces or countries of incorporation in accordance with the corporate laws of the respective states, provinces, or countries of incorporation. Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Certificates of Incorporation will prohibit the issuance of non-voting equity securities. After the Effective Date, the Reorganized Debtors may amend and restate their respective New Certificates of Incorporation and New By-Laws and other constituent documents as permitted by the laws of their respective states, provinces, or countries of incorporation and their respective New Certificates of Incorporation and New By-Laws.

*K.*      *The Executive Transition Agreement.*

The Debtors intend to appoint Jeffery Hartmann as interim Chief Executive Officer pending regulatory approval. The Executive Transition Agreement, attached to the Disclosure Statement as **Exhibit J**, is a comprehensive transition agreement by and between the Debtors and Kevin DeSanctis and Michael Garrity (together, the "Executives"), the Debtors' current Chief Executive Officer and Chief Investment Officer, respectively. Pursuant to the Executive Transition Agreement, the Executives have agreed to resign from any position they hold with the Debtors on the later of the date (a) that provisional regulatory approval is obtained for the appointment of replacement personnel and (b) the Debtors begin soliciting votes for the Plan (the "Resignation Date"). Upon such resignations the Debtors will hire replacement personnel to fill the roles performed by the Executives, except that Mr. DeSanctis will remain Chief Executive Officer, and Mr. Garrity will remain Chief Investment Officer of Revel Development Group LLC ("RDG"), a non-debtor. To the extent Mr. Hartmann does not receive provisional regulatory approval, the Executives shall retain their positions with the Debtors subject to further action of the Debtors' board of directors.

Before joining the Debtors, Mr. Hartmann most recently served as President of The Hartmann Group, LLC, which offers specialized experience in the gaming, hospitality and leisure industries. Prior to that, he was President and Chief Executive Officer of Mohegan Sun from January 2011 until October 2012. Earlier in his tenure at Mohegan Sun, he served as Chief Operating Officer from 2004 through 2010 and as Chief Financial Officer from 1996 until 2004. In 2006, he was appointed Chief Operating Officer of the Mohegan Tribal Gaming Authority ("MTGA"), an instrumentality of the Mohegan Tribe that owns and operates Mohegan Sun. In this position, Hartmann oversaw MTGA Corporate Finance and Strategic Development. Hartmann also served as Chief Financial Officer for the Connecticut Sun, the WNBA's professional women's basketball franchise, which is owned and operated by Mohegan Sun and calls Mohegan Sun Arena home. Prior to joining Mohegan Sun, he served as Vice President of Finance for Foxwoods Management Company from 1991 to 1996. Mr. Hartmann was employed by PricewaterhouseCoopers, LLP, as an Audit Manager from 1984 to 1991. He is a Certified Public Accountant and a graduate of Rutgers University.

RDG or, at their election, the Executives, will enter into a six month development and consulting arrangement (the "Development and Consulting Arrangement") with the Debtors on the terms and conditions described in the Executive Transition Agreement, with such development and consulting services to be performed solely by the Executives. The Development and Consulting Arrangement will be on a full time basis from the Resignation Date through and including May 31, 2013 (the "Development Phase"). Starting on June 1, 2013, the Consulting Arrangement will be for up to 19.9% of the Executives' time until the six month anniversary of the Resignation Date (the "Consulting Phase").

The Executive Transition Agreement was extensively negotiated in good faith and is an integral component of the Debtors' overall restructuring. The Executive Transition Agreement will be expressly assumed by the Reorganized Debtors pursuant to the Plan or earlier pursuant to sections 363 and/or 365 of the Bankruptcy Code. If approval of the Executive Transition Agreement is denied, then the Executives will be permitted a rescission right for five days after such denial (for the avoidance of doubt, in no event shall the Executives be reemployed or reinstated with the Company). In the event that the Executives rescind the Executive Transition Agreement, they shall be deemed to have resigned on the date of the rescission for Good Reason within the meaning of their Employment Agreements.

23

L.      *Directors and Officers of the Reorganized Debtors and Reorganized Revel.*

As of the Effective Date, the term of the current members of the board of directors of Revel AC shall expire, and the initial boards of directors, including the New Revel Board and the New Subsidiary Boards, as well as the officers of each of the Reorganized Debtors shall be appointed in accordance with the New Certificates of Incorporation and New By-Laws of each Reorganized Debtor.

On the Effective Date, the New Revel Board shall consist of seven (7) directors, one (1) of whom shall be the Chief Executive Officer of Revel AC and six (6) of whom shall be initially chosen by the Steering Committee. To the extent that three (3) of the directors selected by the Steering Committee have not received any required regulatory approvals by the Effective Date, the Steering Committee will work in good faith with the Debtors to implement a solution to allow the Reorganized Debtors to emerge on the Effective Date with a sitting board.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose in advance of the Confirmation Hearing the identity and affiliations of any Person proposed to serve on the initial New Revel Board and the New Subsidiary Boards, as well as those Persons that serve as an officer of any of the Reorganized Debtors. To the extent any such director or officer is an "insider" as such term is defined in section 101(31) of the Bankruptcy Code, the nature of any compensation to be paid to such director or officer will also be disclosed. Each such director and officer shall serve from and after the Effective Date pursuant to the terms of the New Certificates of Incorporation, New By-Laws, and other constituent documents of the Reorganized Debtors.

M.      *Effectuating Documents; Further Transactions.*

On and after the Effective Date, the Reorganized Debtors and Reorganized Revel, and the officers and members of the New Boards thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan, including the New Equity Interests, in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization or consents except those expressly required pursuant to the Plan.

N.      *Management Incentive Program.*

The Confirmation Order shall provide that on the Effective Date the Reorganized Debtors will implement the Management Incentive Program, which shall provide for grants of options and/or restricted units or equity reserved for management, directors, and employees in an amount of the New Equity Interests to be issued by the Reorganized Debtors sufficient to properly incentivize the senior management teach of the Reorganized Debtors. The primary participants of the Management Incentive Program, including the amount, form, exercise price, allocation, and vesting of such equity-based awards with respect to such primary participants, shall be decided upon by the New Revel Board.

O.      *New Employment Agreements.*

On the Effective Date, Reorganized Revel shall enter into the New Employment Agreements, if any.

P.      *Exemption from Certain Taxes and Fees.*

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment. Such exemption specifically applies, without limitation, to (1) the creation of any mortgage, deed of trust, lien, or other security interest, (2) the making or assignment of any lease or sublease, (3) any restructuring transaction authorized by the Plan, or (4) the making or delivery of any deed or other instrument of transfer under, in

24

K&E 25446293

furtherance of or in connection with the Plan, including: (a) any merger agreements; (b) agreements of consolidation, restructuring, disposition, liquidation or dissolution; (c) deeds; (d) bills of sale; or (e) assignments executed in connection with any restructuring transaction occurring under the Plan.

Q. *D&O Liability Insurance Policies.*

Notwithstanding anything herein to the contrary, as of the Effective Date, the Debtors shall assume (and assign to the Reorganized Debtors if necessary to continue the D&O Liability Insurance Policies in full force) all of the D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' assumption of the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained herein, Confirmation of the Plan shall not discharge, impair or otherwise modify any obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such obligation shall be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be Filed. On or before the Effective Date, the Reorganized Debtors may obtain reasonably sufficient tail coverage (*i.e.*, D&O insurance coverage that extends beyond the end of the policy period) under a directors and officers' liability insurance policy for the current and former directors, officers, and managers for such terms or periods of time, and placed with such insurers, to be reasonable under the circumstances and reasonably acceptable to the Steering Committee or as otherwise specified and ordered by the Bankruptcy Court in the Confirmation Order and to the extent such tail coverage is obtained on or before the Effective Date, such policies shall be considered D&O Liability Insurance Policies and shall be assumed by the Reorganized Debtors.

R. *Preservation of Causes of Action.*

1. Preservation of Causes of Action.

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII hereof, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. For the avoidance of doubt, the preservation of Causes of Action described in the preceding sentence includes, but is not limited to, the Debtors' right to object to (a) Unsecured Claims in excess of $2.5 million and (b) Administrative Claims. The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors in their discretion. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against them. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.

The Reorganized Debtors reserve and shall retain the applicable Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. The applicable Reorganized Debtor through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

**ARTICLE V.**
**TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

A. *Assumption and Rejection of Executory Contracts and Unexpired Leases.*

On the Effective Date, except as otherwise provided herein, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, Executory Contracts and

25

K&E 25446293

Unexpired Leases shall be deemed assumed as of the Effective Date, unless such Executory Contract or Unexpired Lease: (1) subject to the reasonable consent of the Requisite Consenting Lenders and the Term Loan Agent, was assumed or rejected previously by the Debtors; (2) previously expired or terminated pursuant to its own terms; (3) is the subject of a motion to reject Filed on or before the Effective Date that is in form and substance reasonably acceptable to the Requisite Consenting Lenders and the Term Loan Agent; or (4) is identified as an Executory Contract or Unexpired Lease on the Rejected Executory Contracts and Unexpired Lease List. The Debtors shall assume the Executive Transition Agreement attached to the Disclosure Statement as Exhibit J.

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan or the Rejected Executory Contract and Unexpired Leases List, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order.

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Bankruptcy Court within 30 days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within such time will be automatically disallowed, forever barred from assertion and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order or approval of the Bankruptcy Court. Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims shall be treated in accordance with Article III of the Plan, as applicable.

**Rejection Claims for which a Proof of Claim is not timely Filed will be forever barred from assertion against the Debtors or the Reorganized Debtors, their Estates, and their property unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein. Such Rejection Claims shall, as of the Effective Date, be subject to the discharge and permanent injunction set forth in Article VIII hereof.**

C.      *Cure of Defaults for Executory Contracts and Unexpired Leases Assumed.*

Any monetary defaults under each Executory Contract and Unexpired Lease shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date, subject to the limitations described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption. At least 14 days before the Confirmation Hearing, the Debtors shall distribute, or cause to be distributed, Cure Notices of proposed assumption and proposed amounts of Cure Claims to the applicable third parties. Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related cure amount must be Filed, served, and actually received by the Debtors at least three days before the Confirmation Hearing. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption or cure amount.

26

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date of the Debtors or Reorganized Debtors assume such Executory Contract or Unexpired Lease.  Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order or approval of the Bankruptcy Court.

D.      *Insurance Policies.*

All of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan.  On the Effective Date, the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments related thereto.

E.      *Modifications, Amendments, Supplements, Restatements, or Other Agreements.*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

F.      *Reservation of Rights.*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Rejected Executory Contract and Unexpired Lease List, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or Reorganized Debtors, as applicable, shall have 28 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

G.      *Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting unexpired leases pursuant to section 365(d)(4) of the Bankruptcy Code.

H.      *Contracts and Leases Entered Into After the Petition Date.*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

27

**ARTICLE VI.**
**PROVISIONS GOVERNING DISTRIBUTIONS**

A.      *Timing and Calculation of Amounts to Be Distributed.*

Unless otherwise provided in the Plan, on the Effective Date (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim), or, in each case, as soon as reasonably practicable thereafter, each Holder of an Allowed Claim shall receive the full amount of the distributions that the Plan provides for Allowed Claims in each applicable Class.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Plan.  Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.  The Debtors shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Distribution Record Date; provided, however, that the Distribution Record Date shall not apply to publicly held securities.

B.      *Disbursing Agent.*

Except as otherwise provided in the Plan, all distributions under the Plan shall be made by the Disbursing Agent on the Effective Date.  To the extent the Disbursing Agent is one or more of the Reorganized Debtors, the Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

C.      *Rights and Powers of Disbursing Agent*.

1.      Powers of the Disbursing Agent.

The Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2.      Expenses Incurred On or After the Effective Date.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and out-of-pocket expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

D.      *Delivery of Distributions and Undeliverable or Unclaimed Distributions*.

1.      Delivery of Distributions.

(a)      Delivery of Distributions to Holders of Term Loan Credit Agreement Claims.

Except as otherwise provided in the Plan, all distributions to Holders of Term Loan Credit Agreement Claims shall be governed by the Term Loan Credit Agreement and shall be deemed completed when made to the Disbursing Agent.  The Disbursing Agent shall make such distributions directly to the Holders of Allowed Term Loan Credit Agreement Claims.

(b)      Delivery of Distributions to Second Lien Notes Indenture Trustee.

28

K&E 25446293

Except as otherwise provided in the Plan, all distributions to Holders of Second Lien Note Claims shall be deemed completed when made to the Second Lien Notes Indenture Trustee, who shall be deemed to be the Holder of Second Lien Note Claims for purposes of distributions to be made hereunder.  The Second Lien Notes Indenture Trustee shall hold or direct such distributions for the benefit of the Holders of Allowed Second Lien Note Claims. As soon as practicable in accordance with the requirements set forth in this Article VI, the Second Lien Notes Indenture Trustee shall arrange to deliver such distributions to or on behalf of such Holders of Allowed Second Lien Note Claims.

(c)        Delivery of Distributions in General.

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be made to Holders of record as of the Distribution Record Date by the Reorganized Debtors or the Disbursing Agent, as appropriate:  (1) to the signatory set forth on any of the Proofs of Claim Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim is Filed or if the Debtors have not been notified in writing of a change of address); (2) at the addresses set forth in any written notices of address changes delivered to the Reorganized Debtors or the applicable Disbursing Agent, as appropriate, after the date of any related Proof of Claim; or (3) on any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf. Subject to this Article VI, distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan.  The Debtors, the Reorganized Debtors, and the Disbursing Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan except for gross negligence or willful misconduct.

2.        Minimum Distributions.

No fractional shares of New Equity Interests shall be distributed and no Cash shall be distributed in lieu of such fractional amounts.  When any distribution pursuant to the Plan on account of an Allowed Claim would otherwise result in the issuance of a number of shares of New Equity Interests that is not a whole number, the actual distribution of shares of New Equity Interests shall be rounded as follows:  (a) fractions of one-half (1/2) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (1/2) shall be rounded to the next lower whole number with no further payment therefor.  The total number of authorized shares of New Equity Interests to be distributed pursuant to the Plan shall be adjusted as necessary to account for the foregoing rounding.

3.        Undeliverable Distributions and Unclaimed Property.

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; provided, however, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of the later of one year from (a) the Effective Date and (b) the date of the distribution.  After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Interest in property shall be discharged and forever barred.

E.    *Manner of Payment.*

1.        All distributions of New Equity Interests under the Plan shall be made by the Disbursing Agent on behalf of Reorganized Revel.

2.        All distributions with respect to, or effected with, the proceeds of the Exit Facilities shall be deemed made as of the Effective Date.

3.        All distributions to be made on account of Contingent Payments Rights shall be made pursuant to the terms of the Contingent Payment Rights Term Sheet.

29

4.         All distributions of Cash under the Plan shall be made by the Disbursing Agent on behalf of the applicable Debtor (or Debtors).

5.         At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

F.         *Section 1145 Exemption.*

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of the New Equity Interests as contemplated by Article IV.C of the Plan shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration prior to the offering, issuance, distribution, or sale of Securities.  In addition, under section 1145 of the Bankruptcy Code, such New Equity Interests will be freely tradable in the U.S. by the recipients thereof, subject to the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, and compliance with applicable securities laws and any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments and subject to any restrictions in the New Stockholders Agreement and Reorganized Revel's New Certificate of Incorporation.

G.         *Section 4(a)(2) Exemption*

The Debtors are relying on exemptions from the registration requirements of the Securities Act, including, without limitations, section 4(a)(2) thereof, to exempt the offer and sale of the Plan Securities that may be deemed to be made pursuant to the solicitation of votes on the Plan.  Section 4(a)(2) of the Securities Act exempts transactions not involving a public offering, and section 506 of Regulation D of the Securities Act ("Reg D") provides a safe harbor under section 4(a)(2) for transactions that meet certain requirements, including that the investors participating therein qualify as "accredited investors" as defined in section 501 of Reg. D (17 C.F.R. § 230.501).  The Debtors believe the Holders of 2012 Credit Agreement Claims,  Term Loan Credit Agreement Claims, and Second Lien Note Claims are "accredited investors," and the Ballots include a certification that the voting Holder of such claims is an "accredited investor.

H.         *Compliance with Tax Requirements.*

In connection with the Plan, to the extent applicable, the Reorganized Debtors shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

I.         *Allocations.*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

J.         *Setoffs and Recoupment.*

The Debtors or the Reorganized Debtors may, but shall not be required to, setoff against or recoup from any Claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such Claim it may have against the Holder of such Claim.

30

K&E 25446293

K.      *Claims Paid or Payable by Third Parties.*

        1.      Claims Paid by Third Parties.

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the two-week grace period specified above until the amount is repaid.

        2.      Claims Payable by Third Parties.

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

        3.      Applicability of Insurance Policies.

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT,
## UNLIQUIDATED, AND DISPUTED CLAIMS

A.      *Allowance of Claims.*

Except as expressly provided herein or any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim shall be deemed Allowed unless and until such Claim is deemed Allowed under the Bankruptcy Code, under the Plan, or the Bankruptcy Court enters a Final Order in the Chapter 11 Cases allowing such Claim under section 502 of the Bankruptcy Code. Except as expressly provided in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), the Reorganized Debtors after Confirmation will have and retain any and all rights and defenses the Debtors had with respect to any Claim as of the Petition Date. All Claims of any Entity that owes money to the Debtors shall be disallowed unless and until such Entity pays, in full, the amount it owes the Debtors.

B.      *Claims Administration Responsibilities.*

Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority: (1) to File, withdraw, or litigate to judgment objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the

K&E 25446293

Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

C.       *Estimation of Claims.*

Before or after the Effective Date, the Debtors or Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

D.       *Adjustment to Claims Without Objection.*

Any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, cancelled, or otherwise expunged (including pursuant to the Plan), may be adjusted or expunged (including on the Claims Register, to the extent applicable) by the Reorganized Debtors without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

E.       *Time to File Objections to Claims.*

Any objections to Claims shall be Filed by the Claims Objection Deadline.

F.       *Disallowance of Claims.*

Any Claims held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Reorganized Debtors. All Claims Filed on account of an indemnification obligation to a director, officer, or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court. All Claims Filed on account of an employee benefit shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent the Reorganized Debtors elect to honor such employee benefit (or assume the agreement(s) providing such employee benefit are assumed under the Plan), without any further notice to or action, order, or approval of the Bankruptcy Court.

**WITH RESPECT TO EACH GENERAL UNSECURED CLAIM IN EXCESS OF $2.5 MILLION, EXCEPT AS PROVIDED HEREIN OR OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE CLAIMS BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS.**

K&E 25446293

G.      *Amendments to Claims.*

On or after the Effective Date, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors.  Absent such authorization, any new or amended Claim Filed shall be deemed disallowed in full and expunged without any further action.

H.      *No Distributions Pending Allowance.*

If an objection to a Claim or portion thereof is Filed as set forth in Article VII.B, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim.

I.      *Distributions After Allowance.*

Subject to Article VI.B, to the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan.  As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim unless required under applicable bankruptcy law.

**ARTICLE VIII.**
**SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS**

A.      *Compromise and Settlement of Claims, Interests, and Controversies.*

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of substantially all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim or Interest or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders, and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against them and Causes of Action against other Entities.

B.      *Discharge of Claims and Termination of Interests.*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument or other agreement or document created pursuant to the Plan, the distributions, rights and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt, right, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502

33

K&E 25446293

of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan. Any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

C.      *Release of Liens.*

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtor and its successors and assigns. In addition, the Second Lien Notes Indenture Trustee shall execute and deliver all documents to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Reorganized Debtors to file UCC-3 termination statements (to the extent applicable) with respect thereto.

D.      *Releases by the Debtors.*

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, on and after the Effective Date of the Plan, the Released Parties are hereby expressly, unconditionally, irrevocably, generally, and individually and collectively released, acquitted, and discharged by the Debtors, the Reorganized Debtors, and the Estates from any and all actions, Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereinafter arising, in law, equity, contract, tort, or otherwise, by statute or otherwise, that the Debtors, the Reorganized Debtors, the Estates, or each of their respective Affiliates (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Entity, ever had, now has, or hereafter can, shall, or may have, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Disclosure Statement, the Restructuring Support Agreement or related agreements, instruments, or other documents, or any other act or omission, transaction, agreement, event, or other occurrence relating to the Debtors, taking place on or before the Confirmation Date of the Plan, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party unknown to the Debtors as of the Petition Date that constitutes willful misconduct, fraud, or gross negligence, in each case as determined by Final Order of a court of competent jurisdiction.**

E.      *Releases by Holders.*

**As of the Effective Date of the Plan, to the extent permitted by applicable law, each Holder of a Claim or an Interest shall be deemed to have expressly, unconditionally, irrevocably, generally, and individually and collectively, released, acquitted, and discharged the Debtors, the Reorganized Debtors, and the Released Parties from any and all actions, Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that such Entity (whether individually or collectively) ever had, now has, or hereafter can, shall, or may have, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the**

34

K&E 25446293

transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the Plan Supplement, the Disclosure Statement, the Restructuring Support Agreement, or related agreements, instruments, or other documents, or any other act or omission, transaction, agreement, event, or other occurrence relating to the Debtors taking place on or before the Confirmation Date of the Plan, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct, fraud, or gross negligence, in each case, as determined by Final Order of a court of competent jurisdiction; <u>provided</u>, however, that this Article VIII.E shall not apply to  any party that either did not vote to accept the Plan or submitted a ballot and opted out of the releases contained in this Article VIII.E.

F.       *Liabilities to, and Rights of, Governmental Units.*

Nothing in the Plan or Confirmation Order shall discharge, release, or preclude:  (1) any liability to a Governmental Unit that is not a Claim; (2) any Claim of a Governmental Unit arising on or after the Confirmation Date; (3) any liability to a Governmental Unit on the part of any Person or Entity other than the Debtors or Reorganized Debtors; (4) any valid right of setoff or recoupment by a Governmental Unit; or (5) any criminal liability.  Nothing in the Plan or Confirmation Order shall enjoin or otherwise bar any Governmental Unit from asserting or enforcing, outside the Bankruptcy Court, any liability described in the preceding sentence.  The discharge and injunction provisions contained in the Plan and Confirmation Order are not intended and shall not be construed to bar any Governmental Unit from, after the Confirmation Date, pursuing any police or regulatory action.

G.       *Exculpation.*

**Except as otherwise specifically provided in the Plan or Plan Supplement, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any (1) Exculpated Claim and (2) any obligation, Cause of Action, or liability for any Exculpated Claim, except for those that result from any such act or omission that is determined in a Final Order to have constituted fraud, gross negligence, or willful misconduct, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.**

H.       *Injunction.*

FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY CAUSE OF ACTION RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER.

FROM AND AFTER THE EFFECTIVE DATE, TO THE EXTENT OF THE RELEASES AND EXCULPATION GRANTED IN ARTICLE VIII HEREOF, THE RELEASING PARTIES SHALL BE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE RELEASED PARTIES AND THE EXCULPATED PARTIES AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, ACTION, OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST, OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO ARTICLE VIII HEREOF.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS, OR IN OBLIGATIONS ISSUED PURSUANT TO THE PLAN, ALL ENTITIES WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED PURSUANT TO ARTICLE VIII.D OR ARTICLE VIII.E, DISCHARGED PURSUANT TO ARTICLE VIII.B, OR ARE SUBJECT TO EXCULPATION PURSUANT TO ARTICLE VIII.G ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS: (1) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (2) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF

K&E 25446293

OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (3) CREATING, PERFECTING, OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR ESTATE OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; AND (4) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED OR SETTLED PURSUANT TO THE PLAN.

THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL CLAIMS AND INTERESTS HEREIN SHALL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF CLAIMS AND INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AGAINST THE DEBTORS OR ANY OF THEIR ASSETS, PROPERTY, OR ESTATES.  ON THE EFFECTIVE DATE, ALL SUCH CLAIMS AGAINST THE DEBTORS SHALL BE FULLY RELEASED AND DISCHARGED, AND THE INTERESTS SHALL BE CANCELLED.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR HEREIN OR IN OBLIGATIONS ISSUED PURSUANT HERETO FROM AND AFTER THE EFFECTIVE DATE, ALL CLAIMS SHALL BE FULLY RELEASED AND DISCHARGED, AND THE INTERESTS SHALL BE CANCELLED, AND THE DEBTORS' LIABILITY WITH RESPECT THERETO SHALL BE EXTINGUISHED COMPLETELY, INCLUDING ANY LIABILITY OF THE KIND SPECIFIED UNDER SECTION 502(G) OF THE BANKRUPTCY CODE.

ALL ENTITIES SHALL BE PRECLUDED FROM ASSERTING AGAINST THE DEBTORS, THE DEBTORS' ESTATES, THE REORGANIZED DEBTORS, EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, AND EACH OF THEIR ASSETS AND PROPERTIES, ANY OTHER CLAIMS OR INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS, OR ANY ACT OR OMISSION, TRANSACTION, OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE.

I.      *Subordination Rights Under the Intercreditor Agreement.*

Subject in all respects to the provisions of this Plan, any distributions under the Plan to Holders of Second Lien Note Claims shall be received and retained free from any obligations to hold or transfer the same to any other creditor, and shall not be subject to levy, garnishment, attachment, or other legal process by any Holder by reason of claimed contractual subordination rights.  Except to the extent provided in the Plan, as of the Effective Date, the subordination rights set forth in the Intercreditor Agreement shall be (and deemed to be) waived and the Confirmation Order shall constitute an injunction enjoining any Person from enforcing or attempting to enforce any contractual, legal, or equitable subordination rights to property or other interests distributed under the Plan to Holders of Second Lien Note Claims other than as provided in the Plan.

J.      *Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

36

**ARTICLE IX.**
**CONDITIONS PRECEDENT TO CONFIRMATION**
**AND CONSUMMATION OF THE PLAN**

*A.*      *Conditions Precedent to Confirmation.*

It shall be a condition to Confirmation that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C hereof:

1.      The Bankruptcy Court shall have entered the Confirmation Order in form and substance reasonably acceptable to the Requisite Consenting Lenders, the Term Loan Agent and, solely to the extent adversely affecting their economic interests, the Requisite Consenting 2012 Facility Lenders.

2.      All documents related to the Plan must be in form and substance reasonably acceptable to the Requisite Consenting Lenders, the Term Loan Agent and, solely to the extent adversely affecting their economic interests, the Requisite Consenting 2012 Facility Lenders.

*B.*      *Conditions Precedent to the Effective Date.*

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C hereof:

1.      The Confirmation Order (a) shall have been duly entered and be a Final Order and (b) shall include a finding by the Bankruptcy Court that the New Equity Interests to be issued on the Effective Date will be authorized and exempt from registration under applicable securities law pursuant to section 1145 of the Bankruptcy Code.

2.      Any amendments, modifications, or supplements to the Plan (including the Plan Supplement), if any, shall be reasonably acceptable to:  (a) the Debtors; (b) the Term Loan Agent; (c) the Requisite Consenting Lenders; and (d) the Requisite Consenting 2012 Lenders solely to the extent affecting their economic interests.

3.      All actions, documents, certificates, and agreements necessary to implement this Plan shall have been effected or executed and delivered to the required parties and, to the extent required, Filed with the applicable Governmental Units in accordance with applicable laws.

4.      The Steering Committee shall have reasonably determined that the aggregate amount of General Unsecured Claims will not likely exceed $25 million above the Unsecured Claims Cap or shall have waived such condition.

5.      The Debtors shall enter into the Exit Facilities and the conditions precedent to funding under each of the Exit Facilities (including the payment in full, in Cash of the DIP Facility Claims (excluding any letters of credit being continued under the First Lien Exit Facility)) shall have been satisfied or waived.

6.      The Debtors shall have satisfied the DIP Facility Claims.

7.      Reorganized Revel shall have entered into the New Stockholders Agreement, in form and substance reasonably satisfactory to:  (a) Reorganized Revel; and (b) the Steering Committee.

8.      The Debtors shall have received all gaming authority approvals, if any, necessary to implement the terms of the Plan.

9.      All reasonable fees and expenses (including attorney's fees and fees for other retained professionals, advisors, and consultants) of the 2012 Credit Agreement Agent, the Term Loan Agent, the DIP Facility Agent, the Exit Facility Agents, and the Steering Committee incurred in connection with the Chapter 11

37

Cases, the negotiation and formulation of the Plan, DIP Facility, and Exit Facilities and related documents, and all transactions set forth herein or necessary to implement and consummate the Plan (whether incurred before or after the Petition Date) shall have been paid.

10.    The Debtors shall have assumed the Executive Transition Agreement.

C.    *Waiver of Conditions.*

The conditions to Confirmation and to Consummation set forth in Article IX may be waived only by the Person whom is entitled to satisfaction of such condition, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.

D.    *Effect of Failure of Conditions.*

If the Consummation of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any Claims by the Debtors, any Holders, or any other Entity; (2) prejudice in any manner the rights of the Debtors, any Holders, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders, or any other Entity in any respect.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.    *Modification and Amendments.*

Except as otherwise specifically provided in the Plan, the Debtors reserve the right to modify the Plan with the reasonable consent of counsel to the Steering Committee and Term Loan Agent, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 (as well as those restrictions on modifications set forth in the Plan), each of the Debtors expressly reserves its respective rights to revoke or withdraw, or, with the reasonable consent of counsel to the Steering Committee and Term Loan Agent, to alter, amend, or modify the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

B.    *Effect of Confirmation on Modifications.*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

C.    *Revocation or Withdrawal of Plan.*

The Debtors reserve the right to revoke or withdraw the Plan before the Confirmation Date and to file subsequent plans of reorganization. If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of the Claims or Interests or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall:  (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor, any Holder, or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor, any Holder or any other Entity.

38

**ARTICLE XI.**
**RETENTION OF JURISDICTION**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals (including Fee Claims) authorized pursuant to the Bankruptcy Code or the Plan;

3.      resolve any matters related to:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable, and to hear, determine and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V, the Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory, expired, or terminated;

4.      ensure that distributions to Holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

7.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan, the Plan Supplement, or the Disclosure Statement;

8.      enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9.      resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with Consummation, including interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

11.      resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in Article VIII, and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

39

K&E 25446293

12.      resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim for amounts not timely repaid pursuant to Article VI.K.1;

13.      enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14.      determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, or the Confirmation Order;

15.      enter an order or Final Decree concluding or closing any of the Chapter 11 Cases;

16.      adjudicate any and all disputes arising from or relating to distributions under the Plan;

17.      consider any modifications of the Plan, to cure any defect or omission or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.      determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.      hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising in connection with the implementation of the agreements, documents, or instruments executed in connection with the Plan;

20.      hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

21.      hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in connection with and under the Plan, including under Article VIII;

22.      enforce all orders previously entered by the Bankruptcy Court, resolve any cases, controversies, suits, or disputes that may arise in connection with any entity's rights arising from or obligations incurred in connection with the Plan; and

23.      hear any other matter not inconsistent with the Bankruptcy Code.

### ARTICLE XII.
### MISCELLANEOUS PROVISIONS

A.      *Regulatory Requirements.*

To the extent that any Holder of Claims in Class 2 receives New Equity Interests, such Holder shall be subject to applicable casino regulatory requirements.

B.      *Immediate Binding Effect.*

Subject to Article IX.B and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether their Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

40

K&E 25446293

C.      *Additional Documents.*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents in form and substance reasonably acceptable to the Requisite Consenting Lenders, the Term Loan Agent and, solely to the extent adversely affecting their economic interests, the Requisite Consenting 2012 Facility Lenders, as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors or Reorganized Debtors, as applicable, and all Holders receiving distributions pursuant to the Plan and all other parties in interest may, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

D.      *Statutory Committee and Cessation of Fee and Expense Paymen*t.

On the Effective Date, any Committee appointed in the Chapter 11 Cases shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases.  The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by any statutory committees after the Effective Date.

E.      *Reservation of Rights.*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders before the Effective Date.

F.      *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor, or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

G.      *Notices.*

To be effective, all notices, requests, and demands to or upon the Debtors, the Agents, and the Steering Committee shall be in writing (including by facsimile transmission).  Unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed to the following:

**If to the Debtors:**

Revel Entertainment Group, LLC
550 Boardwalk
Atlantic City, New Jersey 08401
Attention: Mary Helen Medina, General Counsel
Email address: mmedina@revelentertainment.com

**With copies to:**

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Facsimile: (212) 446-4900
Attention:  Marc Kieselstein and Nicole Greenblatt
E-mail address:  marc.kieselstein@kirkland.com and nicole.greenblatt@kirkland.com

- and -

Klehr Harrison Harvey Branzburg LLP
457 Haddonfield Road, Suite 510
Cherry Hill, New Jersey 08002-2220
Attention:  Morton R. Branzburg and Domenic E. Pacitti
Facsimile:  (856) 486-4875
E-mail address:  mbranzburg@klehr.com and dpacitti@klehr.com

**If to the Steering Committee:**

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Facsimile: (212) 492-0629
Attention:  Andrew Rosenberg and Elizabeth McColm
E-mail address:  arosenberg@paulweiss.com and emccolm@paulweiss.com

**If to any of the Agents:**

JPMorgan Chase Bank, N.A.
383 Madison Avenue, Floor 24
New York, New York 10179
Facsimile:  (212) 622-4556
Attention:  Susan E. Atkins
E-mail address:  susan.atkins@jpmorgan.com

**With copies to:**

Cadwalader, Wickersham & Taft LLP
One World Financial Center New York, New York 10281
Facsimile:  (212) 504-6666
Attention:  John J. Rapisardi
E-mail Address:  john. rapisardi@cet.com

After the Effective Date, the Debtors may, in their sole discretion, notify Entities that, in order to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

H.      *Entire Agreement.*

Except as otherwise indicated, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

I.      *Exhibits.*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the website of the Debtors' notice, claims and balloting agent at http://dm.epiq11.com/Revel or the Bankruptcy Court's website at www.njb.uscourts.gov.  To the extent any exhibit or document is inconsistent

with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

J.      *Severability of Plan Provisions.*

If, before Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.   Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is:  (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' consent; and (3) non-severable and mutually dependent.

K.      *Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan and, therefore, no such parties, individuals, or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan or any previous plan.

L.      *Closing of Chapter 11 Cases.*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order necessary to close the Chapter 11 Cases.

M.      *Conflicts.*

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, the Plan Supplement, or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Confirmation Order shall govern and control.

*[Remainder of page intentionally left blank]*

43

Dated:   March 13, 2013
         Camden, New Jersey

                                        REVEL AC, INC., on behalf of itself and each of the other
                                        Debtors

                                        By:   /s/ *Kevin DeSanctis*

                                        Name: Kevin DeSanctis
                                        Title:   Chief Executive Officer and President

COUNSEL:

/s/ *Marc Kieselstein*

James H.M. Sprayregen, P.C. (*pro hac vice* admission pending)
Marc Kieselstein, P.C. (*pro hac vice* admission pending)
Nicole L. Greenblatt (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022-4611
Telephone:       (212) 446-4800
Facsimile:       (212) 446-4900


-and-


Morton R. Branzburg (MB 7251)
Domenic E. Pacitti (DP 1792)
Carol Ann Slocum (CS 2818)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
457 Haddonfield Road, Suite 510
Cherry Hill, New Jersey 08002-2220
Telephone:       (215) 568-6060
Facsimile:       (856) 486-4875


*Proposed Co-Counsel to the Debtors and Debtors in Possession*

44

K&E 25446293